# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### TACOMA DIVISION

| | |
|---|---|
| K.M.K, by and through her mother, guardian, and next friend, STEPHANIE LYNNE BROWN; STEPHANIE LYNNE BROWN, <br><br> *Plaintiffs,* <br><br> v. <br><br> WASHINGTON INTERSCHOLASTIC ACTIVITIES ASSOCIATION; WASHINGTON OFFICE OF SUPERINTENDENT OF PUBLIC INSTRUCTION; WASHINGTON SUPERINTENDENT OF PUBLIC INSTRUCTION CHRIS REYKDAL in his official and individual capacities; PUYALLUP SCHOOL DISTRICT; PUYALLUP SCHOOL DISTRICT TITLE IX COORDINATOR DR. GORDON BROBBEY in his official and individual capacities; ROGERS HIGH SCHOOL PRINCIPAL JASON SMITH in his official and individual capacities; and EMERALD RIDGE HIGH SCHOOL COACH JOHN MORRISON in his official and individual capacities, <br><br> *Defendants.* | No.: <br><br><br> **VERIFIED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

VERIFIED COMPLAINT
(CASE NO.: _____)
1

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

## INTRODUCTION

1. Lies hurt people—in this case, girls. Enforcing the lie that boys can be girls, Washington lets boys take girls' sports and privacy, and, in this case, sexually assault a girl during her own wrestling match—as her mother watched in disbelief.

2. On December 6, 2025, K.M.K., a 15-year-old girl, competed in a Washington Interscholastic Athletic Association-sponsored girls wrestling tournament. Unknown to her and her mother—but known to WIAA and school officials—one of the wrestlers she faced was a male. Had K.M.K. and her mother known, K.M.K. would not have taken the mat.

3. But because she didn't know, she wrestled. And during the match, the male athlete sexually assaulted K.M.K., shoving his fingers through her spandex clothing, digitally penetrating her vagina, and holding the position for several seconds. Visibly distressed, K.M.K. shouted to her mother, who was videorecording the match, that the opponent's fingers are "in my c***hie!"

4. To stop this, K.M.K. allowed the male wrestler to pin her. Shortly afterward, she found out the athlete was male—and felt violated all over again.

5. K.M.K.'s mom swiftly informed K.M.K.'s coaches in writing of the assault and the unfairness of wrestling a male. She even gave them a video of the match.[1]

6. But nothing happened. Despite mandatory reporter laws, officials ignored the incident until it became a national news story weeks later. Even now, they refuse to take it seriously—to deal with the assault, to reserve girls sports for girls, or even to give parents the necessary notice so they can keep their daughters safe.

7. K.M.K. and her mother are bringing this action to hold WIAA, state, and school officials responsible for their refusal to protect girls and to ensure that they restore common sense to girls athletics. So no one else has to go through this.

---

[1] *K.M.K. v. WIAA Wrestling Match*, You Tube, https://youtu.be/_7wwsjZBntU (match video); Exhibits 1 to 4 (emails and texts to school district).

VERIFIED COMPLAINT
(CASE NO.: _____)
2

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

## Jurisdiction and Venue

8.     This action arises under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq., and Title IX's applicable regulations.

9.     This action arises under 42 U.S.C. § 1983 for violations of the U.S. Constitution's Fourteenth Amendment.

10.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a).

11.     This Court has authority to award (1) declaratory relief under 28 U.S.C. § 2201–02 and Fed. R. Civ. P. 57; (2) injunctive relief under 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; (3) damages under 20 U.S.C. § 1681 and 42 U.S.C. § 1983; (4) costs and attorneys' fees under 42 U.S.C. § 1988.

12.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because the events and omissions giving rise to the claims substantially occurred and continue to occur within the Western District of Washington; the effects of the challenged laws are felt here; Defendants perform official duties here; and Plaintiffs and Defendants reside here.

13.     Plaintiffs demand a jury trial.

## PLAINTIFFS

14.     K.M.K. is a girl. She is a sophomore at Rogers High School in the Puyallup School District in Puyallup, Washington. She recently turned 16 years old. She competes in wrestling and soccer.

15.     Stephanie Brown is K.M.K.'s mother, custodian, and general guardian. She brings this suit on K.M.K.'s behalf as K.M.K.'s mother, general guardian, and next friend. Ms. Brown also sues individually on her own behalf.

## DEFENDANTS

16.     Defendant **Washington Interscholastic Activities Association** (WIAA) is a Washington non-profit corporation delegated authority under state law

VERIFIED COMPLAINT
(CASE NO.: _____)
3

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

and by local school districts, including Puyallup School District, to regulate and conduct interscholastic athletics.

17.    WIAA is the primary regulator of interscholastic athletics in Washington. It maintains policies permitting male athletes to compete in girls sports, including girls wrestling.

18.    Its handbook is online and attached as Exhibit 5.[2] Its "gender-diverse inclusivity" toolkit is online and attached as Exhibit 6.[3]

19.    WIAA sets rules and eligibility standards for student athletes, and it determines each sport's season and tournament schedules. WIAA hosts state championship events for many sports, including wrestling. It hosts tournaments for wrestling and other sports. Its members are high schools and middle schools, including public and private schools in the state.

20.    Defendant **Washington Office of Superintendent of Public Instruction** (OSPI) is an arm of the State of Washington. The office is responsible for many aspects of state education policy and funding. It receives federal education funding and disburses funds to local school districts, including Puyallup School District.[4] OSPI waived sovereign immunity for suits under Title IX by accepting federal education funding.

21.    Defendant **Chris Reykdal** is the Washington Superintendent of Public Instruction. He runs OSPI. He sets education and athletics regulations and mandatory guidelines for school districts including policies on Title IX, sex discrimination, sexual assault, and "gender inclusive schools." He enforces

[2] Exhibit 5, WIAA, *WIAA Handbook (2025-2026)*, https://www.wiaa.com/wiaa-handbook/.
[3] Exhibit 6, WIAA, *Gender Diverse Youth Sport Inclusivity Toolkit* (first published 2021), https://assets-rst7.rschooltoday.com/rst7files/uploads/sites/652/2024/05/29125133/Gender-Diversity-Toolkit_2024.pdf.
[4] Wash. Off. of Superintendent of Pub. Instruction, *Federal Allocations (2025)*, https://perma.cc/G2SP-3LPS (identifying various federal funding streams with tens of thousands of dollars to OSPI for funding various local school districts); *Subaward results*, USASpending.gov, https://perma.cc/U79W-2E6X (results for OSPI and Puyallup School District that yields detailed grant-by-grant figures).

VERIFIED COMPLAINT
(CASE NO.: _____)
4

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

regulations and guidelines under which WIAA and school districts must allow males to compete in girls school sports if the male identifies as female.

22.    OSPI's relevant policies on sex and gender are online and are attached as Exhibits 7 to 11.[5]

23.    Defendant **Puyallup School District** (the District) is a municipal corporation organized under Washington law that receives federal funding, including a budgeted $19,585,100 in federal funds in 2024–25.[6] At all relevant times, both the male athlete and K.M.K. have attended high schools in the District and participated in District-sponsored athletics. It has three high schools: Rogers High School (K.M.K.'s school), Emerald Ridge High School (the male wrestler's school), and Puyallup High School (which neither attend).

24.    The District's policies are online,[7] and excerpts of its policies on athletics, nondiscrimination, sexual harassment, parental involvement, absences, and "gender-inclusive schools" are attached as Exhibits 12 to 27.[8]

---

[5] Exhibit 7, OSPI, *Guidelines for Schools to Implement Chapters 28A.640 and 28A.642 RCW and Chapter 392-190 WAC* (2012) (OSPI 2012 Guidelines), https://ospi.k12.wa.us/sites/default/files/2023-08/prohibiting_discrimination_in_washington_public_schools_february2012revisedsep2019disclaimer_1.pdf?utm_source=chatgpt.com; *see also* Exhibit 8, OSPI, *Gender-Inclusive Schools* (last visited April 13, 2026), https://ospi.k12.wa.us/policy-funding/equity-and-civil-rights/information-families-civil-rights-washington-schools/gender-inclusive-schools (OSPI Gender-Inclusive Schools Webpage 1); Exhibit 9, OSPI, *Gender-Inclusive Schools* (last visited May 29, 2026), https://ospi.k12.wa.us/policy-funding/equity-and-civil-rights/resources-school-districts-civil-rights-washington-schools/gender-inclusive-schools (OSPI Gender-Inclusive Schools Webpage 2); Exhibit 10, OSPI, *Supporting LGBTQ+ Students* (last visited May 29, 2026), https://ospi.k12.wa.us/student-success/support-programs/supporting-lgbtq-students; Exhibit 11, OSPI, *Error* (last visited May 29, 2026) https://ospi.k12.wa.us/error.

[6] Puyallup School District, *Budget Information*, https://perma.cc/26FE-PYH8 (last visited May 29, 2026).

[7] Puyallup School District, *Policies*, https://perma.cc/EZ5K-CL35 (last visited May 29, 2026).

[8] Exhibit 12, Puyallup School District, Policy 2151 (athletics and activities eligibility); Exhibit 13, Policy 2151R (athletics and activities eligibility); Exhibit 14, Puyallup School District, Policy 3112 (social emotional climate); Exhibit 15, Puyallup School District, Policy 3112R (social emotional climate); Exhibit 16, Puyallup School District, Policy 3122 (excused and unexcused absences); Exhibit 17, Puyallup School District, Policy 3122R (excused and unexcused absences); Exhibit 18, Puyallup School District, Policy 3205 (sexual harassment); Exhibit 19, Puyallup School District, Policy 3205R (sexual harassment); Exhibit 20, Puyallup School District, Policy 3207 (prohibition of harassment, intimidation and bullying of students); Exhibit 21, Puyallup School District, Policy 3207F (prohibition of harassment, intimidation and bullying of students); Exhibit 21, Puyallup

VERIFIED COMPLAINT
(CASE NO.: _____)
5

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

25.    Defendant **Dr. Gordon Brobbey** is the Title IX Coordinator for the District. He is tasked with implementing the school board's policies on Title IX, sex discrimination, sexual assault, sexual harassment, and other forms of staff or student misconduct, including by addressing violations of these policies at all schools.

26.    Defendant **Jason Smith** is the Principal at Rogers High School, where he oversees its educational and athletic programs, including girls wrestling, and where he supervises the Athletic Coordinator.

27.    Defendant **John Morrison** is a girls wrestling coach at Emerald Ridge High School. He is the male athlete's coach. He directed the male to take the mat against K.M.K., and, among other things, he witnessed the assault and failed to take appropriate action.

28.    Other District employees involved in this matter include:

- Richard Lasso, Interim Superintendent of Puyallup School District, the chief official responsible for the operation of the District, the implementation of all policies, and the supervision of the Title IX Coordinator and all school principals.

- Lucia Scott, Daniel Carlson, and Thomas Tripple: girls wrestling coaches at Rogers High School who coached K.M.K. this year. Among other things, they all witnessed the assault, received K.M.K.'s reports of her assault, and failed to take appropriate action to report it to law enforcement.

---

School District, Policy 3207R (prohibition of harassment, intimidation and bullying of students); Exhibit 22, Puyallup School District, Policy 3207R (prohibition of harassment, intimidation and bullying of students); Exhibit 23, Puyallup School District, Policy 3210 (nondiscrimination); Exhibit 24, Puyallup School District, Policy 3210R (nondiscrimination); Exhibit 25, Policy 3211 (gender-inclusive schools); Exhibit 26, Puyallup School District, Policy 3211R (gender-inclusive schools); Exhibit 27, Puyallup School District, Policy 4130 (parental involvement).

VERIFIED COMPLAINT
(CASE NO.: _____)
6

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

- Peter Collins, the Athletic Coordinator at Rogers High School. He oversees athletic programs at Rogers, including girls wrestling, and supervises the coaches.

29.     Each individual defendant acted in the scope of employment.

**Factual Background**

**I.    The success of girls wrestling after Title IX**

30.     In 1972, Congress passed Title IX, a landmark law intended to level the playing field for women and girls to access the benefits of school athletics as men and boys had done for decades.

31.     Since then, opportunities for female students to participate in school sports have burgeoned. In the first half-century of Title IX, girls participation in high school sports went from 300,000 to 3.4 million—a growth of more than 1000% percent. During the same period, boys' participation in high school sports rose from 3.6 million to 4.5 million—a growth of about 125%.[9]

32.     Wrestling has historically been a male-dominated sport.

33.     As recounted by the National Federation of State High School Athletic Associations (NFHS), even after Title IX was enacted, wrestling participation by girls "stayed low for years, as most girls were forced to practice and compete on boys teams—if they were even allowed to join at all."[10] The first girls-only state wrestling championship was held in Texas in 1998. *Id.*

34.     But since then, wrestling has been a Title IX success story. Girls wrestling was added to the Olympic Games in 2004. *Id.* In 2007, girls wrestling became an official high school sport in Washington. Washington held its first girls-only state championship in 2013. *Id.*

---

[9] Brenda Alvarez, *Title IX At 50: Where We've Been, Where We're Headed, and Why It Still Matters*, NEA Today (July 7, 2022), https://perma.cc/AFD7-QSLZ.

[10] Jordan Morey, *High School Wrestling's Comeback: Participation, Opportunity Reach All-time Highs*, NFHS High School Today (Nov. 5, 2025), https://perma.cc/F3TX-BGFM.

VERIFIED COMPLAINT                                    Alliance Defending Freedom
(CASE NO.: _____)                                44180 Riverside Pkwy
7                                                    Lansdowne, Virginia 20176
                                                     (571) 707-4655

35. Wrestling is a no-cut sport in every weight class. *Id.*

36. In past years, WIAA officials acknowledged the importance of developing girls wrestling as its own sport, separate from boys wrestling. As high school girls began to join the sport, they sometimes agreed to wrestle boys because there weren't sufficient girls events.[11] In these instances, girls and their parents *knew* they would be wrestling against boys and voluntarily agreed to assume the associated risks.

37. WIAA Assistant Executive Director Jim Meyerhoff said in 2011 that the goal was to "grow girls wrestling" so that girls would not be wrestling against boys. *Id.* "We need to have girls wrestling girls and guys wrestling guys." *See id.* The media noted that "by doing so Washington avoids situations where a boy or girl is placed in an awkward situation if he or she doesn't feel comfortable wrestling someone of the opposite gender." *Id.* "The WIAA has gotten it right by making it so no one will have to face such a dilemma. And even better, they have created an athletic outlet for over 1,000 girls and growing." *Id.*

38. Wrestling experienced marked growth nationwide in the 2020s, largely due to "the rapid growth of girls wrestling programs."[12] Rich Bender, Executive Director of USA Wrestling, says wrestling has a "unique ability to welcome anyone willing to work hard and build character, confidence and community." *Id.*

39. Wrestling is now one of the most popular high school girls sports. *Id.* In Washington, about 10,000 athletes compete in boys wrestling, and about 3,500 athletes compete in girls wrestling.[13]

40. According to the 2024-25 NFHS High School Athletics Participation Survey, wrestling is the sixth-most-popular sport for boys with 300,214 participants

---

[11] John Boyle, *Washington isn't Iowa*, HeraldNet.com (Feb. 19, 2011), https://perma.cc/7JBM-WER5.
[12] *See supra* note 10.
[13] *See* Nat'l Fed'n of State High Sch. Ass'ns, *High School Athletics Participation Survey (2024-2025)* at 62, 72, https://perma.cc/FVL6-JZA2 (last visited May 29, 2026).

VERIFIED COMPLAINT
(CASE NO.: _____)
8

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

in 11,526 schools nationwide. For girls, it ranks 12th with 74,064 participants in 8,100 schools.[14]

41.    Forty-six states now sanction an official interscholastic state championship for girls.[15]

42.    In recent years, intercollegiate girls wrestling programs have also increased. In 2022, the National Association of Intercollegiate Athletics (NAIA) adopted girls wrestling as its 28th championship sport. *Id*. In March 2026, the National Collegiate Athletic Association (NCAA) held its first-ever girls wrestling championship.[16] As the athletic director at McKendree University said, intercollegiate girls wrestling programs have "allow[ed] institutions to expand participation opportunities for female student-athletes, while increasing enrollment and visibility." *Id*.

43.    This growth and increased visibility for girls wrestling has provided an opportunity for many young women, including K.M.K., to fall in love with the sport.

## II.    K.M.K. unknowingly wrestled a male, who sexually assaulted her during the match.

44.    K.M.K. started wrestling when she was four. Her three older brothers wrestled. Seeing them compete, and their passion for wrestling, she wanted to learn too.

45.    Wrestling season generally runs from late November to mid-February. K.M.K. also plays soccer, but wrestling is her favorite sport. She's also good at it.

46.    In high school, wrestlers do an inter-team competition at the beginning of the season to determine who will compete on varsity in each weight class. Only one

[14] Press Release, Nat'l Fed'n of State High Sch. Ass'ns, *Adjustment in Minimum Body Fat Percentage for Females Highlights High School Wrestling Rules Changes* (April 16, 2026), https://perma.cc/4WA9-BFRD.

[15] Nat'l Wrestling Coaches Ass'n (NWCA), *Growing Women's Wrestling*, https://perma.cc/E8K5-QP78 (last visited May 202, 2026).

[16] Olivia Brown, *The first NCAA women's wrestling champions are crowned. How bright is the sport's future?*, NCAA Media Center (March 9, 2026), https://perma.cc/86UW-XWCV.

VERIFIED COMPLAINT                                          Alliance Defending Freedom
(CASE NO.: _____)                                      44180 Riverside Pkwy
9                                                          Lansdowne, Virginia 20176
                                                           (571) 707-4655

member of each weight class competes on varsity for each team. The rest of the players are ranked within junior varsity and by their weight class.

47. This year (2025-2026), as a sophomore, K.M.K. was ranked first for the junior varsity team for her weight class (190 lb.). This ranking means that she was one spot away from holding the varsity place for her weight division. K.M.K. was in this same position (first in her weight division for JV) last year as a freshman.

48. When she returned to the team this year as a sophomore, she was excited to improve her skills during practice and competitions and to get to spend time with her teammates.

49. Matches are determined collaboratively by the coaches for the initial match. After the first match, a wrestler's competitor depends on who won in previous matches, through bracket-style pairings.

50. In wrestling matches, there are three periods of 1.5 to 2 minutes each. Whoever scores the most points during these matches wins, unless a wrestler gets pinned. If a wrestler gets pinned, the match ends immediately, even if not all three periods have been completed. The wrestler who got pinned loses.

51. At the beginning of a wrestling match, the players shake hands. They shake hands again after the match and also shake hands with their coaches and the opponent's coaches at the end of the match.

52. Once a match has been set, there are several ways it can end before time expires: pre-match forfeiture, tapping out, getting pinned, or point margin.

53. K.M.K. has never seen anyone tap out and does not know how it is done.

54. K.M.K.'s first wrestling tournament for her sophomore season was on Saturday, December 6, 2025—the Lady Jag Kickoff wrestling tournament at Emerald Ridge High School. It was a WIAA-sponsored and Puyallup School

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

55. District-sponsored tournament specifically sanctioned and advertised for the sport of girls (and not boys) wrestling.

56. K.M.K. competed in the JV 190B weight-class bracket.

57. At the end of the day, K.M.K. was scheduled to compete in a fifth and final match. The winner of this match would receive third place overall in the weight class at the tournament, and the wrestler who did not win this match would receive fourth place.

58. K.M.K.'s opponent in the fifth match was a wrestler from Emerald Ridge High School, who K.M.K. and Ms. Brown did not know ahead of the match, but they understood this wrestler to be a girl.

59. K.M.K's coach and the WIAA tournament official confirmed that this was her match, and they directed her to take the mat against this opponent.

60. Emerald Ridge Coach John Morrison directed K.M.K.'s competitor to take the mat.

61. Ms. Brown watched and videorecorded the match.

62. K.M.K.'s three coaches and her opponent's coach observed the match, too.

63. A videographer recorded the match for WIAA and transmitted the video to District and WIAA officials afterward, as is standard practice.

64. Before the match started, K.M.K. and her opponent shook hands.

65. K.M.K. thought that her technical skill was better than her opponent's, but she observed that her opponent was stronger and more powerful.

66. K.M.K. began the second period of this match physically on top of her opponent, which is a favorable position.

67. During the second period, the opponent reached between K.M.K.'s legs with his left hand, and pushed fingers hard, through her singlet, her Nike pro

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

68. spandex shorts, and her underwear. The opponent's fingers penetrated her vagina for several seconds, causing great pain.

69. K.M.K. was horrified and shocked and felt deeply violated. As this was happening, she first tried to push the wrestler off her, but she wasn't able to. She cried to her mom that her opponents' fingers are "in my c***hie!"

70. Her reaction is visible in the video of the match. It was an incredibly offensive act and caused intense physical discomfort that persisted following the assault.

71. Her mom was on the opposite side of the mat, so she couldn't see exactly what this wrestler was doing to K.M.K. "I don't know what she said or why her face looked like that," her mom can be heard saying to someone off camera.

72. While she couldn't see what was happening, Ms. Brown recognized immediately that something was wrong with K.M.K.

73. K.M.K. wanted the assault to end, so she began trying to give up and try to lose the match. Close to a minute after she had stopped trying to win, the male was behind her. The male's right forearm pressed against her in the crack between her butt cheeks, while his right hand groped her again forcefully in the pelvic region between her legs and toward the front of her pelvis. He did not penetrate her vagina at that time. K.M.K. found this second touching deeply offensive and humiliating, especially as he was still wrestling her and pinning her down less than a minute after he had sexually assaulted her—all while she was no longer trying to win the match. Seconds later, she allowed herself to be pinned completely, losing the match.

74. This result meant that the male was named the winner. He became a top-three finisher, and K.M.K. was knocked to fourth place.

75. If K.M.K. had placed third in the tournament, she would have been honored at any awards ceremonies at the end of the tournament, where, if held, she

VERIFIED COMPLAINT
(CASE NO.: _____)
12

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

would have stood on a podium and she would have received a medal on a ribbon for her neck.

76. Instead, the male athlete was entitled to be honored at any awards ceremonies, the male athlete was entitled to take K.M.K.'s podium spot, and the male athlete was entitled to receive K.M.K.'s medal on a ribbon for his neck.

77. If K.M.K. had placed third, it would have helped her qualify for league and then state.

78. Instead this placement helped the boy qualify for league and then state.

79. At the end of the match, K.M.K. had to shake her opponent's hand and the hand of this wrestler's coach. She did. But she was so distraught she did not shake hands with her own coaches like usual.

80. Rather than investigate, her coaches walked away.

81. So K.M.K. ran to her mother sobbing.

82. She intended to tell her mom that her opponent had sexually assaulted her, but she couldn't get the words out clearly—the feeling of shock and violation was so strong.

83. In her twelve years of wrestling, nothing like this has ever happened to her or anyone she knows. This is not a legal wrestling move, and it is not something that could easily happen accidentally. Wrestling singlets are very tight spandex and so the fabric resists pressure, and K.M.K was wearing three layers of fabric.

84. There is no legal move in wrestling that requires putting a hand in the area between an opponent's legs. And her opponent not only put a hand there, but kept it there for several seconds, pressing fingers through her clothes, penetrating her and causing pain. And then, almost a minute later, after she had given up trying to win, he groped her again.

VERIFIED COMPLAINT
(CASE NO.: _____)
13

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

85. There is an expression in wrestling called an "oil check," which generally refers to a form of flagrant misconduct that involves one wrestler digitally penetrating an opponent's anus or vagina to cause shock and so gain an advantage. This flagrant misconduct can result in penalties, disqualification, and criminal charges.

86. In its criminal statutes, Washington defines "sexual intercourse" to include "any penetration of the vagina or anus however slight, by an object," with exceptions only for "medically recognized treatment or diagnostic purposes." RCW 9A.44.010(14).

87. Under RCW 9A.44.060(1), a person is guilty of rape in the third degree, a class C felony, where the victim did not consent as defined in RCW 9A.44.010(2), to sexual intercourse. See RCW 9A.44.010(2) ("'[C]onsent' means that at the time of the act of sexual intercourse or sexual contact there are actual words or conduct indicating freely given agreement to have sexual intercourse or sexual contact.").

88. No athletic tradition or any claimed absence of sexual motivation justifies digital penetration during a wrestling match. Digital penetration falls outside the scope of implied consent to participating in athletics because, under normal circumstances of girls wrestling, it is not a reasonably foreseeable hazard from the perspective of a girl wrestler. Nor is sexual assault or groping generally accepted by society as part of any lawful athletic contest.

89. As K.M.K. was trying to talk to her mom about what had happened, a coach from another District team came up and told her that her opponent in that match was a male.

90. This deepened her feeling of violation and shock. She felt betrayed that she'd been forced to wrestle a male opponent without her knowledge or consent.

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

91.    K.M.K. had planned to report the assault before she knew her opponent was a male. She then resolved to report both the assault and the lack of notice that she was wrestling a male.

**III.    K.M.K.'s family reported everything to the school.**

92.    On Monday morning, December 8, 2025, Ms. Brown sent a written complaint to the school by email stating that K.M.K. had unknowingly wrestled a male during her fifth match and that K.M.K. had been sexually assaulted. Exhibit 1.

93.    Under state law, "professional school personnel" must report assault complaints to law enforcement "at the first opportunity, but in no case longer than 48 hours." RCW 26.44.030 (a) & (h). Each school official must also immediately inform Dr. Brobbey, the Title IX Coordinator. Exhibit 7, OSPI 2012 Guidelines at 62–66.

94.    Because Ms. Brown knew these rules, including that officials must report assault complaints both internally within the District's reporting channels and to law enforcement on these strict timelines, K.M.K. and Ms. Brown relied on K.M.K.'s coaches and the District to report the assault right away, both internally within the District and to law enforcement.

95.    That same morning, Coach Lucia Scott responded that she did not know K.M.K.'s opponent was male and that she would not have put K.M.K. on the mat had she known. Coach Scott said she would get back with K.M.K.'s mom later that day or the next. Because of this email, K.M.K. and Ms. Brown relied on Coach Scott to ensure that this complaint was properly reported.

96.    At 6:23 p.m., Coach Scott asked for the video of the match. Ms. Brown texted the video to Coach Scott and shared the words that K.M.K. can be seen mouthing during the video. Coach Scott responded, "Thank you." This message gave

VERIFIED COMPLAINT
(CASE NO.: _____)
15

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

K.M.K. and Ms. Brown additional reason to rely on Coach Scott to ensure that this complaint was properly reported. Exhibit 2.

97.    As a result of the assault, K.M.K. suffered physical pain, discomfort, and soreness in her pelvic area, as well as emotional distress that continues to this day.

98.    The incident also caused K.M.K. substantial anxiety.

99.    Ms. Brown texted Coach Scott an update from K.M.K.'s orthopedic appointment on December 9, sharing that K.M.K. would need to take some time off for a leg injury. Coach Scott did not respond.

100.    K.M.K.'s anxiety continued and increased, which caused her to miss school in January and February.

101.    K.M.K. also became ill, keeping her away from school for additional time. During this time, K.M.K. and Ms. Brown trusted Coach Scott that the school was investigating and reporting her complaint.

102.    On January 2, 2026, at the conclusion of winter break, K.M.K. was cleared to return to wrestling after her leg injury. This would have given her six weeks to continue practicing and competing because the state championship was not until February 19-20, 2026.

103.    There had still been no action on K.M.K.'s reported assault or her report that she had been unknowingly directed to wrestle against a male. It was terrifying to realize that the coaches K.M.K. had trusted had so little regard for her safety.

104.    Realizing that K.M.K. was not safe in the hands of the state, WIAA, and school officials in charge of girls wrestling, K.M.K. and her mother made the difficult decision that she would not return to the wrestling team during the 2025-2026 school year until the officials protected her. But for the officials' failure to protect her rights, she would have returned.

VERIFIED COMPLAINT
(CASE NO.: _____)
16

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

## IV.   The District and WIAA did nothing—while letting males endanger other female wrestlers.

105.   The coaches witnessed the assault, and the coaches knew the details of K.M.K.'s complaint by no later than December 8, 2025. The District was required to report this complaint to Dr. Brobbey, the Title IX Coordinator, immediately and to law enforcement within 48 hours. RCW 26.44.030 (a) & (h); Exhibit 7, OSPI 2012 Guidelines at 62–66.

106.   Under OSPI's policies, by December 28, 2025 (20 days after the December 8 report), the District should have issued an investigative report, and by January 7, 2026 (30 days after the report), it should have issued a written determination. Between December 28 and January 7, the parties should have received the opportunity to submit written questions to any party or witness and been allowed time for follow-up questions.

107.   Alternatively, under the operative policies, the District should have requested an extension of time in December or January, and it should have given a reason for the extension as well as the anticipated date of response. But none of that happened.

108.   K.M.K. and Ms. Brown began to grow increasingly concerned as they continued to hear nothing from the District after winter break.

109.   On January 25, 2026, K.M.K. saw a video from local journalist Brandi Kruse, reporting that thirteen girls had expressed discomfort to their school administrators because two males were competing in girls wrestling and that they had been allowed in the girls bathroom and locker room.[17] The video said one of the male students was in the 190 lb. division on the girls wrestling team at Emerald Ridge. K.M.K. realized this was likely the same male athlete she had wrestled.

---

[17] unDivided with Brandi Kruse, *Girls forced to wrestle, share locker rooms with biological males*, YouTube (Jan. 23, 2026), https://perma.cc/KT7U-HFHJ.

VERIFIED COMPLAINT
(CASE NO.: _____)
17

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

110. Based on the information in the video and K.M.K.'s and Ms. Brown's own experiences, they determined that the male athlete in the 190 lb. weight class discussed in Ms. Kruse's video is the same person who had assaulted K.M.K. on December 6, 2025.

111. The other male wrestler at Emerald Ridge is in the next higher JV division, the 235 lb. division.

112. According to information in the video, Emerald Ridge girls reported to District officials that they were uncomfortable with the males' presence and behavior in the girls locker room no later than Monday, December 15, 2025–exactly a week after Ms. Brown reported the assault on K.M.K. Yet, District officials failed to address their concerns.

113. The video further states that, after the girls' report, the two male wrestlers at Emerald Ridge said they would change clothes in another area. But this solution, according to the reporting, lasted for "one day." Then, the males returned to the girls locker room. When the girls brought this to the school's attention, according to the video, they were given handouts from the OSPI on gender inclusion and gender identity, expression, and sexual orientation, and told that nothing more would be done.

114. The Title IX Coordinator for K.M.K.'s school is Dr. Gordon Brobbey, the same as the Title IX Coordinator for Emerald Ridge, because the schools are in the same school district. If proper reporting had occurred, Dr. Brobbey would have been aware of not only the assault K.M.K. suffered at the December 6 match but also the girls' complaint about privacy in their locker room. Yet he allowed these same male students to continue to compete on the girls wrestling team and access the girls locker room.

VERIFIED COMPLAINT
(CASE NO.: _____)
18

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

115. Based on the information in the video and Plaintiffs' own experiences, K.M.K. and Ms. Brown determined that Emerald Ridge's Coach John Morrison had full knowledge of the sex of the male athlete who wrestled against K.M.K., and he witnessed the assault on K.M.K. that had occurred the week before, but Mr. Morrison continued to allow the athlete to compete with the girls wrestling team and access the girls locker room.

116. K.M.K. didn't want what had happened to her to happen to anyone else. Because she realized that the school was intentionally not taking action, K.M.K. decided to share what had happened to her—to prevent other girls from being violated as she had been. She submitted her story to Ms. Kruse's tip line for the UnDivided podcast.

117. On January 28, K.M.K. messaged Coach Scott asking for an update on the school's investigation and response to the reported incident. Coach Scott wrote: "Hi [K.M.K.], unfortunately they will not tell me any information about the situation. I spoke with admin (Mr. Smith) [Rogers High School Principal Jason Smith] but they will not provide any information to me." Exhibit 3 (text exchange).

118. K.M.K. replied, "My mom want[s] to know if since the district is dismissing the issue she should file sexual assault charges[.]" Coach Scott responded: "As of right now, they have shut me out on the situation. If that is something you want to pursue, I would most certainly speak to [Rogers HS Athletic Coordinator Peter] Collins and admin. I'm sorry I can't be much help on the situation."

119. Plaintiffs understood "admin" to refer to Mr. Smith as well as Dr. Brobbey and Puyallup School District Interim Superintendent Richard Lasso.

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

120. Coach Scott's message conveyed that these officials had been informed of the situation, were responsible for future actions, and had excluded her (Coach Scott) from decision making.

121. But these officials were taking no substantive or meaningful action despite their knowledge of the reported assault.

122. Up to that point, the District had done nothing.

123. Early on January 29, 2026, K.M.K. went to find Rogers High School Principal Smith to see if anything was being done.

124. K.M.K. found Assistant Principal Conor Collins in a school hallway near a security guard by the security office.

125. K.M.K. told him that she was looking for Mr. Smith, and she asked if Assistant Principal Collins knew where Mr. Smith was, so she could have a conversation with Mr. Smith.

126. Assistant Principal Collins insisted that she tell him what about.

127. Because Assistant Principal Collins pressed her to know why she needed to talk to Mr. Smith, K.M.K. felt forced to reply and to disclose her sexual assault in a very public open setting.

128. K.M.K. said that she wanted to talk to Mr. Smith about the sexual assault that happened to her.

129. The assistant principal did not respond with alarm, curiosity, or compassion.

130. Instead, he brusquely said that he would see if Mr. Smith could take time that day and that he would take a message to Mr. Smith, if K.M.K. liked.

131. Later that day, Rogers High School Principal Smith spoke with K.M.K. for about five minutes. Mr. Smith told her that the school takes sexual assaults very seriously, but he did not say that anything had been done to investigate the assault,

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

report it to law enforcement on time, or ensure that other girls were protected from similar situations. Instead, he told her that he had reported the incident to the Emerald Ridge athletic director.

132.    Nicole Thompson, Ms. Kruse's producer, reached out to Rogers High School for comment later that same day.

133.    The next day, January 30—the day after the media contacted the District about K.M.K.'s assault by a male athlete and the District knew it couldn't keep its failure to act quiet—Principal Smith called Ms. Brown. He told Ms. Brown he had no updates, but that the school takes these things "very seriously."

134.    Later that day at 3:10 p.m., the District responded to Ms. Thompson declining comment.

135.    At some point that day, the District also—for the first time and nearly two months after ignoring the 48-hour deadline imposed by Washington law—reported K.M.K.'s allegations to the Pierce County Sheriff's Office. The Pierce County Sheriff's Office then opened an investigation.

136.    On February 3, Principal Smith again called Ms. Brown to say he had no updates but repeated that the District takes the matter seriously.

137.    The same day, a school resource officer (an employee of the Pierce County Sheriff's Department) for the first time asked for statements from K.M.K. and Ms. Brown, which they provided. Both also gave him video of the match.

138.    Ms. Brown and K.M.K. still heard nothing over the next several days from the District about taking any action to protect or support K.M.K., and they were not apprised of the District or either school opening any kind of investigation.

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

## V.   K.M.K. turned to the media to hold Defendants accountable—but Defendants still ignored her.

139.   On February 9, 2026, Ms. Kruse published an article and video interview sharing K.M.K.'s story.[18]

140.   The video went viral and became a national news story, prompting the U.S. Department of Education to announce—through its Secretary—its intent to investigate.[19]

141.   Despite national outcry, the District still didn't adequately respond or take steps to keep K.M.K. safe from future harm. Nearly 2.5 months after the incident was reported, and after both the Pierce County Sheriff's Office and the federal government had opened investigations, the District opened a District investigation—but that investigation still remains ongoing, and no change has occurred.

142.   Upon information and belief, by February 9, 2026, whether from internal reports or media reports, WIAA had learned of K.M.K.'s assault by a male in a WIAA-sponsored wrestling match. But WIAA also did nothing.

143.   Over a week later, on February 17, WIAA confirmed that the male wrestler who assaulted K.M.K. had withdrawn from the girls wrestling state championship set to start that weekend.[20] News reports indicated that the athlete

---

[18] unDivided with Brandi Kruse, *Teen wrestler claims school ignored assault by trans opponent*, YouTube (Feb. 9, 2026), https://perma.cc/UKM3-FZG2; unDivided with Brandi Kruse, *Teen athlete says she was sexually violated by trans wrestler – and the school district did nothing*, Patreon (Feb. 9, 2026), https://www.patreon.com/posts/teen-athlete-she-150338658.

[19] unDivided with Brandi Kruse, *Federal government to investigate alleged assault of female wrestler by trans opponent*, YouTube (Feb. 16, 2026), https://perma.cc/A26S-KR23; Press Release, U.S. Dep't of Education, *U.S. Department of Education Investigates Washington State School District Over Alleged Sexual Assault of Female Wrestler by Male Competitor* (Feb. 13, 2026), https://perma.cc/KA9C-WQ97.

[20] unDivided with Brandi Kruse, *Male wrestler drops out of girls' state championship*, YouTube (Feb. 17, 2026), https://perma.cc/3RXB-ZPPP; Isabela Lund, *Teen wrestler accused of assault in Puyallup drops out of state championship*, The News Tribune (Feb. 17, 2026), https://perma.cc/S55R-YHK3.

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

voluntarily withdrew and is able to compete in WIAA girls wrestling next year, during the 2026-2027 season.

144. The other male wrestler at Emerald Ridge competes in the 235 lb. division—the next class up from K.M.K. He is believed to still be at that school and on the girls wrestling team.

145. In general, the goal for wrestlers is to be at the top of a weight class but not over—in order to maximize muscle mass for each competition. This leads to athletes hovering around the cusp of going up a weight class.

146. K.M.K., like most wrestlers, follows this strategy. She manages her weight to consistently be at the top of her weight class but not over. Sometimes, K.M.K. has weighed in a pound or two over and had to lose weight before a match. This is likely to happen again, and she might not be able to lose enough weight to maintain her weight class before a new competition. The 235-pound weight class is the weight-class directly above K.M.K.'s current weight class. So she will likely be required to compete in the 235-pound weight class in some tournaments. If she weighs in at that 235-pound level, she wants to compete in that weight class rather than miss the competition entirely. Both the male wrestlers could easily weigh in at either the 190-pound or the 235-pound class.

147. K.M.K. competes against wrestlers from all over the state, especially wrestlers in her local district. Upon returning to competition, she would be likely to wrestle one or more males at Emerald Ridge or male wrestlers from other schools.

## VI. The District ignored public complaints about how it treated K.M.K.

148. By February 17, 2026—if not sooner—the school district superintendent and the school board members also learned of K.M.K.'s assault by a male in a wrestling match. They too failed to take meaningful action.

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

149.   The same day the male athlete withdrew, a number of parents who had learned of K.M.K.'s story complained about K.M.K.'s treatment at the Puyallup School Board meeting.

150.   Present at the meeting were Board President Gretchen Miles and Board members Melissa Bedford, David Berg, Shannon Burch, and Joseph Romero, as well as Interim Superintendent Richard Lasso.[21]

151.   The public made specific complaints at this meeting about fairness in girls wrestling, parental rights, sports safety, and the District's inadequate response to K.M.K.'s complaint.[22] The following members of the public spoke at the meeting:

- Ivana Rotari, who said: "This girl complained to the school about it. She is brave enough to do that. If anyone knows what it's like to be told to keep quiet and sweep it under the rug, you'd feel pretty unworthy ... Her voice, along with many other girls' voices, aren't being heard by the authority that they trust. Why was it that this was reported weeks later to law enforcement?"

- Sherry Tayoff, who said: "Why was the sexual assault accusation minimized, ignored, and dismissed for 53 days until the incident became … public knowledge? How are your employees being held accountable for shirking their legal responsibilities as mandatory reporters? ... How do you intend to facilitate justice for the young woman who endured this crime and protect her and all the girls participating not only in sports?"

---

[21] unDivided with Brandi Kruse, *Parents pack school board meeting to demand protections for girls' sports*, YouTube (Feb. 21, 2026), https://perma.cc/9Y9P-9HWL.
[22] Puyallup School District, *Regular Board Meeting at Kessler Center and livestreamed via Zoom Tuesday, February 17, 2026*, https://perma.cc/7TCG-Y84Q (link to video and minutes).

VERIFIED COMPLAINT
(CASE NO.: _____)
24

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

- Dawn Land, who said: "When girls at Emerald Ridge asked school officials to protect them by keeping boys out of the girls locker rooms, the girls were patronized and ignored. ... Our daughters deserve better. Allowing boys into the girls locker rooms and onto the girls wrestling team has escalated into ... a federal investigation into Puyallup's flagrant disregard for Title IX. The Puyallup School District needs to stop treating parents as the enemy."

- Joe Savage, who said: "What are you as a school board going to do to ensure the safety of girls that you are responsible for? And why was this not reported? Why did the staff not report this to the police when they [were] initially informed?"

- An unnamed mother of a female athlete, who said: "I'm deeply concerned with how the Puyallup School District handled the incident involving a male in girls sports and competing in the wrestling event, and the subsequent allegations of sexual assault. Regardless of differing opinions on athletic participation policies, any allegation of misconduct should be treated with the utmost seriousness, transparency, and adherence to mandatory reporting laws. The safety and well-being of our students must always be the District's highest priority, which is what we keep being told by your staff when confronted with concerns. . . .When a student comes forward with such a serious claim as the female wrestler did it's not optional, nor is it your job to evaluate whether it should be reported. But it's your obligation to ensure that proper authorities are notified so that the matter can be investigated appropriately ... Can you imagine how this girl and her family felt after reporting her concern and waiting

VERIFIED COMPLAINT
(CASE NO.: _____)
25

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

months before anything was done? Parents entrust this board and District leaders with the protection of their children. That trust requires clear protocols, consistent enforcement of reporting requirements, and transparency when incidents occur."

152. But despite hearing these public complaints, the District chose not to remedy the situation for K.M.K.—choosing to be deliberately indifferent to her.

**VII.    K.M.K. experiences a hostile environment at school.**

153. Throughout this time, K.M.K. experienced hostility at school. Immediately after she went public with her complaint, the school security officers would no longer acknowledge her. She felt uncomfortable and afraid, and even asked her mom if she could bring mace to school.

154. Coach Scott does not look K.M.K.'s way when K.M.K. sees her in the hallway. When K.M.K. was walking with another member of the team and they saw Coach Scott, that team member greeted the coach, and Coach Scott acted as if she didn't hear. Coach Scott similarly ignored K.M.K. on another occasion when K.M.K. was walking in the school parking lot with her mother, Ms. Brown.

155. One of K.M.K's friends on the team told her that Coach Tripple had met with the team when the article came out and asked them if they had seen the article or video. The friend told K.M.K. that Coach Tripple then said that there was no need to discuss it at practice.

156. Girls on K.M.K.'s wrestling team have made hostile comments to K.M.K., telling her it was her fault that the coach was "in trouble." This suggests the District and its employees have blamed K.M.K. for the situation rather than taking responsibility for their acts and omissions.

157. K.M.K.'s assault was a widespread topic of conversation, and many students made negative and hurtful comments about K.M.K.

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

158.   In class, for example, a student told K.M.K., "You shouldn't even be on the wrestling team if you can't handle an oil check."

159.   Another student, for instance, offensively said, "Just because you were fingered by a tranny doesn't mean you should be on the news."

160.   These words cut deeply. It has already been an incredibly trying time, and the verbal attacks by students and inaction of those who work at the school have been very hurtful, offensive, difficult, and traumatic for K.M.K.

161.   No coach or other school official offered help or encouragement. Nor did they do anything to alleviate the negative comments other students directed at K.M.K.

162.   It has been incredibly difficult and hurtful for K.M.K. that school officials have treated her with coldness and distance. This has made her feel anxiety at school and like she couldn't return to the wrestling team without experiencing hostility from both her teammates and coaches.

163.   The change in treatment started right after Ms. Kruse's article was published.

164.   Because of the way she was treated by District employees and fellow students whose behavior the District didn't stop, all of which was caused by WIAA's and the District's own failure to properly investigate and remedy the situation when Ms. Brown first complained about it, K.M.K. was emotionally unable to attend or remain at school on certain days following the article's publication.

**VIII.  The District belatedly opens an investigation—but it doesn't prompt action.**

165.   It was not until February 20, 2026—presumably prompted by the public outcry at the school board meeting—that Gordon Brobbey, the District's Title IX Coordinator, provided Ms. Brown a copy of the school policy and regulation on

VERIFIED COMPLAINT
(CASE NO.: _____)
27

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

166. handling Title IX complaints of sexual harassment and sexual assault. Attaching the policy to an email to Ms. Brown, he stated that he is aware of allegations of misconduct by the male and complaint mishandling by the District. He also stated that the District had opened an investigation and that the investigation would conclude within 30 days. The email instructed Ms. Brown to inform Brobbey if K.M.K. would like "supportive measures." More than two months after the report of sexual assault, this was the first time that the District mentioned any investigation and the first time that the District offered K.M.K. any support.

167. On February 21, Amie Brandmire, Assistant Superintendent of Human Resources and Employee Relations for the District, introduced Ms. Brown by email to the assigned Title IX investigator, attorney Nate Schmutz.

168. On March 26, Ms. Brandmire informed Ms. Brown that the District anticipated the investigation would go for another 30 days with a projected end by April 21.

169. On April 21, Ms. Brandmire informed Ms. Brown that the District anticipated the investigation would go for another 30 days with a projected end by May 21.

170. On May 20, Ms. Brandmire informed Ms. Brown that the District anticipated the investigation would go for another 30 days with a projected end by June 22.

171. The investigator has the material that K.M.K. provided to the school. K.M.K. has also provided information to the investigator directly in response to follow-up questions that he sent to her in April 2026. The investigator also has K.M.K.'s statement given to the Pierce County Sheriff's Department school resource officer.

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

172. The investigation has yet to conclude. And K.M.K has yet to receive any resolution.

173. K.M.K. is unable to access athletic opportunities without fear of encountering her assailant, other male competitors, and staff who are hostile and indifferent to her safety and her report of sexual assault. Because of this, K.M.K. has not played any WIAA or District-sponsored sports, including wrestling, since the December 6, 2025, sexual assault and deliberately indifferent response. Defendants' policies and actions exclude her from soccer and other sports as well, as the lack of notice and safety concerns apply to competing against males in soccer, too.

174. Had the defendants prevented the incident or properly responded to it, she would have continued participating in wrestling and other sports. If defendants adequately respond in the future, she would continue participating in wrestling and other sports.

**IX.   The District declines to rectify the situation.**

175. While awaiting news on the investigation, Ms. Brown sought supportive measures for K.M.K. in three areas. She sent these requests through her counsel to Dr. Brobbey on March 27. Exhibit 4 (email exchange).

176. First, K.M.K. found out in late March that she was assigned for state testing to a room where Coach Carlson would proctor. Because of Coach Carlson's role in the December 6 match and the aftermath, K.M.K. felt uncomfortable and believed that testing in Coach Carlson's room would negatively impact her performance on the test.

177. So Ms. Brown requested, as a supportive measure, that K.M.K. be reassigned to a different state testing room.

VERIFIED COMPLAINT
(CASE NO.: _____)
29

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

178. Second, Ms. Brown requested supportive measures so that K.M.K. could return to girls wrestling. The request explained that despite K.M.K.'s fears of going back to wrestling, she would love to return to competition if it were truly a girls-only sport. Even without that, she would return with assurances that she would not unknowingly be made to wrestle a male competitor—and could opt out of any such match without penalty—and that she could return to an environment where she wouldn't be treated with hostility for being assaulted or discriminated against, or for reporting the assault and discrimination.

179. To these ends, Ms. Brown requested a policy change so that K.M.K. would not compete against males or would not need to forfeit matches or lose rankings for not competing against males. But even if the school would not change its policy, Ms. Brown asked for at least (1) an assurance that Ms. Brown would receive notice and the opportunity for her daughter to opt out of any matches against males without penalty or adverse consequences and (2) permission for K.M.K. to wrestle for a team (preferably Puyallup High School, given its convenience) whose players and coaches had not already demonstrated hostility and retaliatory intent.

180. Third, Ms. Brown explained that due to anxiety from this situation, K.M.K. had to miss school, and she asked that these be excused absences.

181. On April 3, Dr. Gordon Brobbey agreed to move K.M.K.'s state testing room and classified her absences as excused.

182. He denied the remaining requests.

183. The District refused to change any policy, allow K.M.K. to change teams, or even promise to give her mother notice whenever her daughter is matched against a male athlete so that she could forfeit the match. The District's policies and actions thus excluded K.M.K. from girls wrestling—while her assailant and other males could continue to compete.

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

184.    The District's actions exclude K.M.K. from wrestling and other educational opportunities, deny her educational benefits, discriminate on the basis of sex, and show deliberate indifference.

## X.    Defendants failed to follow the policies they adopted to prevent and remedy sexual assault and a hostile environment.

185.    WIAA policies require member schools to adopt "step-by-step protocols for responding to an incident of inappropriate or discriminatory behavior or harassment that takes place at … WIAA-sanctioned events." Exhibit 5, WIAA Handbook Policy 17.28.2.1, at p.31.

186.    The District has sex nondiscrimination, sexual harassment, and hostile environment policies that mirror mandatory OSPI policies. RCW 28A.600.200(1); Exhibit 18-19, Policy 3205, 3205R. These policies require the school to take prompt and effective steps reasonably calculated to end discrimination and harassment when a District employee knows, or reasonably should know, that such discriminatory harassment is occurring or has occurred. Exhibit 23-24, Policy 3210, 3210R. The District has a formal complaint procedure and requires its compliance officer (believed to be the same person as its Title IX coordinator) to investigate complaints. *Id.*

187.    The policies mandate detailed complaint procedures for a report of sexual assault. Exhibit 18–19, 3205, 3205R. All staff have a duty to take immediate action, to promptly intervene, to notify the principal and Title IX Coordinator, and to report criminal misconduct to law enforcement. *Id.* The District pledges to "take prompt, equitable and remedial action within its authority on all reports, complaints and grievances alleging sexual harassment that come to the attention of the district, either formally or informally." Exhibit 18, 3205, at 3.

VERIFIED COMPLAINT
(CASE NO.: _____)
31

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

188.   K.M.K.'s assault and the hostile environment she experienced (and continues to experience) fall under all these policies and should have triggered Defendants' investigations and complaint procedures.

189.   By their inaction, Defendants did not in fact follow their sex discrimination, sexual harassment, and hostile environment policies.

190.   WIAA, OSPI, and the District have also adopted as their own Title IX and its implementing regulations and guidance, which require that if an entity subject to Title IX offers athletic programs or opportunities separated by sex, it must do so in a manner that "provide[s] equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c); *see* WAC 392-190-025; Exhibit 7, OSPI 2012 Guidelines at 40–54; Exhibit 12-13 Policy 2151, 2151R; Exhibit 5, WIAA Handbook, App. 2, at pp. 90–91.

191.   They did not follow these policies, nor did they investigate K.M.K.'s complaint that she was improperly forced to wrestle against a male without her knowledge.

**XI.    The District adopted OSPI- and WIAA-required athletic policies that harm K.M.K.**

192.   The District has adopted other policies required by OSPI and WIAA that put K.M.K. in danger and that led to her unknowingly wrestling against a male.

193.   The District has adopted a gender-identity nondiscrimination policy, last revised in September 2025. Exhibit 23, Policy 3210.

194.   The District's policy on interscholastic athletic and activities eligibility incorporates its gender-identity nondiscrimination policy into interscholastic athletics. Exhibits 12-13, Policy 2151, 2151R.

195.   The District's policy on "Gender Inclusive Schools," last revised in January 2025, details how these nondiscrimination policies apply in sports,

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

facilities, overnight accommodations, pronouns, and concealing a student's "transition" from parents, peers, and others. Exhibits 25-26, Policy 3211, 3211R.

196. The policies require males who identify as females to be allowed to compete in girls sports.

197. Under this policy, the District also maintains official records showing when a student seeks to identify at school contrary to sex.

198. As Dr. Brobbey wrote, the District interprets these policies to prohibit staff from informing parents or students when girls are set to compete against males in sports or from allowing parental opt-out rights in these situations. Its position is to conceal when males compete against girls in sports.

199. The District also has harassment policies that impede students from objecting to competing against and/or using sex-designated facilities with a student of the opposite sex. Exhibits 20-21, Policy 3207, 3207R.

**XII.  OSPI requires schools and WIAA to have athletic policies that harm K.M.K.**

200. Despite accepting federal funding and thus voluntarily acceding to Title IX, OSPI contends that Washington law requires allowing males who identify as female to compete in girls sports. RCW 49.60.030, RCW 49.60.040(28), RCW 28A.642.010, RCW 28A.642.012(3).

201. Under RCW 28A.642.020, OSPI has created regulations with gender-identity nondiscrimination provisions that Defendants interpret as requiring girls to compete against males who identify as girls in sports. WAC 392-190-005; WAC 392-190-025(1).

202. OSPI issued mandatory guidance further requiring that school districts allow males who identify as female to compete in girls sports. Exhibit 7, OSPI 2012 Guidelines at 30.

VERIFIED COMPLAINT
(CASE NO.: _____)
33

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

203.   Under RCW 28A.642.080, school districts must adopt OSPI's "model transgender student policy and procedure," and this model policy that must incorporate OSPI's "rules and guidelines developed under RCW 28A.642.020 to eliminate discrimination in Washington public schools on the basis of gender identity and expression." RCW 28A.642.080(1), (3).

204.   OSPI monitors and enforces school district compliance with this law. RCW 28A.642.030. By statute, OSPI must create "a compliance timetable, rules, and guidelines for enforcement," and OSPI has the power to issue orders against local school districts in order to enforce this law. RCW 28A.642.005, RCW 28A.642.030, RCW 28A.642.050. Such an enforcement order against a local school district "may include, but is not limited to, termination of all or part of state apportionment or categorical moneys to the offending school district, termination of specified programs in which violations may be flagrant within the offending school district, institution of corrective action, and the placement of the offending school district on probation with appropriate sanctions until compliance is achieved." RCW 28A.642.050.

205.   OSPI has no process for providing notice and opt-out opportunities to girls competing against males, and no such policy or process has been adopted to date despite the Supreme Court's decision in *Mirabelli v. Bonta*, 146 S. Ct. 797 (2026).

206.   Implementing these policies, OSPI wrote to WIAA, directed it to follow OSPI's policies, and told WIAA that WIAA and member schools must allow males who identify as female to compete in girls sports.

VERIFIED COMPLAINT
(CASE NO.: _____)
34

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

## XIII. WIAA runs high-school sports under authority delegated by school districts.

207.    Although organized as a private entity, WIAA is Washington's statutorily authorized regulatory body for interscholastic sports. RCW 28A.600.200. Washington statutes provide that WIAA's actions are treated as the actions of each member school's school board. *E.g.*, RCW 28A.600.200(3)(d).

208.    Approximately 90% of WIAA's members are public schools. The vast majority of WIAA's member schools are recipients of federal financial assistance administered by the U.S. Department of Education and other federal agencies.

209.    Rogers High School and Emerald Ridge High School are WIAA members and recipients of federal funding subject to Title IX.

210.    WIAA controls interscholastic athletic programs for the District.

211.    WIAA members pay annual dues and are required to comply with WIAA rules and regulations. Exhibit 5, Handbook 3.3.0, at p.6.

212.    WIAA sets standards for athlete eligibility and rules governing competition in each sport. Member schools, including Puyallup schools, must adopt and follow these rules for their interscholastic athletic programs. Exhibit 5, Handbook 3.3.0, 3.3.4, 3.3.5, at p.6.

213.    WIAA exercises pervasive and controlling authority over its member schools' federally funded athletic programs.

214.    WIAA is an indirect recipient of federal funds administered by the U.S. Department of Education.

215.    WIAA is governed by a 13-member Executive Board, most of whom are representative of public schools or public school districts.

VERIFIED COMPLAINT
(CASE NO.: _____)
35

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

216.    WIAA is a state actor for purposes of § 1983 and, because it exercises the authority of school boards, WIAA is also a political subdivision (and not an arm of the state) for purposes of *Monell* liability.

**XIV.    Following OSPI policy, WIAA requires schools to allow males to compete against females if those males identify as female.**

217.    WIAA policies ostensibly require "separate and equal programs for boys and girls" because, WIAA says, it "is committed to strong athletic programs for all of its students." Exhibit 5, Handbook App. 2, at p.90 (Position Statement). Schools must "designate the sex of students allowed to participate on a team for each sport." Exhibit 5, Handbook App. 2, at p.90 (Participation – Limitation Based on Gender).

218.    Recognizing the historically limited opportunities for girls, WIAA also sets standards that differ for boys and for girls. *Id.*

219.    But in 2007, WIAA began redefining "boys" and "girls" categories based on an individual's gender identity rather than the individual's sex. Thus, in that year and continuing since, sports that WIAA had previously designated for the female sex became partially mixed-sex in that boys who identified as girls could play against girls (but boys who identified as boys could not).

220.    WIAA requires member schools to follow its policy on gender identity participation: "Athletes will participate in programs consistent with their gender identity or the gender most consistently expressed." Exhibit 5, Handbook 18.16.0, pp.40–41; *see also id.*, Handbook 19.6.2 at p.46 (policy for determining eligibility based on gender identity), App. 3 at p.91: Gender Identity—Definitions.

221.    WIAA controls how schools determine a student's eligibility to participate "consistent with their gender identity," Exhibit 5, Handbook 18.16.0, at 40. WIAA policies set specific procedures and forms for reviewing a school's decisions on

student eligibility, including eligibility based on "gender identity." Exhibit 5, Handbook 19.6.2, at p.46.

222. WIAA instructs schools not to ask a student for "proof of gender, like a birth certificate or doctor's statement." Exhibit 6, Gender Diverse Inclusivity Toolkit, at 11. To do so would be, according to WIAA, an "arbitrary and discriminatory practice." *Id*. And it says "nonbinary" students should be free to "select the gendered team on which they feel most comfortable participating." *Id*. at 16.

223. WIAA's policy requiring schools not to verify sex (or even verify a stated gender identity) is a separately adopted policy that independently caused harm, on top of all its other policies allowing males in girls sports.

224. WIAA's rules do not provide for notice to other students, their parents, or opposing teams when a student of the opposite sex is competing based on gender identity. And no such notice is given.

## XV. Defendants' policies discriminate based on sex and create known harms for girls by making them compete against males.

225. OSPI, WIAA, and District policies force girls to compete against males.

226. These policies result in programs and policies that exclude female students from fair and safe interscholastic athletics, deprive female athletes of the benefits of interscholastic athletics, and otherwise discriminate against female student athletes on the basis of sex in violation of Title IX. 20 U.S.C. § 1681(a).

227. Before 1967, WIAA did not sponsor any girls sports.

228. In 1967, WIAA added its first regulations for girls athletics.

229. This was an intentionally sex-based decision to create a protected category for girls, intentionally and knowingly based on the physiological differences between males and females as relevant to athletics.

VERIFIED COMPLAINT
(CASE NO.: _____)
37

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

230. Meanwhile, in 1975, the Title IX athletics regulations blessed WIAA's approach by creating a safe harbor—34 C.F.R. § 106.41(b)—for girls-only teams in sports involving competitive skill or contact.

231. Following the adoption of the Title IX athletics regulations, WIAA intentionally maintained a program of women's sports designed and intended to qualify for the § 106.41(b) safe harbor, all based on WIAA's knowledge of the physiological differences between males and females.

232. In 2007, Defendants carried through this intentional choice by separating wrestling teams by sex, again based on the physiological differences between the sexes and the understandable and intentional desire not to force girls to wrestle against boys.

233. By this decision, WIAA deliberately chose not to have co-ed teams—where all athletes compete in a single sport—for interscholastic wrestling.

234. Co-ed teams—both in wrestling and more generally—historically resulted in the exclusion of girls from competition, denying them meaningful athletic opportunity, because females are at a physiological disadvantage.

235. Creating meaningful athletic opportunities for girls is why Washington and many states intentionally abandoned co-ed wrestling teams and made the sex-based choice to create separate wrestling teams for girls. Taking the eligibility requirements together as a holistic set of rules, Washington's wrestling teams were intentionally created as sex-based teams, with sex-based distinctions.

236. But now, Washington's wrestling teams do not serve that original sex-based purpose of creating meaningful athletic opportunity for girls. Instead, they depart from the physiological justifications that undergirded sex-designation, now allowing some (but not all) males may compete on girls teams, based on reasons that have nothing to do with biological differences or disadvantages.

VERIFIED COMPLAINT
(CASE NO.: _____)
38

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

237.   This was intentional: by permitting some males to compete on girls teams and thereby intentionally removing itself from the § 106.41(b) safe harbor, WIAA made the intentional, sex-conscious choice not to have true sex-designation, and instead to prioritize the subjective desires of some males over the interests of female athletes. That is intentional sex discrimination.

238.   At the same time, Washington's wrestling teams did not return to being true coed teams. Wrestling still has a male and female category, and any athletes whose stated gender identity matches their sex cannot join the team of the other sex.

239.   By allowing participation on teams by members of either sex on grounds unrelated to sex, these policies undo the reason for sex-based teams in the first place: enabling girls to have meaningful athletic opportunities.

240.   Defendants knew this would harm girls: WIAA's own statements about the importance of sex-designation in wrestling make that plain. But WIAA was deliberately indifferent to that harm and intentionally chose to treat males who identify as female better than biological females by giving the former access to sports where they have a biological advantage and concomitantly disadvantaging the latter.

241.   The WIAA, OSPI, and District athletic policies lead to obvious exclusionary harms because the biology-based differences between girls and boys are what justify sex-designated categories in sports. Without female-only teams, equal opportunity in athletics is illusory. Male advantages are such that even "isolated instances of male participation upon girls' teams creat[es] an advantage for those teams." *Petrie v. Ill. High Sch. Ass'n*, 394 N.E.2d 855, 861 (Ill. App. Ct. 1979). And this has been documented as male athletes across the country are

VERIFIED COMPLAINT
(CASE NO.: _____)
39

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

winning state titles in girls athletic competitions. *E.g., Soule v. Connecticut Ass'n of Sch.*, 755 F. Supp. 3d 172 (D. Conn. 2024).

**XVI.   Females face a heightened risk of physical injury when males compete in female sports because of the biological differences between males and females.**

242.   Genuine physiological differences are the premise for having sex-designated sports. When males compete in girls sports, these differences generate risks to safety and fairness due to males' physiological competitive advantage.

243.   On average, male athletes outperform female athletes of comparable talent and training in nearly every sport. Sex-designated categories for female athletes are necessary to provide fair competitive opportunities for girls and to avoid eliminating girls from competitive athletics.

244.   Even before puberty, boys consistently outperform girls on average by a measurable degree. After puberty, male advantage vastly increases due to the wide range of changes during puberty.

245.   Male puberty brings with it stronger bones, greater efficiency in blood oxygenation, taller height, broader wingspan, and increased lean body mass.[23] These attributes translate to males' ability to jump higher, throw farther, run faster, and hit harder.

246.   Broadly, the male athletic advantage is conferred by males having athletically superior skeletal, muscular, and cardiovascular systems, including

- Larger lungs and denser alveoli in the lungs, enabling faster oxygen uptake;

---

[23] *See* Alison M. McManus & Neil Armstrong, *Physiology of elite young female athletes*, 56 J. Med. & Sport Sci. 23 (2010), https://pubmed.ncbi.nlm.nih.gov/21178365/; Benjamin D. Levine et al., *The Role of Testosterone in Athletic Performance*, Duke Ctr. For Sports L. & Poly's 1 (Jan. 2019), https://bit.ly/3YPTEYe.

VERIFIED COMPLAINT
(CASE NO.: _____)
40

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

- Larger hearts and per-stroke pumping volume, and more hemoglobin per unit of blood, all enabling higher short-term and sustained levels of oxygen transport to the muscles;
- An increased number of muscle fibers and increased muscle mass;
- Higher myoglobin concentration within muscle fibers, enabling faster transfer and cellular respiration of oxygen within the muscle to unleash power;
- Larger bones, enabling greater volumes of muscle fiber;
- Longer bones, enabling greater mechanical leverage and thus enabling males to unleash more power; and
- Increased mineral density in bones, resulting in stronger bones, providing superior protection against both stress fractures and fractures from collisions.

247.    Female puberty, meanwhile, brings distinctive changes to girls' bodies that—while critical for healthy development—measurably impede training and athletic performance. These changes include increased body fat, wider hips and different hip joint orientation, and menstruation.[24]

248.    Because of these inherent physiological differences, male athletes consistently achieve performance records 10–50% higher than comparably fit and trained females of the same age.

249.    By comparison, females are more susceptible to injury than males—especially when competing against males. Emerging scientific evidence shows that females are more prone to concussions (with more severe outcomes) than are males; and that females are at a higher risk of Anterior Cruciate Ligament (ACL) injuries.

250.    In March 2026, after reviewing the scientific evidence, the International Olympic Committee concluded that "male sex confers performance advantage in all sports and events that rely on strength, power, and/or endurance," so "[t]o protect fairness in such sports and events, as well as safety particularly in contact sports

---

[24] *See* Alice Meignié et al., *The Effects of Menstrual Cycle Phase on Elite Athlete Performance: A Critical and Systematic Review*, 12 Frontiers in Physiol. 1 (May 19, 2021), https://perma.cc/JM53-DSUX.

VERIFIED COMPLAINT
(CASE NO.: _____)
41

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

(e.g. combat, collision, projectile sports), it is necessary and adequate to base eligibility for competition on biological sex."[25]

251.    Males retain performance advantages, including greater strength and lean body mass, even when engaging in testosterone suppression.[26] Nor is there evidence that puberty blockers eliminate male advantage, including advantages that predate puberty.

252.    WIAA, OSPI, and the District are aware of these and similar facts about male physiological advantage.

253.    By denying female student athletes female-only athletic teams and competition, Defendants substantially increase the risk to female athletes of physical injury, sexual harassment, and assault.

254.    Because officials know the sex of all athletes in a competition, it is possible for all Defendants to respect all students and parents but avoid harming girls like K.M.K. For example, Defendants could let parents direct officials to assign daughters only to wrestling matches against other girls. Or officials could issue disqualifications and forfeits (with or without penalty) as appropriate in particular matches or events without making public any individual student names, attributes, or reasons. There are doubtless other ways to respect and protect all athletes—but Defendants have chosen none of them, and instead they have chosen to harm girls like K.M.K.

---

[25] International Olympic Committee, *IOC Policy on the Protection of the Female (Women's) Category in Olympic Sport and Guiding Considerations for International Federations and Sports Governing Bodies* (Mar.26, 2026), https://perma.cc/3YQJ-XTV2.

[26] Emma N. Hilton & Tommy R. Lundberg, *Transgender Women in The Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage*, 51 Sports Medicine 200, 211 (2021).

**XVII. Defendant's adoption and retention of their sex-discriminatory policies show intentional discrimination against girls and deliberate indifference to the known harms that their policies create for girls.**

255.   OSPI, WIAA, and the District adopted and maintain policies allowing males who identify as female to compete in girls sports. And their respective officials adopted, maintain, retain, and enforce those policies.

256.   These policies first call for sex-designated sports. That's an intentionally sex-based decision. They then permit some, but not all, boys to play sports otherwise designated for girls, removing girls sports from the § 106.41(b) safe harbor. That too is an intentionally sex-based decision to flout the safe harbor.

257.   Their policies treat girls differently from males because co-ed teams in practice exclude girls from participation and deny them of meaningful competitive athletic opportunities, as girls are at a physiological disadvantage when forced to compete against the opposite sex. Males do not suffer this group-wide exclusion and denial of rights when girls seek to compete in male sports, as males are at a physiological advantage when forced to compete against the opposite sex.

258.   Defendants have had a reasonable opportunity to rectify the situation.

259.   Through their leadership officials, OSPI, WIAA, and the District have received—and disregarded—complaints outlining the exclusionary harms of male participation on female athletes, including the harms of the male athlete who wrestled and assaulted K.M.K.

260.   But, despite these complaints, they have chosen to retain their policies and practices.

VERIFIED COMPLAINT
(CASE NO.: _____)
43

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

**A. OSPI and Reykdal have received and ignored complaints about the harm of its athletic policies to girls.**

261.    OSPI is aware of the physical differences between male and female student athletes and how it harms girls by forcing them to compete against males. But it has deliberately, intentionally, and knowingly chosen to disregard the interests of female athletes and instead chosen to prioritize the interests of males who identify as female.

262.    The state legislature and Governor Bob Ferguson are aware of complaints against the harms to girls, but refuse to hold hearings or pass legislation, and they oppose a citizen initiative that would restore fairness in girls sports.[27]

263.    When asked about his own daughter competing against males in sports, the Governor doubled down on current policy.[28] The Governor said that state policy on any gender-related issue "won't change as long as I am governor."[29]

264.    The state filed an amicus brief in *Female Athletes United (FAU) v. Keith Ellison* et al., supporting Minnesota's ongoing fight to make girls compete against males in Minnesota high school athletics.[30] The attorney general noted that, "our state has long sought to abolish" policies that would protect girls from having to compete against males. *Id.*

---

[27] Jake Goldstein-Street, *WA Democrats won't hold hearings on parental rights, trans athlete initiatives*, Wash. State Standard (Jan. 9, 2026), https://washingtonstatestandard.com/2026/01/09/wa-democrats-wont-hold-hearings-on-parental-rights-trans-athlete-initiatives/#:~:text=Bob%20Ferguson%2C%20a%20Democrat%2C%20said%20he%20hasn't,a%20vote%2C%20I%20tend%20in%20general%2C%20as.

[28] Joe Hutchinson, *Woke Washington governor sneers at journalist for voicing concern about biological males competing in women's sports*, Daily Mail (Jan. 14, 2026), https://perma.cc/7R4M-CLNR.

[29] Governor Bob Ferguson (@GovBobFerguson), X (June 18, 2025, 1:01 PM), https://perma.cc/T5HZ-YRC4.

[30] Press Release, Washington State Office of the Attorney General Nick Brown, *AG Brown leads coalition supporting Minnesota's trans-inclusive policy for youth sports* (Oct. 31, 2025), https://perma.cc/D7YN-TU8Y.

VERIFIED COMPLAINT                                      Alliance Defending Freedom
(CASE NO.: _____)                                  44180 Riverside Pkwy
44                                                      Lansdowne, Virginia 20176
                                                        (571) 707-4655

265. OSPI and the governor have received complaints from school districts and female athletes about how these policies harm girls (complaints that also were filed with the U.S. Department of Education).

266. The Kennewick School Board filed a Title IX Complaint against Superintendent Reykdal, OSPI, and WIAA about sports and the harm to girls.[31] Superintendent Reykdal acknowledged this complaint. In response, he said Kennewick's sex-based policies violate state law and civil rights guidelines for public schools.[32]

267. Central Valley School Board filed a complaint about sports and the harm to girls under OSPI policies.[33] Eastmont School District and Warden Joint Consolidated School District also filed similar complaints (and the U.S. Department of Education has informed OSPI of all these complaints.)[34]

268. Female athletes Soleil Hoefer and K.L.—both of whom were forced to race against a male athlete from East Valley High School—filed a Title IX complaint against OSPI. Their complaint detailed the unfairness of having to compete against a male.[35]

269. In February 2025, a parents' network filed a complaint detailing the harms experienced by an 8th-grade girl named A.W. from Sterling Junior High School in the Eastmont School District in Washington state. A.W. was forced to race against a biological male from Liberty High School at the Cashmere Junior

---

[31] Letter from Kennewick Sch. Bd. to U.S. Dep't of Educ. Office of Civil Rights (Mar. 26, 2025), https://perma.cc/D3GG-FLTB.

[32] Tim Clouser (The Center Square), *Title IX, trans athletes and $31M: Washington state school board files civil rights complaint*, The Chronicle (Mar. 28, 2025), https://perma.cc/4LK6-S3XD.

[33] Connor McEvoy, *Central Valley School Board votes to file federal civil rights complaint over Title IX conflicts*, KREM2 (May 5, 2025), https://perma.cc/K4TF-L3TX.

[34] Letter from U.S. Dep't of Educ. to Superintendent Chris Reykdal (Apr. 30, 2025), https://perma.cc/4K2U-Z2AR.

[35] Letter from Katherine L. Anderson, et. al to U.S. Dep't of Educ. Office for Civil Rights (Apr. 2, 2025), https://adflegal.org/wp-content/uploads/2025/04/ocr-2025-04-02-complaint-title-ix-1.pdf.

VERIFIED COMPLAINT
(CASE NO.: _____)
45

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

Olympics in the 1600-meter race.[36] The parents' complaint also described the reasons why some school board members have sought to change WIAA policies to protect girls sports. *Id*. The complaint also mentioned that OSPI is auditing school districts for whether they have adopted OSPI policies on this issue and is finding schools to be non-complaint and deficient if they limit girls sports to females. *Id*.

270.    When a journalist contacted OSPI for comment on the parents' complaint, OSPI responded in an email: "We have continued to advise school districts to stay in compliance with state law, which prohibits discrimination on the basis of gender identity."[37]

271.    On April 1, 2026, female athlete A.W. and another girl, F.S. (a female athlete who refused to play basketball with a male at Tumwater School District), met with Superintendent Reykdal to share their complaints about how OSPI and WIAA policies harm girls who have to compete against males in sports.[38] One girl said, "I'd like to see what they have to say to me and listen to my story and listen to other girls stories and still tell me that it isn't happening." *Id*. The girls also brought many letters from girls and parents on the subject for him to read. *Id*.

272.    The girls reported that "[w]e were going to [Superintendent Reykdal] with our concerns and our feelings over things and the truth." *Id*. "He was able to hear us." *Id*. "He could definitely tell that me and [F.S.] are extremely passionate about this and that it's not just us in this struggle, it's a lot of other women and girls across Washington. And I think in that moment, he definitely felt my struggle. Like I think he could tell that this is an issue." *Id*.

---

[36] Washington Parents Network, *Washington Parents Network Title IX Complaint* (Feb. 28, 2025), https://perma.cc/Z9EB-2FVM.

[37] Carleen Johnson, *Washington Parents Network files Title IX complaint against Reykdal, Ferguson*, The Center Square (Feb. 28, 2025), https://perma.cc/7MXF-32DC.

[38] unDivided with Brandi Kruse, *Another meaningless EO?*, YouTube, at 3:13 to 18:00 (Apr. 1, 2026), https://perma.cc/5BZ8-JH8B.

273.   In other interviews, Superintendent Reykdal confirmed that he has heard "the conversation" on this issue.[39] "These are all sincerely held beliefs on both sides of these issues," he acknowledged.

274.   Superintendent Reykdal has acknowledged that the controversy over males in girls sports "[is] a big issue."[40] He has also acknowledged his awareness of the ballot initiative to save girls sports. *Id.* He is also aware of the U.S. Department of Education's ongoing investigation into OSPI over its policies under Title IX. *Id.*

275.   Superintendent Reykdal said Washington policy has "held up for decades and decades, so we feel really good about that."[41] He made this remark during an interview after the U.S. Department of Education launched a Title IX investigation into the Tumwater School District over claims that it allowed a male athlete to participate in a girls basketball game in a way that harmed girls. *Id.*

276.   On his campaign website, Superintendent Reykdal states that he is "absolutely committed" to ensuring "gender-inclusive bathroom access and inclusion in sports and other activities," which is to say that he is committed to ensuring that males who identify as female can compete in girls sports.[42]

277.   He has also said in a media video that it would be "inaccurate" to say there are only two genders.[43] Based on this theory, "Our state laws make clear that

[39] Carleen Johnson, *WATCH: Reykdal tells school districts to 'abide by the law' on trans athletes*, The Center Square (Jan. 8, 2026), https://perma.cc/GAX7-Q32B.
[40] Inside Olympia, *Inside Olympia - May 22, 2025*, YouTube, at 12:00 to 22:00 (May 22, 2025), https://perma.cc/9L5W-HP8P.
[41] Freddy Monares, *Washington's top school official on protections for trans students and access to federal funds*, KNKX Pub. Radio (Mar 7, 2025), https://perma.cc/H3GW-ZDSY.
[42] Chris Reykdal, *Priorities*, Chris Reykdal.org, https://perma.cc/4ZBQ-J4QH (last visited May 29, 2026).
[43] Ryan Morik, *Washington state school district votes to keep biological males out of girls sports despite state pushback*, Fox News (May 23, 2025), https://perma.cc/RAN4-HNNJ; waOSPI, *State Superintendent Chris Reykdal Update on Federal Actions and Guidance*, YouTube (Feb. 20, 2025), https://youtu.be/ouTkWtTTMxg?si=lji6-NeD6Po_bAE2.

VERIFIED COMPLAINT                                    Alliance Defending Freedom
(CASE NO.: _____)                                44180 Riverside Pkwy
47                                                   Lansdowne, Virginia 20176
                                                     (571) 707-4655

students get to identify and participate in activities based on the gender in which they identify. We're going to uphold that law."[44]

**B. OSPI and Reykdal have enforced OSPI policies against school districts despite the harm to girls.**

278.    In 2025, under Superintendent Reykdal's direction, OSPI investigated and audited every school district in the state to check if they had adopted OSPI's mandatory policies that school districts allow males to compete in girls sports.

279.    OSPI found that 71% (224) had implemented OSPI's mandatory "gender-inclusive" policies but that 29% (92) had not, and so OSPI reported that OSPI had issued letters to all of them requiring "corrective actions."[45]

280.    When the Tumwater School District voted to reject the mandatory OSPI model policy and to petition WIAA to change its sports policy in 2025, OSPI wrote a letter to the Tumwater School District threatening enforcement action under RCW 28A.642.050 and stating that the Tumwater School District was violating state law.[46] (The U.S. Department of Education then opened an investigation into OSPI for this and similar letters,[47] and in response OSPI again stood by its position that it could force school districts to adopt its policy under which males have a right to compete in girls sports.[48])

281.    When the Mead School District did not adopt OSPI's policies in 2025, OSPI wrote a letter to the Mead School District in 2025 threatening enforcement action under RCW 28A.642.050 and stating that it too was violating state law by

---

[44] waOSPI, State *Superintendent Chris Reykdal Update on Federal Actions and Guidance* (Feb. 20, 2025), https://perma.cc/2458-LTU4 (starting at 4:00).

[45] Washington Office of Superintendent of Public Instruction, *Report To The Legislature*: *2024–25 Statewide Civil Rights Review* at 11–12 (2025), https://perma.cc/W6HP-YW5Y.

[46] Source ONE News Staff, *OSPI Clashes with Tumwater School Board Over Girls' Sports Protection Vote, Cites Discrimination Concerns*, Source One News (Mar. 12, 2025), https://perma.cc/PY2Z-3GW4.

[47] *See supra* note 34.

[48] Press Release, Washington Office of Superintendent of Public Instruction, *State Superintendent Chris Reykdal's Statement on U.S. Department of Education's Investigation into Washington State's Gender-Inclusive Schools Law* (Apr. 30, 2025), https://perma.cc/KE9P-S6X7.

VERIFIED COMPLAINT
(CASE NO.: _____)
48

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

protecting girls sports.[49] From the letter, the Mead School District realized that if the Mead School District were to violate "OSPI's interpretation of state law," it "would jeopardize essential state funding for our schools" that flow from state taxpayers through OSPI. *Id.* (The U.S. Department of Education also opened an investigation into OSPI for this letter.[50])

282.    When the Kennewick School District did not adopt the mandatory OSPI model policy in 2025—because it declined to ignore parental rights and sought to protect female athletes—OSPI wrote a letter to the Kennewick School District finding it in violation of state law.[51] The Kennewick School District recognized that its refusal to comply with OSPI's demand "surely will result in the state retaliating in the form of withholding state funding, further threatening our ability to serve students in need." *Id.* (The Kennewick School District also filed a Title IX complaint with the U.S. Department of Education. *Id.*)

283.    The Moses Lake School District received a similar email from OSPI as well about its non-compliance with OSPI's mandatory policies.[52] (It too filed a federal Title IX complaint. *Id.*) In a letter that the Moses Lake School District wrote to Superintendent Reykdal, the Moses Lake School District noted the harm to girls that come from OSPI policies.[53]

284.    In response, OSPI wrote back to the Moses Lake School District, copying WIAA.[54] OSPI stated that the Moses Lake School District decision to protect girls sports violated state law. *Id.* OSPI also said that OSPI expected district employees

[49] Letter from Mead Sch. Dist. to U.S. Dep't of Educ. (Mar. 11, 2025), https://perma.cc/82TX-LBFQ.
[50] Tim Clouser, *Title IX fight escalates as WA districts push back on gender identity policies*, The Center Square (May 1, 2025), https://perma.cc/3LUR-KSRK.
[51] *See supra* note 31.
[52] Letter from Moses Lake Sch. Dist. to U.S. Dep't of Justice & U.S. Dep't of Educ. Office for Civil Rights (Mar. 20, 2025), https://perma.cc/S77V-5CXS.
[53] Letter from Moses Lake Sch. Dist. to Governor Bob Ferguson & Superintendent Chris Reykdal (Feb. 25, 2025), https://perma.cc/7XBM-CXAB.
[54] Letter from Sarah Albertson, Managing Attorney, Washington Office of Superintendent of Public Instruction, to Moses Lake Sch. Dist. (Mar. 6, 2025), https://perma.cc/JEW9-8RAA.

VERIFIED COMPLAINT                                      Alliance Defending Freedom
(CASE NO.: _____)                                  44180 Riverside Pkwy
49                                                     Lansdowne, Virginia 20176
                                                       (571) 707-4655

to refuse to comply with board policy, suggested the Moses Lake School District athletic directors' professional certifications would now be "at risk," and threatened "corrective action" against the Moses Lake School District's state funding under RCW 28A.642.050 and WAC 392-190-080. *Id.* at 2.

285.   In response to OSPI's demands for corrective actions—sent to every non-compliant school district in the state—60% (55) of the non-compliant schools districts adopted OSPI's policy, while 40% (37) of the non-compliant school districts did not.[55]

286.   In December 2025, OSPI concluded its review and sent a report to the legislature listing these remaining non-compliant school districts. *Id.*

287.   One of OSPI's corrective action orders against a school district is now pending before a state administrative hearing commission.[56] OSPI ordered the La Center School District to comply with OSPI policies but the La Center School District refused to adopt OSPI's gender-inclusive policy in full (refusing, for example, to affirmatively ask each child his or her preferred pronouns).[57] OSPI had earlier warned the La Center School District that its failure to agree to take on OSPI's "corrective actions" (including adopting the full OSPI gender-inclusive policy) would result in compliance orders "or the initiation of sanctions." *Id.* The Washington Office of Administrative Hearings is now considering the La Center School District's appeal. (The U.S. Department of Education also opened an investigation into OSPI over this matter.[58])

---

[55]*See supra* note 45.
[56] Third Prehearing Order, *In re La Center Sch. Dist.*, Docket No. 03-2025-OSPI-02502 (Wash. Off. of Admin. Hr'gs Dec. 2, 2025), https://perma.cc/VWH3-GLZ4.
[57] Letter from Washington Office of Superintendent of Public Instruction to La Center School District (Feb. 26, 2025), https://perma.cc/JVV8-W4DT.
[58] Press Release, U.S. Dep't of Educ., *Title IX Special Investigations Team Launches Directed Investigation into Washington State Superintendent's Office* (Apr. 30, 2025), https://perma.cc/S72X-ZEYJ.

VERIFIED COMPLAINT                                      Alliance Defending Freedom
(CASE NO.: _____)                                  44180 Riverside Pkwy
50                                                     Lansdowne, Virginia 20176
                                                       (571) 707-4655

288. When asked about federal efforts to restore fairness in girls sports by reserving girls sports for female athletes, Superintendent Reykdal said, "State law prohibits discrimination on the basis of gender identity, and we will not back down from that."[59] He later added: "Our guidance to districts is pretty simple. It's on our website. We've sent them communication. They need to follow state law."[60]

289. In a related statement, he said: "Since 2006, Washington state law has prohibited discrimination on the basis of gender identity, and the state has allowed students to participate in school-based athletics in alignment with their gender identity since 2007. These protections fit within the scope of what is allowed by federal law and have been successfully established and implemented for nearly two decades."[61]

290. As to the "districts in Washington where school boards are willfully out of compliance, he said, "We'll be continuing to pursue those investigations as we move forward."[62]

**C. OSPI and Reykdal recognize that OSPI policies do not allow girls' parents to protect them from competing against males.**

291. OSPI is aware that its gender policies do not account for the Fourteenth Amendment's protections for parental rights. OSPI policies do not allow parents to protect girls by giving them notice of matches against males or by allowing parents to opt girls out of matches against males.

292. On its website for its gender rules and guidelines, OSPI acknowledges the problem: "We are reviewing the guidance and resources we offer to school districts

---

[59] Washington Office of Superintendent of Public Instruction, *State Superintendent Chris Reykdal's Statement on President Trump's Order to Discriminate Against Trans Female Athletes* (Feb. 6, 2025), https://perma.cc/BTF4-ZP38.
[60] Maryssa Rillo, *State Law vs. Federal Rules: How Washington schools are dealing with transgender athlete participation*, KXLY.com (Mar. 5, 2025), https://perma.cc/875F-WJJY.
[61] *See supra* note 48.
[62] Carleen Johnson, *OSPI remains defiant as federal funding for Washington state schools is at risk*, The Center Square (June 26, 2025), https://perma.cc/3ERT-GMT9.

VERIFIED COMPLAINT
(CASE NO.: _____)
51

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

to ensure their consistency with the Supreme Court's recent order in *Mirabelli v. Bonta* and to provide a safe and supportive environment for all children."

293.   But, whatever the scope of its parental-rights review, OSPI has not yet changed any OSPI rules or guidance since *Mirabelli*. The website still includes the same regulations and mandatory guidance. And OSPI's website still says, "**All students have the right to be treated consistent with their gender identity at school.**"[63]

294.   In a recent interview after the Supreme Court's interim order in *Mirabelli*, Superintendent Reykdal explained that he did not think the decision meant anything more than sharing complete written records about a child with the child's parents.[64] So he would not be changing OSPI rules or guidance after *Mirabelli* except to account for sharing complete written records about a child with the child's parents, and he likely would not even make that change until after the *Mirabelli* case concludes. *Id.*

**D. WIAA has received but ignored complaints about how its policies harm girls by allowing males to compete against them.**

295.   WIAA is aware of the physical differences between male and female student athletes but has chosen to be deliberately indifferent to the harms to girls and to prioritize the interests of males who identify as female.

296.   WIAA knows that males have inherent physical advantages over female athletes. That is why the rules it promulgates for interscholastic sports use different equipment (e.g., hurdle heights) and standards (e.g., race distance) in sports designated for girls and boys.

---

[63] Exhibit 9, https://ospi.k12.wa.us/policy-funding/equity-and-civil-rights/resources-school-districts-civil-rights-washington-schools/gender-inclusive-schools (emphasis in original).
[64] Inside Olympia, *Inside Olympia - Chris Reykdal, OSPI*, YouTube, at 42:00 to 50:00 (Apr. 9, 2026), https://perma.cc/E4NT-KVTL; Exhibit 11, OSPI, *Error*, https://ospi.k12.wa.us/error ("OSPI and Washington public schools respect the First Amendment right of parents and guardians to freely exercise their religion and their Fourteenth Amendment right to direct the health care of their children.").

VERIFIED COMPLAINT
(CASE NO.: _____)
52

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

297. In wrestling, weight classes for boys and girls differ, and weigh-ins are based on different body-fat percentages, all because of the physical differences between males and females. WIAA's wrestling rules adopt standards for boys and girls weight classes set out by NFHS. Exhibit 5, Handbook 48.5.0 at p.87-88; *see also* Press Release, NFHS, *Adjustment in Minimum Body Fat Percentage for Females Highlights High School Wrestling Rules Changes* (April 16, 2026).

298. For 2025-2026, WIAA set girls weight classes at 100, 105, 110, 115, 120, 125, 130, 135, 140, 145, 155, 170, 190, and 235.

299. For 2025-2026, WIAA set boys weight classes at 106, 113, 120, 126, 132, 138, 144, 150, 157, 165, 175, 190, 215, and 285.[65]

300. WIAA refuses to change its policies even though it knows they deprive female students of fair competition and prevent their full participation in athletics.

301. Defendants know that male athletes competing in girls sports have led to controversy and concern about harm to girls.

302. For example, a male athlete named V.G. was named state champion in WIAA girls track and field events in 2024 and 2025.[66]

303. Media coverage was significant.[67]

304. Tumwater High School girls protested V.G.'s championship award the next day. WIAA was aware of their protest, as it acknowledged in a statement to at least one media outlet.[68] WIAA refused to disqualify V.G. from girls sports or otherwise change its policies.

[65] *See* Wash. Interscholastic Activities Ass'n (WIAA), *Washington Wrestling Weight Management Program* (Sept. 29, 2025), https://perma.cc/WN6M-BSR7.
[66] Elena Perry, *Defending state track champion, transgender athlete Verónica Garcia wins second state title*, The Spokesman-Review (May 31, 2025), https://perma.cc/822Q-VGDAwww.spokesman.com/stories/2025/may/31/defending-state-track-champion-transgender-athlete/; Ryan Morik, *High school girls stage protest after trans athlete wins 2nd straight state track championship*, Fox News (June 2, 2025), https://perma.cc/74JR-8827; 2A-3A-4A-Wash. State Track & Field Meet, *Results* (May 26, 2024), https://perma.cc/LZ65-XFUD ; *see* 2025 State 2A-3A-4A-Track & Field Championships, *Results* (Dec. 11, 2025), https://perma.cc/VU9P-BQS3 .
[67] *See supra* note 66.
[68] *See supra* note 66.

VERIFIED COMPLAINT
(CASE NO.: _____)
53

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

305.   WIAA member Shelton High School fielded a girls basketball team during the 2025 season that included a male athlete identifying as a girl. At a game in February 2025, at least two girls on the opposing team, Tumwater High School, refused to play out of concern for their safety. (And then one of them faced an investigation and retaliation from the school district for "misgendering" the male student.)

306.   It was reported that opposing players protested and one girl on an opposing team was injured when the male player tackled her to the ground and fell on top of her (and the U.S. Department of Education opened a Title IX investigation into the school district). WIAA knew about these events, but it refused to change its policies.[69]

307.   In 2025, at least 13 WIAA-member school boards tried to amend WIAA policies so that girls sports would be reserved for females. One proposal, Proposed Amendment #7, would have limited designated girls teams to "students whose biological sex is female," and replaced boys' teams with an "open" category for any student-athlete who wants to participate. Another, Proposed Amendment #8, would have created a new "open" category for students of either sex, while limiting boys' and girls teams by biological sex.

308.   The State, OSPI, and Superintendent Reykdal applied pressure and threats to WIAA against WIAA changing its policies, demonstrating their awareness of and deliberate indifference to the harm to girls.

309.   Because WIAA chose to accept OSPI's position, WIAA announced that the proposals would violate state law, so the Representative Assembly's votes on Proposed Amendments #7 and #8 would be treated as "advisory."

---

[69] *See supra* note 36; Press Release, U.S. Dep't of Educ., *Office for Civil Rights Launches Title IX Investigation into Washington State School District* (Mar. 3, 2025), https://perma.cc/RMV2-UJ7D.

VERIFIED COMPLAINT
(CASE NO.: _____)
54

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

310. In so doing, the Executive Board overrode the votes of member school administrators to preserve the policy as "advisory only."

311. Sean Bessette, director of communications for WIAA, explained: "The WIAA has been told by the Attorney General's office, the Office for Civil Rights, and the Office of Superintendent of Public Instruction that (the) proposed amendments would be a violation under current Washington state law, affirming our attorney's legal review."[70] "The WIAA remains committed to following state law, and those amendments focused on gender-identity participation would not be implemented on August 1 if they were to pass under current state law."

312. Commenting on the failure of the advisory amendments that would protect girls from competing against males, WIAA Executive Director Mick Hoffman said WIAA does not "debate the issue because as an association, they are obligated to follow the law."[71]

313. He then acknowledged—but dismissed—complaints to WIAA on the subject, saying: "We would hope that people would spend that time and energy where they can make a real impact on it rather than just complaining." *Id.*

314. Now, WIAA has refused to change its gender-identity policies even in light of the well-documented harm to K.M.K. and other female athletes caused by males competing in girls sports.

315. In 2026, many school districts sought to amend WIAA policies to limit girls teams to biological females. Still, nothing has changed.

316. The media reported how school districts across the state made their positions known on the issue to WIAA in support of Proposed Amendment #7 and #8. Colville School District Superintendent Kevin Knight said his district supported

---

[70] Frank Sumrall, *WIAA says vote on member amendments banning transgender athletes violates state law*, MyNorthwest.com (Apr. 3, 2025), https://perma.cc/2KZB-B5K4.

[71] Denise Whitaker, *Proposals to ban transgender student-athletes from girls' sports in Washington fail*, KOMO News (Apr. 22, 2025), https://perma.cc/V47V-AN6Y.

VERIFIED COMPLAINT
(CASE NO.: _____)
55

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

the amendments based on community concerns that it "is inherently not safe or not fair for female athletes to compete against" males.[72]

317. Once again, WIAA refused to accept a vote on this issue. The WIAA Executive Board overrode a majority vote of member school administrators to preserve the policy as "advisory only."

318. Despite a majority of the school-administrator delegates in the WIAA Representative Assembly voting for those amendments,[73] WIAA said it "remains consistent: The WIAA remains committed to following Washington state law and will continue to do so moving forward." *Id.* Media reported that a WIAA spokesperson commented that WIAA officials "aren't concerned that Washingtonians may be upset by their rejection."[74]

319. By refusing to change its gender-identity-based policies, WIAA has been deliberately indifferent to the heightened risk of harm to female student-athletes caused by its gender-identity-based participation requirements.

320. WIAA knows that its gender-identity-based policies deprived girls of benefits, excluded girls, and discriminated against girls in interscholastic athletics programs. Its deliberate indifference to these harms heightened the risk of injury to and discrimination against girls, who, like K.M.K., have reasonably concluded that WIAA will do nothing to support them if they protest, suffer an injury, or seek policy change.

---

[72] Daniel Pursell, *WIAA transgender athlete amendment fails to pass*, KXLY.com (Apr. 21, 2026), https://perma.cc/685L-WK7P.

[73] According to WIAA, "The Representative Assembly is comprised of 53 school administrators—35 from high schools and 18 from middle-level schools—representing each of the six WIAA districts. The Assembly votes on proposed amendments, with voting delegates typically casting proxy votes aligned with the opinions of their league and WIAA District." Wash. Interscholastic Activities Ass'n (WIAA), *WIAA Representative Assembly Approves 22 Amendments* (Apr. 20, 2026), https://perma.cc/ZRZ6-MMZK.

[74] The Chronicle, *Let's Go Washington releases statement on WIAA blocking amendment restricting trans athletes*, Yahoo!Sports.com (Apr. 24, 2026), https://perma.cc/W5TV-8B2E.

VERIFIED COMPLAINT                                      Alliance Defending Freedom
(CASE NO.: _____)                                  44180 Riverside Pkwy
56                                                     Lansdowne, Virginia 20176
                                                       (571) 707-4655

321.    School sports offer girls the opportunity for development and growth, but these years are limited. When biological girls are sidelined in their own sports, rather than receive lessons of empowerment and strength, the girls hear a message of discouragement and exclusion.

**E. The District received but ignored complaints about how its policies harm girls by allowing males to compete against them.**

322.    By delegating authority to WIAA and remaining a member of WIAA—and by mirroring WIAA policies in its own policies—the District has ratified WIAA's decisions and made them its own.

323.    The District is aware of the physical differences between male and female student athletes but is deliberately indifferent to that risk.

324.    By retaining and failing to change its gender-identity-based policies and customs, even after complaints and opportunities for reconsideration, the District has been deliberately indifferent to the heightened risk of harm to female student-athletes caused by its gender-identity-based participation requirements.

325.    As discussed above, the District was informed of the harms of its policies at the school board meeting and in K.M.K.'s complaints. But it has chosen to retain its policies, despite its harm to K.M.K. and girls like her.

**XVIII.  Defendants' policies harm K.M.K.**

326.    K.M.K. has two years of high school left. She wants to be able to compete again. But under Defendants' policies and actions, she cannot do so because competing against a male would deprive her of a fair and safe opportunity to compete. She cannot sign up for wrestling at all given the safety risks caused by these policies, the lack of notice to her of when she might wrestle a male, and the current hostile environment, all of which reflect Defendants' deliberate indifference. Therefore, Defendants have excluded K.M.K. from wrestling and other sports.

VERIFIED COMPLAINT
(CASE NO.: _____)
57

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

327.   OSPI, WIAA, and District athletic policies and conduct do not provide girls a similar quality of experience as males, and the benefits, opportunities, and treatment of each sex are not equal or equal in effect. Their policies and conduct of allowing sports to be separate not by sex but based on gender identity deny benefits for female athletes compared with benefits or services available to male athletes.

328.   Until the female category is protected from male entrants, K.M.K. will continue to be excluded from sports, denied the benefits of sports, and discriminated against because of her sex. She has lost and will continue to lose fair competition; athletic victories and the public recognition associated with victories; opportunities to advance to higher-level competitions; and visibility to college recruiters.

329.   The harassment and assault on K.M.K. by a male wrestler was sex-based harm, and it constituted sexual violence, with resulting bodily injury, emotional distress, hostile environment, exclusion from educational and athletic opportunities, and other harm. Intentional sex discrimination includes sexual harassment and sexual misconduct, such as physical abuse and assault.

330.   K.M.K. would not have suffered the digital penetration of her vagina if she were male because it would have been a physical impossibility.

331.   Discriminatory intent motivated Defendants' deliberate indifference as they would have taken these actions more seriously if she had been a male assaulted by a male. That's because Defendants' gender-identity policies would not have played a role in their decisions.

332.   Defendants acted with intent and with deliberate indifference to the known or obvious fact that statutory, constitutional, and other violations would result from their actions and from their policies, practices, customs, and usages.

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

333.   Defendants' actions resulted in damages. These damages include bodily injury, including physical harm for being sexually assaulted and the resulting physical effects; lost educational and athletic benefits and opportunities, including lost access to wrestling and other sports, lost time in school, and lost access to District complaint-resolution procedures; and out-of-pocket economic losses, such as lost or wasted time and money spent for her wrestling training and obtaining wrestling equipment.

334.   K.M.K. and Ms. Brown have also been harmed by the violation of Ms. Brown's parental rights—by the loss of Ms. Brown's right to direct K.M.K.'s care, custody, control, and upbringing during the period of unlawful deprivation.

335.   By refusing to protect K.M.K., Defendants have caused K.M.K. and Ms. Brown to suffer emotional distress, pain and suffering, mental anguish, dignitary injury, impairment of reputation, personal humiliation, loss of enjoyment of life, and diminished capacity to function personally.

## LEGAL ALLEGATIONS

### First Claim
### Title IX, 20 U.S.C. § 1681(a) – Athletics
### For K.M.K.
### Against WIAA, OSPI, and the District

336.   This claim is brought for K.M.K. against Defendants WIAA, OSPI, and the District, which are subject to Title IX and its regulations.

337.   In violation of 20 U.S.C. § 1681(a) and its regulations, WIAA, OSPI, and the District's policies and actions exclude K.M.K. from wrestling and other educational opportunities, deny her educational benefits, and discriminate on the basis of sex—all with intent and deliberate indifference.

VERIFIED COMPLAINT
(CASE NO.: _____)
59

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

338. WIAA, OSPI, and the District violated 20 U.S.C. § 1681(a) and its regulations by intentionally discriminating against girls by implementing sex-based policies creating a protected category for girls wrestling and then destroying that category and removing it from the regulatory safe harbor via policies permitting some males to participate in girls wrestling.

339. WIAA, OSPI, and the District intentionally discriminate against girls by intentionally subordinating girls interests to males' interests and intentionally treating males better than girls.

340. WIAA, OSPI, and the District exhibited deliberate indifference to the heightened risk of harm, deprivation of opportunities, and inherent unfairness to female students caused by males' participating in athletic competitions reserved for girls by implementing and maintaining these policies despite being apprised that the policies harm girls by excluding them from the full and equal benefits of athletic participation and by depriving them of fair and safe competition.

341. WIAA, OSPI, and the District have a policy and practice of allowing sex-based sports but then also allowing some males to compete against females in contact sports without disclosure, verification, or safety protocols.

342. WIAA, OSPI, and the District excluded K.M.K. from wrestling and other educational opportunities, denied her educational benefits, and discriminated on the basis of sex.

343. These policies and practices created a heightened risk that female students would be excluded from participation in, denied the benefits of, and subjected to discrimination in interscholastic athletics programs.

344. This heightened risk was known to WIAA, OSPI, and the District and it existed in contexts within each of these defendants' control—specifically, interscholastic athletics programs. But WIAA, OSPI, and the District deliberately

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

ignored that risk, even when they knew the policies were actually harming K.M.K. and other girls.

345. WIAA, OSPA, and the District further violate the Title IX regulations by creating a girls wrestling program that neither qualifies for the § 106.41(b) safe harbor nor complies with the § 106.41(a) non-discrimination requirement. This regulatory violation is a species of intentional discrimination because these defendants intentionally removed girls sports from the safe harbor by admitting males to those sports, intentionally subordinating girls' interests to the interests of males who wanted to play girls' sports.

346. WIAA, OSPI, and the District further violate the Title IX regulations by failing to provide equal athletic opportunity for girls in admitting boys to girls sports, including wrestling. This is also a species of intentional discrimination because it involved an intentional choice to remove the protections for girls sports and admit boys to those sports.

347. WIAA, OSPI, and the District's Title IX violations harm and will continue to harm K.M.K. and other female student-athletes in Washington.

348. K.M.K. seeks declaratory and injunctive relief, as well as damages in an amount to be determined at trial.

## Second Claim
### Title IX, 20 U.S.C. § 1681(a) – Assault, Harassment, Hostile Environment For K.M.K.
### Against WIAA, OSPI, and the District

349. This claim is brought for K.M.K. against Defendants WIAA, OSPI, and the District, which are subject to Title IX and its regulations.

350. WIAA, OSPI, and the District have violated 20 U.S.C. § 1681(a) and its regulations by acting with deliberate indifference to a known risk of sexual assault and by their clearly unreasonable response to a known incident of sexual assault.

VERIFIED COMPLAINT
(CASE NO.: _____)
61

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

351. K.M.K.'s assault and the resulting actions from WIAA, OSPI, and the District were harassment and created a hostile environment that were sufficiently severe, persistent, and pervasive to interfere with her education.

352. WIAA, OSPI, and the District's officials had actual knowledge of all relevant policies, of the risk of sex-based or sexual assault, of the assault on K.M.K., of K.M.K.'s sex-based harm, and of the resulting hostile environment, but they responded with deliberate indifference.

353. WIAA, OSPI, and the District could have alleviated or remedied the harm to K.M.K., but they did not respond adequately and failed to take appropriate remedial action.

354. WIAA, OSPI, and the District failed to comply with the state mandatory reporting law and failed to enforce policies addressing peer-to-peer sexual harassment that would have protected K.M.K.

355. WIAA, OSPI, and the District's Title IX violations harm and will continue to harm K.M.K. and other female student-athletes in Washington.

356. K.M.K. seeks declaratory and injunctive relief, as well as damages in an amount to be determined at trial.

**Third Claim**
**Fundamental Right to Direct Child's Care, Upbringing, and Education**
**U.S. Const., amend. XIV; 42 U.S.C. § 1983**
**For Stephanie Brown**
**Against Reykdal (official and individual capacity), WIAA and the District**

357. This claim is brought by Ms. Brown on her own behalf against Defendants WIAA and the District for injunctive relief and damages and against Superintendent Chris Reykdal in his official capacity for injunctive relief and in his individual capacity for damages.

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

358. WIAA is a state actor for purposes of § 1983 and, because it exercises the authority of school boards, WIAA is also a political subdivision (and not an arm of the state) for purposes of *Monell* liability.

359. WIAA, Reykdal, and the District adopted and maintained policies that deliberately concealed from Ms. Brown whether her daughter would have to compete against a male athlete in a girls wrestling tournament.

360. WIAA, Reykdal, and the District failed to provide Ms. Brown notice of or an opportunity to opt out of K.M.K. wrestling a male in a high-school competition.

361. WIAA and Reykdal adopted and maintained a policy that prohibited member schools from notifying parents when their daughters would be matched against males.

362. The District implemented these policies and adopted additional policies that affirmatively concealed this information from parents like Ms. Brown.

363. WIAA, the District, and Reykdal (as the official responsible for OSPI's guidance to schools and WIAA), knew that these policies would result in parents being denied information necessary to protect their children, but they affirmatively maintained this concealment.

364. The Fourteenth Amendment protects "the [liberty] interest of parents in the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.). This includes parents' fundamental rights to direct their children's care, upbringing and education in the school context. *Mirabelli v. Bonta*, 146 S. Ct. 797, 803 (2026).

365. This parental right also includes "the right not to be shut out" of consequential decisions regarding their children's care. *Id*. Government policies that keep important information parents—information that is necessary for parents to protect their children's health and well-being—violate this fundamental right.

366. WIAA and the District maintains official records showing when a student identifies at school contrary to their biological sex, yet interprets its policies "to prohibit staff from informing parents" when their daughters will compete against males.

367. This policy shuts parents out of the consequential decision regarding whether their child will wrestle an opposite-sex athlete. It denies parents the information they need to protect their children and direct their care, upbringing, and education.

368. When the government conceals from parents information necessary to make these consequential decisions, it violates their fundamental right no less than if it had expressly prohibited them from making a particular decision.

369. WIAA, Reykdal, and the District failed to provide Ms. Brown actual notice of any policy allowing males to compete against her daughter and also failed to provide her actual notice of the decision to have her daughter wrestle a male athlete.

370. Had they provided Ms. Brown such actual notice, she could have taken steps to protect her daughter and exercised her fundamental right to direct her daughter's care, upbringing, and education.

371. Ms. Brown has never consented and does not consent to K.M.K. wrestling a male in high school competition.

372. WIAA, Reykdal, and the District knew that during a WIAA- and District-sponsored girls wrestling tournament, male athletes could wrestle against females and that no notice or opt-out existed. Under their policies, neither WIAA nor the District would notify parents if their daughters were matched against males or accommodate a request to have their daughters only wrestle girls. Under these

VERIFIED COMPLAINT
(CASE NO.: _____)
64

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

373.    policies, K.M.K. was instructed to wrestle against a male athlete and these defendants failed to provide notice or the opportunity to opt out to Ms. Brown.

374.    WIAA, Reykdal, and the District maintain an official policy or practice, or a regular custom or usage, of not apprising parents when their female children are set to compete against male athletes in female-designated athletic competition. WIAA, Reykdal, and the District also maintain an official policy or practice, or a regular custom or usage, of withholding from parents and their female children the right and opportunity to opt out of such competition. By structuring their policies to deny parents notice, defendants unconstitutionally condition K.M.K.'s participation in the public benefit of interscholastic athletics on Ms. Brown's and K.M.K's willingness to accept a burden on the exercise of their constitutional rights. As a result, the constitutional violations alleged in this count will continue and be repeated.

375.    Strict scrutiny applies to these defendants' violations of Ms. Brown's fundamental right to direct the care, upbringing, and education of her child.

376.    There is no legitimate, much less compelling, state interest that outweighs Ms. Brown's constitutional right to direct the care, upbringing, and education of her daughter. No state interest justifies secretly overriding parents' decisions about their children's safety and privacy. "[C]hildren's safety is the overriding equity." *Mirabelli*, 146 S. Ct. at 803.

377.    The actions violating Ms. Brown's fundamental rights are neither narrowly tailored to any compelling interest nor rationally related to a legitimate interest.

378.    Ms. Brown seeks compensatory, presumed, and nominal damages and declaratory and injunctive relief against WIAA, the District, and Reykdal. Additionally, she seeks punitive damages against Reykdal.

VERIFIED COMPLAINT
(CASE NO.: _____)
65

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

**Fourth Claim**
**Equal Protection Clause**
**U.S. Const., amend. XIV; 42 U.S.C. § 1983**
**For K.M.K.**
**Against Brobbey and Smith (official and individual capacities)**

379.    This claim is brought for K.M.K. against Defendant Title IX Coordinator Dr. Gordon Brobbey and Defendant Principal Jason Smith in each defendant's official capacity for injunctive relief and in each defendant's individual capacity for damages.

380.    Brobbey and Smith violated K.M.K.'s right to equal protection under the law under the Fourteenth Amendment of the U.S. Constitution, which includes a right to be free from sex discrimination in the form of (1) officials' deliberate indifference to peer-on-peer sexual assault and harassment and (2) officials' resulting creation of a hostile environment—rights which are and were clearly established.

381.    K.M.K. is a member of a protected class based on her sex as a female.

382.    K.M.K.'s assault and officials' resulting actions constitute harassment and create a hostile environment that were sufficiently severe, persistent, or pervasive to interfere with her education.

383.    Brobbey and Smith had actual knowledge of all relevant policies, of the assault on K.M.K., of K.M.K.'s sex-based harm, and of the resulting hostile environment, but they responded with deliberate indifference.

384.    Brobbey and Smith were in a position of authority to alleviate or remedy the harm to K.M.K. but they did not respond adequately.

385.    Brobbey and Smith failed to comply with the state mandatory reporting law and failed to enforce policies addressing peer-to-peer sexual harassment that would have protected K.M.K.

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

386.    K.M.K. seeks injunctive and declaratory relief, as well as actual or compensatory damages, nominal damages, presumed damages, and punitive damages, all in an amount to be determined at trial.

**Fifth Claim**
**State-Created Danger**
**U.S. Const., amend. XIV; 42 U.S.C. § 1983**
**For K.M.K.**
**Against Reykdal and Morrison (official and individual capacities) and**
**WIAA and the District**

387.    This claim is brought for K.M.K. against Defendants WIAA and the District for injunctive relief and damages, and against Defendant Superintendent Chris Reykdal and Defendant Coach John Morrison in each of their individual defendant's official capacities for injunctive relief and official capacities for damages.

388.    WIAA is a state actor for purposes of § 1983 and, because it exercises the authority of school boards, WIAA is also a political subdivision (and not an arm of the state) for purposes of *Monell* liability.

389.    In violation of the Fourteenth Amendment's guarantees of due process and protections for privileges and immunities, these defendants placed K.M.K. in a state-created danger through their affirmative conduct—by their policy choices and actions.

390.    These WIAA, Reykdal, and the District adopted and implemented policies that created a new danger, under which males would wrestle teenage girls. Morrison then placed K.M.K. in the position of wrestling a male at a girls wrestling tournament without telling her that her opponent was a male. The male then sexually assaulted K.M.K., harming her bodily integrity. WIAA, Reykdal, the District, and Morrison thus left K.M.K. in a more dangerous position than they

found her because, before this event, her experience was that when she participated in girls wrestling, her opponents would be girls.

391.    WIAA, Reykdal, the District, and Morrison's actions directly led to the foreseeable assault, resulting in bodily injury, emotional distress, and a hostile environment.

392.    WIAA, Reykdal, the District, and Morrison's acted with deliberate indifference to a known or obvious danger, both in creating the danger that K.M.K. would be sexually assaulted and in their deliberate indifference to the resulting harm.

393.    WIAA, Reykdal, the District, and Morrison's were in a position of authority to avoid, alleviate, or remedy the harm to K.M.K., but they did not respond adequately.

394.    WIAA Reykdal, and the District maintain an official policy or practice, or a regular custom or usage, of allowing males to wrestle in the girls wrestling category without informing competitors or their parents, and Morrison is subject to them. So the constitutional violations alleged here will continue and be repeated.

395.    K.M.K. seeks injunctive and declaratory relief against WIAA, Reykdal, the District, and Morrison, and actual, compensatory, presumed, and nominal damages against WIAA, Reykdal, the District, and Morrison. Additionally, she seeks punitive damages against Reykdal and Morrison.

## RELIEF REQUESTED

Plaintiffs respectfully request that this Court enter judgment against Defendants and provide Plaintiffs with the following relief:

I.  A declaration that, as set forth in the first through fifth claims,

    A.  OSPI, WIAA, and the District violate Title IX by their actions that intentionally or with deliberate indifference to K.M.K., exclude her from educational and athletic opportunities, deny her the benefits of educational and athletic opportunities, and discriminate against her on the basis of sex, in forcing her to compete against a male athlete in a competition designated for girls, in risking her safety in athletics, in their response to her sexual assault, and in their creation of a hostile environment.

    B.  Reykdal, WIAA, and the District violate Ms. Brown's fundamental parental rights protected under the U.S. Constitution's Fourteenth Amendment in ways identified above, including by failing to provide parental notice and opt-out rights when a girl is to compete against a male in athletic programs designated for girls;

    C.  Brobbey and Smith violate the Equal Protection Clause by their actions that intentionally or with deliberate indifference to K.M.K., exclude her from educational and athletic opportunities, deny her the benefits of educational and athletic opportunities, and discriminate against her on the basis of sex, in their response to her sexual assault, and in their creation of a hostile environment.

    D.  WIAA, Reykdal, the District, and Morrison violate the Fourteenth Amendment's guarantees of due process and protections for privileges and immunities by placing K.M.K. in a state-created danger through their affirmative conduct—by their

VERIFIED COMPLAINT
(CASE NO.: _____)
69

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

policy choices and actions under which she competes in girls wrestling against a male and sexual assault resulted.

II.    A preliminary and permanent injunction that would:

A. On all claims, preclude OSPI, Reykdal, WIAA, and the District from allowing male athletes to compete with or against K.M.K. in girls wrestling, girls soccer, or other sports designated for women or girls that are contact sports or sports involving competitive athletic skill;

B. On all claims, require OSPI, Reykdal, WIAA, and the District to declare ineligible any male athletes competing or seeking to compete with or against K.M.K. in girls wrestling, girls soccer, or other sports designated for women or girls that are contact sports or sports involving competitive athletic skill;

C. On the third claim (Fourteenth Amendment parental rights), Require the District to provide parental notice and opt-out rights to Ms. Brown when K.M.K. is to compete against a male in girls wrestling, girls soccer, or other girls athletic programs;

D. On all claims, require OSPI, Reykdal, WIAA, and the District to correct all records where K.M.K. lost to a biologically male athlete, with respect to any record or recognition purporting to record match statistics, victories, rankings, or qualifications for competitions designated for girls, and conversely to correctly give credit, rankings, and/or titles to K.M.K. when she would have received such credit, rankings, and/or titles, including recognizing her as the sole third place winner at the December

VERIFIED COMPLAINT
(CASE NO.: _____)
70

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

2025 Lady Jag Kickoff wrestling tournament with all due honors and awards, including awarding her any third-place medal and ribbon;

E. On all claims, require all Defendants to provide K.M.K. a chance to participate in girls wrestling in a non-hostile environment, such as by facilitating her participation on another school's girls wrestling team, without academic penalty, athletic eligibility penalty, or other cost;

F. On all claims, require OSPI, Reykdal, WIAA, and the District to restore to K.M.K. her lost athletic eligibility and opportunity to compete in high school sports, for the time in her sophomore year she was excluded from sports by her assailant's competition and under Defendants' unlawful policies and actions;

G. On all claims, require all Defendants to provide sex-discrimination, sexual-assault, and sexual-harassment prevention and response training to all relevant employees of in a way designed to avoid repetition of the events in this case;

III. For all claims, an award of actual, compensatory, presumed, and nominal damages in an amount to be determined at trial;

IV. For the constitutional claims under Section 1983 (the third, fourth, and fifth claims), punitive damages against Reykdal, Brobbey, Smith, and Morrison in their individual capacities.

V. An award of Plaintiff's costs and reasonable attorneys' fees and expenses, as authorized by 42 U.S.C. § 1988 and any other applicable law.

VI. That this Court retain jurisdiction to enforce its orders;

VERIFIED COMPLAINT
(CASE NO.: _____)
71

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

VII.    That this Court issue the requested injunctive relief without a condition of bond or other security required of Plaintiff; and

VIII.   Any other relief that the Court may deem just and proper.

Respectfully submitted this 9th day of June, 2026.

By: /s/ Katherine L. Anderson

Abigail St. Hilaire
Washington Bar No. 48914
**Ellis, Li & McKinstry PLLC**
1700 Seventh Avenue, Suite 1810
Seattle, Washington 98101
(206) 682-0565
(202) 625-1052 Fax
asthilaire@elmlaw.com

Suzanne E. Beecher*
CA Bar No. 329586*
**Alliance Defending Freedom**
440 1st Street NW, Suite 600
Washington, DC 20001
Telephone: (202) 644-9010
Facsimile: (202) 347-3622
sbeecher@adflegal.org

*Pro Hac Vice Application
Forthcoming*

Jonathan A. Scruggs*
Arizona Bar No. 030505
Katherine L. Anderson
Washington Bar No. 41707
Henry W. Frampton, IV*
SC Bar No. 75314
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, AZ 85260
Telephone: (480) 444-0020
Facsimile: (480) 444-0028
jscruggs@ADFlegal.org
kanderson@ADFlegal.org
hframpton@adflegal.org

Julie Marie Blake*
VA Bar No. 97891
**Alliance Defending Freedom**
44180 Riverside Parkway
Lansdowne, VA 20176
Telephone: (571) 707-4655
Facsimile: (571) 707-4790
jblake@ADFlegal.org

Natalie D. Thompson*
Texas Bar No. 24088529
**Alliance Defending Freedom**
7250 Dallas Parkway, Suite 700
Plano, Texas 75024
Telephone: (469) 894-8700
Facsimile: (480) 444-0020

*Attorneys for Plaintiffs*

VERIFIED COMPLAINT
(CASE NO.: _____)
72

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

## DECLARATION UNDER PENALTY OF PERJURY

I, Stephanie Brown, have read the foregoing complaint. I declare under penalty of perjury, under 28 U.S.C. § 1746, that the factual allegations pertaining to my personal experiences are true and correct to the best of my knowledge.

Executed June 6, 2026, at Puyallup, Washington.

Stephanie Brown

VERIFIED COMPLAINT
(CASE NO.: _____)
73

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655

## DECLARATION UNDER PENALTY OF PERJURY

I, K.M.K., have read the foregoing complaint. I declare under penalty of perjury, under 28 U.S.C. § 1746, that the factual allegations pertaining to my personal experiences are true and correct to the best of my knowledge.

Executed June ___5___, 2026, at Puyallup, Washington.

_K.M. K._____
K.M.K.

Alliance Defending Freedom
44180 Riverside Pkwy
Lansdowne, Virginia 20176
(571) 707-4655