# EXHIBIT 7






# Prohibiting Discrimination in Washington Public Schools

*Guidelines for school districts to implement*
*Chapters 28A.640 and 28A.642 RCW and Chapter 392-190 WAC*



**Randy I. Dorn**
State Superintendent of
Public Instruction

**February 2012**

*NOTE: These guidelines are currently under revision and may not reflect OSPI's revised rules in Chapter 392-190 WAC (effective December 19, 2014), which supersede these guidelines where different.*

This publication may provide hyperlinks to web sites that are not maintained or monitored by OSPI. OSPI does not make any warranty, express or implied, with respect to the use of the links provided, or guarantee the accuracy, usefulness, or adequacy of any resources or information available at or from these links. OSPI is not responsible for the content of any off-site pages or any other sites linked from this publication.

OSPI provides equal access to all programs and services without discrimination based on sex, race, creed, religion, color, national origin, age, honorably discharged veteran or military status, sexual orientation including gender expression or identity, the presence of any sensory, mental, or physical disability, or the use of a trained dog guide or service animal by a person with a disability. For questions and complaints of alleged discrimination, contact OSPI's Equity and Civil Rights Director (Title IX/Section 504 Coordinator) at (360) 725-6162/TTY: (360) 664-3631 or P.O. Box 47200 Olympia, WA 98504-7200.

# Prohibiting Discrimination in Washington Public Schools

*Guidelines for school districts to implement*
*Chapters 28A.640 and 28A.642 RCW and Chapter 392-190 WAC*

**Prepared by:**
Susanne Beauchaine, MPA, Program Supervisor
Calandra Sechrist, J.D., Program Supervisor
Pat Smithson, M.Ed., Program Supervisor

Yvonne Ryans, Ed.D., Director

**Equity and Civil Rights Office**
**Office of Superintendent of Public Instruction**

Randy Dorn
Superintendent of Public Instruction

Ken Kanikeberg
Chief of Staff

Bob Harmon
Assistant Superintendent
Special Programs, Secondary Education,
School Improvement, and Federal Accountability

February 2012

*NOTE: These guidelines are currently under revision and may not reflect OSPI's revised rules in Chapter 392-190*
*WAC (effective December 19, 2014), which supersede these guidelines where different.*

# Table of Contents

**INTRODUCTION** ..................................................................................................................**6**

**I.     COUNSELING AND GUIDANCE SERVICES**..................................................................**7**
Disproportionate Enrollment..................................................................................... 7
Assignment of Students to Schools and Classes........................................................ 7
Approaches to Achieving Diversity in Schools and Programs.................................... 9

**II.    TEXTBOOKS AND INSTRUCTIONAL MATERIALS** ...................................................**12**

**III.   ACCESS TO COURSE OFFERINGS AND SCHOOL PROGRAMS**..................................**13**
School Enrollment................................................................................................... 13
Students with Limited English Proficiency.............................................................. 13
Translation and Interpretation Services.................................................................. 16
Students with Disabilities........................................................................................ 18
Students and Service Animals.................................................................................. 21
Access to School District Online Programs ............................................................. 23
Single-Sex Classes................................................................................................... 25
Student Discipline ................................................................................................... 26
Religious Discrimination ......................................................................................... 27
Gender Identity and Gender Expression.................................................................. 28
Pregnant and Parenting Students............................................................................ 31

**IV.    DISCRIMINATORY HARASSMENT** ..........................................................................**32**

**V.     SEXUAL HARASSMENT**..........................................................................................**36**

**VI.    RECREATIONAL AND ATHLETIC ACTIVITIES** ........................................................**40**
Separate Teams....................................................................................................... 40
Annual Evaluation of Athletic Programs.................................................................. 40
Students' Athletic Interests and Abilities ................................................................ 41
Three Part Test for Athletic Equity ......................................................................... 42
Student Athletic Interest Survey............................................................................. 44
Scheduling of Games and Practices ........................................................................ 47
Equipment, Uniforms, and Supplies ....................................................................... 48
Facilities.................................................................................................................. 49
Coaching.................................................................................................................. 50
Publicity and Awards............................................................................................... 51
Medical Services and Training ................................................................................ 51
Travel and Per Diem................................................................................................ 52

Housing, Laundry, and Dining Facilities and Services ............................................. 52
Booster Clubs and Donations.................................................................................. 52
Students with Disabilities and Athletic Participation .............................................. 53

**VII.    EMPLOYMENT DISCRIMINATION AND AFFIRMATIVE ACTION...........................55**
Employment Discrimination .................................................................................... 55
Affirmative Action in Employment .......................................................................... 56

**VIII.   PROCEDURAL REQUIREMENTS.........................................................................59**
Compliance Coordinator ......................................................................................... 59
Nondiscrimination Statement.................................................................................. 60

**IX.     DISCRIMINATION COMPLAINT AND APPEAL PROCEDURES...............................62**
Discrimination Complaints to the School District.................................................... 63
Appeals to the School Board.................................................................................... 65
Appeals to OSPI....................................................................................................... 66

**X.      OSPI MONITORING AND ENFORCEMENT ..........................................................67**
OSPI Monitoring...................................................................................................... 67
Complaints Initiated By OSPI .................................................................................. 69
Permissible Sanctions ............................................................................................. 70

**XI.     APPENDICES ....................................................................................................71**
Appendix A – Definitions ........................................................................................ 72
Appendix B – Nondiscrimination Laws .................................................................... 74
Appendix C – Sample Utilization Analysis and Goals for Affirmative Action Plans ............... 76
Appendix D – Checklist of Procedural and Reporting Requirements........................ 79
Appendix E – Investigation Tips and Techniques..................................................... 80

**INDEX.......................................................................................................................83**

# Introduction

**BACKGROUND**

In 2010, a new state law was passed, chapter 28A.642 of the Revised Code of Washington (RCW), prohibiting discrimination in Washington public schools based on race, creed, religion, color, national origin, sexual orientation including gender expression or identity, veteran or military status, the presence of any sensory, mental, or physical disability, or the use of a trained dog guide or service animal by a person with a disability. This law is similar to the sexual equality law, chapter 28A.640 RCW, which prohibits discrimination based on sex.

Under this new law, the Office of Superintendent of Public Instruction (OSPI) was directed to develop rules and guidelines to eliminate discrimination in public school employment, counseling and guidance services for students, recreational and athletic activities, access to course offerings, and in textbooks and instructional materials. The rules were adopted on May 13, 2011 and are codified in chapter 392-190 of the Washington Administrative Code (WAC).

**PURPOSE**

These guidelines constitute OSPI's interpretation of chapters 28A.640 and 28A.642 RCW and of chapter 392-190 WAC and are provided to support school districts' understanding of their obligations under these laws. The information in this publication is specific to state law and is not inclusive of all obligations required of school districts under federal and state nondiscrimination laws. As recipients of federal financial assistance, school districts are also obligated under federal civil rights laws and regulations, including Title IX of the Education Amendments of 1972 (34 C.F.R. Part 106), Section 504 of the Rehabilitation Act of 1973 (34 C.F.R. Part 104), Title II of the Americans with Disabilities Act (28 C.F.R. §35.106), Titles VI and VII of the Civil Rights Act of 1964 (34 C.F.R. Part 100, 42 U.S.C. §2000e, et seq.), and the Boy Scouts of America Equal Access Act (34 C.F.R. Part 108). Where federal regulations cover similar substantive areas, these guidelines mirror the federal regulations when consistent with state law.

OSPI will use these guidelines when monitoring school districts for compliance with state laws pursuant to WAC 392-190-076. Nothing in this publication should be construed as guidelines that would subject any school district to legal liability in a civil action brought pursuant to RCW 28A.640.040 or RCW 28A.642.040. The information in this publication is subject to change based on future legal and policy changes. Before taking action based on the information in this publication, please review state and federal laws and regulations and/or consult with legal counsel familiar with your particular circumstances. This publication is intended for informational purposes only and does not constitute legal advice.

# I. Counseling and Guidance Services

## DISPROPORTIONATE ENROLLMENT

**1. Are school districts required to ensure that all schools and classes are balanced based on sex, race, and national origin?**

No. While school districts may not segregate students on the basis of sex, race, or national origin in assigning students to schools or in making classroom assignments (see Single-Sex Classes on page 25), the law does not require that each school within a school district have a racially balanced student population. In some areas, the population distribution of a school district enrolling large numbers of minority and nonminority students may result in schools with substantially disproportionate enrollments of students of one race or ethnicity. School districts should routinely review course and program enrollment disaggregated by sex, race, English Language Learners, and disability (Section 504 and Special Education) to identify potential disparities in course and program enrollment.

**2. What should a school district do if a course or program has substantially disproportionate enrollment based on sex, race, and national origin?**

Schools must be able to demonstrate valid and nondiscriminatory reasons for disproportionate enrollment and ensure that all students are provided nondiscriminatory counseling services. If a disparity is identified, the school district must take action to ensure that the disproportionality is not the result of discrimination. Such actions may include reviewing master schedule conflicts, assignments of students to courses, recruitment efforts, and counseling information provided to students and parents.

**3. Is it permissible for courses for limited English proficient students to have disproportionate enrollment based on national origin?**

Yes. Many schools have developed courses of instruction that are designed for the needs of limited English proficient students. Courses for limited English proficient students may have disproportionate enrollment based on national origin so long as they are designed to allow students to move into regular classes within a reasonable period of time (see page 13).

## ASSIGNMENT OF STUDENTS TO SCHOOLS AND CLASSES

**4. How should school districts ensure that testing, evaluations, and criteria for student assignment do not result in discrimination?**

School districts should use appropriate testing, evaluations, and criteria before assigning students to specialized classes or courses of study. Tests must be educationally sound indicators of a student's particular needs and achievement level, in order to avoid student assignment to inappropriate courses. For example, if a school tests students with limited English proficiency in English, the school may receive scores that are not valid indicators of students' achievement levels and may then assign the students to classes that do not meet their needs. School staff should be sensitive to their own individual biases when informing students and parents of program and course opportunities. Schools should consider the following questions when periodically reviewing counseling and guidance services:

- What is the process to ensure that all students and parents are informed of all course and program offerings, regardless of English language proficiency, disability, or other protected class?
- Does the school district provide bias awareness training for all school staff involved in counseling and guidance services (*see* WAC 392-190-020)?
- Are course catalogs and brochures periodically reviewed for bias?
- Is the process for developing student schedules reviewed to ensure that counselors and advisors are not discouraging any student from enrolling in a particular program or course based on factors not related to program criteria?
- Are students discouraged from exploring subjects and activities not traditional for their sex (*see* WAC 392-190-010)?
- Does the school use multiple measures, rather than a single testing instrument, to ensure appropriate student assignment?

**5. May school districts assign students to classes or instructional groups based on ability grouping?**

Yes. School districts may assign students based on ability if the criteria used by school districts to assign students are not discriminatory, and provides the opportunity for students to progress from one ability group to another. Ability grouping is the assignment of students to classes or instructional groups based on a student's level of ability or achievement. Ability grouping sometimes results in courses with substantially disproportionate enrollments of students based on sex, race, national origin, or disability. School districts have a responsibility to ensure that they do not use practices that result in discrimination. If ability grouping results in classes with substantially disproportionate enrollments of students based on sex, race, national origin, or disability, school districts must demonstrate that there is a valid educational justification for their ability grouping practices. Failure to demonstrate a valid educational justification may constitute discrimination.

**6. May a school district ask a parent to waive ELL services or revoke consent for special education or Section 504 services as a condition of acceptance to the district or a particular program?**

No. A school district cannot categorically deny admission to a student because the student needs ELL services or special education or related aids or services. A school district must provide all students an equal opportunity to meet any appropriate minimum eligibility criteria for admission.

---

*Additional Resources:*

Student Assignment in Elementary and Secondary Schools and Title IV (U.S. Department of Education):
http://www2.ed.gov/about/offices/list/ocr/docs/tviassgn.html

The Guidance Counselor's Role in Ensuring Equal Educational Opportunity (U.S. Department of Education):
http://www2.ed.gov/about/offices/list/ocr/docs/hq43ef.html

---

## APPROACHES TO ACHIEVING DIVERSITY IN SCHOOLS AND PROGRAMS

**7. May school districts consider race and national origin in order to achieve diversity or avoid racial isolation in schools or programs?**

Yes. Under certain circumstances, school districts may voluntarily use race and national origin to meet a compelling interest to seek diversity and avoid racial isolation (*see Parents Involved in Community Schools v. Seattle School District No. 1*, 555 U.S. 701 (2007)). In doing so, school districts should be prepared to explain how these objectives fit within their overall mission. Approaches that achieve diversity or avoid racial isolation fall into two broad categories – those that do not rely on the race of individual students (race-neutral), and those that do. School districts should consider race-neutral approaches before adopting approaches that rely on the race of individual students. ***As this is a complex area of the law, school districts are encouraged to work with their legal counsel when making these decisions.***

**8. When should school districts use race-neutral approaches to achieve diversity?**

Before using approaches that rely on the race of individual students, school districts should first determine if they can achieve diversity by using race-neutral approaches. Race-neutral approaches can be used for decisions about individual students, such as admissions decisions for competitive schools or programs, as well as for decisions made on an aggregate basis, such as the drawing of boundary lines that affect a large number of students. Examples of race-neutral approaches include, but are not limited to, the use of criteria such as: students' socioeconomic status; students' household status (e.g., dual or single-parent household); neighborhood socioeconomic status; geography (e.g., existing neighborhood lines); and composition of area housing (e.g., subsidized housing, single-family home, high-density public housing, or rental housing).

**9. Are school districts required to use only race-neutral approaches to achieve diversity?**

No. School districts are required to use race-neutral approaches only if they are workable (s*ee Grutter v. Bollinger*, 539 U.S. 306 (2003)). In some cases, race-neutral approaches will be unworkable because they will be ineffective to achieve the diversity that the school district seeks or to address racial isolation in the district's schools. When race-neutral approaches would be unworkable or ineffective, school districts may employ generalized race-based approaches.

**10. What are some ways in which school districts can use race-neutral approaches to achieve diversity?**

*Recruitment*

When seeking to increase the diversity of the applicant pool of a school or program, school districts may focus outreach and recruitment efforts to reach diverse applicants. This can include placing flyers, making announcements, and conducting parent engagement activities at schools with diverse student populations or encouraging individual students to apply. Such actions simply enlarge the applicant pool to help ensure that it is inclusive; they do not determine which students will ultimately be admitted to the program.

*School and Program Siting Decisions*
School districts routinely make decisions about the siting of schools and special programs, such as specialized academic, athletic, or extracurricular programs. School districts seeking to achieve diversity or avoid racial isolation may make siting decisions to further those interests, such as choosing a location in a diverse neighborhood. A school district's decision to close a school or to discontinue a special program in an effort to achieve diversity or avoid racial isolation is analyzed in the same manner as the decision to site a school or program.

*Open and Choice Enrollment Decisions*
Some school districts use open enrollment or school choice programs to assign students to schools. These programs allow parents to choose among (or rank by preference) district schools. The school district then assigns students based in part on parents' choices. School districts seeking to achieve diversity or avoid racial isolation may design or redesign such programs to further those interests. For example, a school district could use a program that assigns a diversity priority to specific geographic areas based on the area's racial demographics or economic data. Students could then be assigned to a school based on a combination of parents' choices and a lottery that gives priority based on the area in which they reside.

*Admission to Specialized Schools and Programs*
Some school districts have schools or programs to which students apply and are selected through a competitive admissions process. School districts seeking to achieve diversity or avoid racial isolation may develop admissions criteria and procedures for such schools or programs to further those interests. For example, a school district could give greater weight to the applications of students from neighborhoods selected specifically because of their racial composition.

*Inter-District and Intra-District Transfers*
Numerous school districts use transfer programs to allow students to move between schools within and outside the district. School districts seeking to achieve diversity or avoid racial isolation may use transfer programs to further those interests. For example, a school district could design a transfer program that expressly relies upon the overall racial composition of geographic areas within the district. In evaluating requests to transfer into a predominantly Latino school, for instance, a school district could give priority to students who live in a neighborhood comprised predominantly of non-Latino households, regardless of the race of the particular student requesting the transfer.

**11. When can school districts use individual racial classifications to achieve diversity?**
If a school district determines that race-neutral approaches would be unworkable, it may consider using an individual student's race as *one* factor among others in considering how an individual student's school assignment would contribute to achieving diversity or avoiding racial isolation. For example, a school district may consider a student's race as a "plus factor" (among other, non-racial considerations). A school district should not evaluate student applicants in a way that makes a student's race his or her defining feature.

A school district may only consider the race of individual students if it does so in a manner that is narrowly tailored to meet a compelling interest. When school districts adopt approaches that consider the race of individual students, they should do so in a manner that closely fits their goals of achieving diversity or avoiding racial isolation and includes race no more than necessary to meet those ends (*see Grutter v. Bollinger*, 539 U.S. 306, 339 (2003)). A school district that uses individual racial classifications should periodically review the program to determine whether such racial classifications remain necessary and modify its practices as needed. School districts should maintain documentation that describes their educational objectives and the process they followed in structuring their programs, including alternatives that they considered and rejected.

---

*Additional Resources:*

Guidance on the Voluntary Use of Race to Achieve Diversity and Avoid Racial Isolation in Elementary and Secondary Schools (U.S. Department of Education and U.S. Department of Justice): http://www2.ed.gov/about/offices/list/ocr/docs/guidance-ese-201111.html

---

# II. Textbooks and Instructional Materials

**1. What are instructional materials?**
Instructional materials may include, but are not limited to, textbooks, books, reference materials, magazine and newspaper articles, computer software, multimedia, videos, and music.

**2. Are school districts required to have an instructional materials policy?**
Yes. School districts are required under RCW 28A.320.230 to adopt an instructional materials policy related to the selection or removal of instructional materials.

**3. Must a school district's instructional materials policy include screening criteria to identify and eliminate bias in instructional materials?**
Yes. Under WAC 392-190-055, the instructional materials policy of each school district must establish and use appropriate screening criteria designed to identify and eliminate bias pertaining to sex, race, creed, religion, color, national origin, veteran or military status, sexual orientation, gender expression or identity, disability, and the use of a trained dog guide or service animal in all textbooks and instructional materials, including reference materials and audio-visual materials. OSPI provides guidelines to identify bias in instructional materials in the Washington Models for the Evaluation of Bias Content in Instructional Materials:
http://www.k12.wa.us/Equity/Districts/ReviewingforBias.aspx

**4. Are school districts required to have an instructional materials committee?**
Yes. State law requires school districts to establish an instructional materials committee to support the selection of instructional materials as well as to provide a system for receiving written complaints regarding materials used by the school district (RCW 28A.320.230). A school district's procedures should provide clear steps for how the district will receive and respond to challenges regarding the use of any instructional material in the district.

**5. Who should serve on the instructional materials committee?**
The committee should be inclusive and consist of members of the school district's professional staff, including representation from the district's curriculum development committees, classroom teachers, librarians, administrators, as well as interested parents and community members (RCW 28A.320.230). The school board may choose to include parents on the committee, so long as parent members make up less than half of the membership.

**6. What if a school district's instructional materials contain bias and cannot be replaced immediately?**
If a school district finds that any instructional materials contain bias, the school district should either replace the materials or should acquire supplemental materials or aids to be used concurrent with existing materials for the purpose of countering the bias content. Supplemental instructional materials, such as classic and contemporary literary works, periodicals, and technical journals, may contain bias if they are educationally necessary or advisable (WAC 392-190-055).

*NOTE: These guidelines are currently under revision and may not reflect OSPI's revised rules in Chapter 392-190 WAC (effective December 19, 2014), which supersede these guidelines where different.*

# III. Access to Course Offerings and School Programs

## SCHOOL ENROLLMENT

**1. May a school district inquire about a student or parent's U.S. citizenship status or include such questions on enrollment forms?**

No. School districts may not request information with the purpose or result of denying access to public schools on the basis of race or national origin. Requesting students' citizenship or immigration status, or that of their parents, is not relevant to establish residency requirements and may discourage undocumented students from enrolling in school. Prohibiting or discouraging children from enrolling in school because they or their parents are not U.S. citizens or are undocumented may be in violation of state and federal law and may be discrimination based on national origin (*see Plyler v. Doe*, 457 U.S. 202 (1982)).

**2. May a school district require students or parents to provide Social Security Numbers for enrollment purposes?**

No. A school district may not deny enrollment to a student if his or her parent refuses to provide a Social Security Number. If a school district chooses to request a Social Security Number, the school district must include the following in the request:
1. Inform the individual that disclosure is voluntary;
2. Provide the statutory or other basis for why the district is requesting the number; and
3. Explain how the district will use the number.

**3. How can school districts ensure that school enrollment practices are nondiscriminatory?**

School districts should annually review all district and building registration forms and revise as needed to ensure that they do not request information that may be discriminatory. Staff training at the school and district level is encouraged to help ensure compliance with state and federal law, specifically for those staff involved in student registration.

> *Additional Resource:*
> Dear Colleague Letter (May 6, 2011) – Information on the Rights of All Children to Enroll in School (U.S. Department of Education): http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201101.html.

## STUDENTS WITH LIMITED ENGLISH PROFICIENCY

**4. Are school districts required to provide services for students with limited English proficiency?**

Yes. School districts are responsible for providing equal educational opportunity to students with limited English proficiency. School districts must take steps to help students overcome language barriers and ensure that they can participate meaningfully in the district's educational programs. For additional resources regarding programs available for limited English proficient students, visit OSPI's Migrant and Bilingual Education web site at:
http://www.k12.wa.us/MigrantBilingual/BilingualProgram.aspx

**5. How are students identified as English Language Learners (ELL)?**
School districts must have procedures to identify each student's primary language and eligibility for services, as outlined in WAC 392-160-015. These procedures must include:
1. A home language survey, completed by the student or the student's parent/guardian, which identifies the student's primary language as other than English; and
2. Provisions for testing students on the state-approved Washington language proficiency placement test.

**6. Are school districts required to implement a particular language acquisition program for ELL students?**
Federal laws do not require one particular educational approach for the instruction of ELL students. State law, however, requires that school districts make available to each eligible student a Transitional Bilingual Instructional Program (TBIP), or an alternative instructional program if the use of two languages is not feasible (WAC 392-160-010, 392-160-040). Under WAC 392-160-005, TBIP is a system of instruction which:
1. Uses two languages, one of which is English, as a means of instruction to build upon and expand language skills to enable a student to achieve competency in English;
2. Introduces concepts and knowledge in the primary language of a student, and reinforces them in the English language; and
3. Tests students in the subject matter in English.

**7. When can a school district provide an alternative instructional program, in lieu of TBIP?**
School districts may elect to provide an alternative instructional program under one or more of the following conditions (WAC 392-160-040):
1. Necessary instructional materials in the student's primary language are unavailable and the district has made reasonable efforts to obtain necessary materials without success;
2. The capacity of the district's bilingual instructional program is temporarily exceeded by an unexpected increase in the enrollment of eligible students;
3. Bilingual instruction cannot be provided to students without substantially impairing their basic education because of their distribution throughout many grade levels or school; or
4. Teachers who are trained in bilingual education methods and sufficiently skilled in the non-English primary language(s) are unavailable, and the district has made reasonable attempts to obtain the services of such teachers.

**8. What factors must school districts consider when implementing a language acquisition program for ELL students?**
When reviewing its language acquisition program, a school must consider if the program meets the following three factors *(see Casteñeda v. Pickard* 648 F.2d 989 (5th Cir., 1981)):
1. *Sound Educational Theory*
   The school's program must be based on a sound educational theory or principle.

2. *Effective Implementation*
   The school's program must be reasonably calculated to effectively implement the program and the educational theory. Schools must have the necessary staff, curricular materials, and facilities in place, and they must be used properly to support the program.
3. *Program Evaluation and Modification*
   The school must develop and implement appropriate evaluation standards, including exit criteria, to measure the progress of students. The results of the school's program should show that language barriers are actually being overcome. If the program is not successful after a reasonable time period, the school district must modify the program accordingly and monitor for effectiveness.

**9. If a school district has identified very few ELL students, is the district required to have an ELL "program"?**
Yes. While there is not one prescribed program model or evaluation approach, school districts must ensure that students are not denied an equal opportunity or educational services due to a lack of proficiency in English. Regardless of whether a school district receives grant moneys from Title III of the Elementary and Secondary Education Act or TBIP, all school districts are responsible for providing services to limited English proficient students.

**10. Are school districts required to provide ELL students an opportunity to participate in all programs and activities?**
Yes. School districts must allow ELL students the opportunity to participate in all programs, services, and activities, and may not deny a student from participating solely based on their limited English proficiency. This opportunity for involvement includes honors and advanced courses, Career and Technical Education, Highly Capable Programs, online programs, Advanced Placement, extracurricular activities, and athletic programs. For programs with entrance exams, testing ELL students in English may not demonstrate their ability or skills. Testing in the student's primary language may be necessary to provide ELL students an equal opportunity to participate.

**11. Should school districts take precautions to ensure that ELL students are not misidentified as students with disabilities?**
Yes. If students are not proficient in speaking, reading, writing, or understanding English, testing them in English may not demonstrate their ability or achievement skills. Steps must be taken to ensure students are assigned to special education classes because of an identified disability, rather than a lack of English language proficiency. For information about special education evaluation procedures, including administering assessments and evaluations in a student's native language, review WAC 392-172A-03020 or visit OSPI's Special Education web site at: http://www.k12.wa.us/specialed/.

---

*Additional Resources:*
OSPI Migrant and Bilingual Education Office: http://www.k12.wa.us/MigrantBilingual/BilingualProgram.aspx.

Questions and Answers on the Rights of Limited English Proficient Students (U.S. Department of Education): http://ed.gov/about/offices/list/ocr/qa-ell.html

---

## TRANSLATION AND INTERPRETATION SERVICES

**12. What is the difference between translation and interpretation services?**

Translation is the rendering of something *written* from one language to another. Interpretation is the facilitating of *oral* or sign language communication from one language to another.

**13. Are school districts required to provide sign language interpretation services for persons with hearing impairments?**

A school district may be required to provide a sign language interpreter as a reasonable accommodation for a person with a disability. A sign language interpreter may be necessary, for example, to communicate with a parent with a hearing impairment, or for a member of the public to attend and access a public event (*see* RCW 49.60.215, Title II of the ADA). Depending on the nature of an event, a school district may provide other reasonable accommodations, such as assistive technology, in lieu of sign language services. Unless a school district can show that this would pose an undue hardship, the district would need to provide an interpreter or other reasonable accommodation. In most cases, cost alone does not constitute an undue hardship.

**14. Are school districts required to provide translation and interpretation services for parents with limited English proficiency?**

Yes. School districts are responsible for adequately notifying limited English proficient parents of school activities, programs, and services that are called to the attention of other parents. Translation and interpretation services may be required to ensure that students and parents have meaningful access to all vital communications. Such communications should be sufficient so that parents can make well-informed decisions about their children's participation in the school district's programs and services. Each school district should develop a process to identify the language needs of its parents, such as on enrollment forms. School districts should also inform staff on how to access translation and interpreter services when needed. Failing to take reasonable steps to ensure meaningful access for limited English proficient persons can be a form of national origin discrimination (*see Lau v. Nichols*, 414 U.S. 563 (1974)).

**15. What vital communications should school districts translate or interpret for limited English proficient parents?**

School districts must ensure that parents can access vital information in a language they can understand. Vital communications are written and oral communications that contain information that is critical for accessing educational programs and opportunities, or is required by law. Vital communications that require an interpreter may include, for example: parent-teacher conferences, special education meetings, and meetings regarding student discipline. A school district must translate vital *documents* when a significant percentage of the population in a school district needs that information in a language other than English to communicate effectively. Vital documents may include, for example: program information and applications, discipline notices, consent forms, complaint forms, notices of rights, and letters or notices that require a response. If there is small number of parents with particular language needs, or if a school district is unable to translate a document because of undue expense, the district must still provide the information to parents in a language they can understand, such as an oral translation of a document using an interpreter.

**16. May a school district charge students or their parents for the cost of translation and interpretation services?**

No. School districts may not charge a fee for translation and interpretation services, as this is a basic education responsibility.

---

*Note: If interpretation or translation services are used for specific programs (e.g., Special Education, ELL), schools may be able to utilize grant moneys for such services.*

---

**17. May a school district use a student or a parent's child or family member to serve as an interpreter for *vital* communications?**

No. School districts should not use children or family members to serve as interpreters for *vital* communications. While children may be more proficient and comfortable in English than their parents, their interpretation may not be objective or accurate. Relying on children in place of adult interpreters may place an undue burden on students, may undermine parental authority, and may not provide parents with reliable information to make informed decisions. In rare emergency situations, school districts may have to rely on a family member for communications. If an in-person interpreter is not readily available, school districts should consider using other methods to communicate information, such as phone interpretation.

---

**OVERCOMING INTERPRETATION/TRANSLATION CHALLENGES**

**Example 1:** A Burmese student recently enrolled in a school district. At enrollment, the student's parents informed the school district that they speak very limited English. The district has been unable to find a local interpreter for an upcoming parent-teacher conference. To communicate with the family during the meeting, the district used a phone interpretation service where the teacher had the interpreter on speaker phone during the meeting to interpret.

**Example 2:** A school recently had a lockdown. The school needs to send notices to parents regarding the lockdown the same day, but does not have time to translate the notices for its limited English proficient parents. The school sent the notices to parents in English, but placed a previously-printed label on each notice, translated into multiple languages, explaining that this is an important notice and parents can call the front office to have the document translated over the phone.

**Example 3:** A small school district with a large Spanish-speaking population is seeking cost-effective ways to translate documents and forms into Spanish. The district coordinated with neighboring school districts to share translated documents, such as bullying report forms and special education notices.

---

*Additional Resources:*

Resources for Districts: Interpretation and Translation Services (OSPI):
http://www.k12.wa.us/Equity/Interpretation.aspx

Information for Spanish-Speaking Students and Parents (OSPI):
http://www.k12.wa.us/Parents/Espanol/default.aspx

Federal Interagency Working Group on Limited English Proficiency: http://www.lep.gov/

---

## STUDENTS WITH DISABILITIES

Discrimination based on disability is prohibited in public schools (RCW 28A.642.010). School districts must abide by the rules, regulations, and guidance developed by the U.S. Department of Education related to Section 504 of the Rehabilitation Act of 1973 (34 C.F.R. Part 104) and Title II of the Americans with Disabilities Act of 1990 (28 C.F.R. Part 35).

*Note: This section does not address Special Education under the Individuals with Disabilities Education Act (IDEA) and chapter 392-172A WAC. For information about Special Education, visit OSPI's Special Education web site at: http://www.k12.wa.us/specialed/.*

### 18. What is Section 504?
Section 504 is a federal law that protects the rights of individuals with disabilities in programs and activities that receive Federal financial assistance. Section 504 provides that: "No otherwise qualified individual with a disability…shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…" (29 U.S.C. §794). The Office for Civil Rights (OCR) within the U.S. Department of Education enforces Section 504 in public schools.

### 19. What does Section 504 require of a school district?
Section 504 regulations require school districts to provide a "free appropriate public education" (FAPE) to each qualified student with a disability within the district's jurisdiction, regardless of the nature or severity of a student's disability. FAPE consists of the provision of regular or special education and related aids and services designed to meet the student's individual educational needs as adequately as the needs of nondisabled students are met (34 C.F.R. Part 104).

### 20. What procedural safeguards are required under Section 504?
School districts must employ procedural safeguards regarding the identification, evaluation, or educational placement of persons who, because of disability, need or are believed to need special instruction or related services. School districts are required to establish and implement procedural safeguards that include notice, an opportunity for parents to review relevant records, an impartial hearing with opportunity for participation by the student's parents, representation by counsel and a review procedure (34 C.F.R. §104.36).

### 21. When is a student protected under Section 504?
To be protected under Section 504, a student must (1) have a physical or mental impairment that substantially limits one or more major life activities; or (2) have a record of such an impairment; or (3) be regarded as having such an impairment. An impairment need not prevent or severely or significantly restrict a major life activity to be considered substantially limiting. Major life activities include, but are not limited to, functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, working, eating, sleeping, standing, lifting, bending, reading, concentrating, thinking, communicating, and "major bodily functions," such as the functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions (34 C.F.R. §104.3).

**22. How does a school district determine if a student is eligible for Section 504 services?**
A school district must evaluate a student for Section 504 eligibility if the district knows or suspects that a student, because of a disability, needs aids or services to participate in or benefit from the district's education program, regardless of whether the student has a medical diagnosis. School districts must evaluate a student before classifying the student as having a disability or providing the student with accommodations or services (34 C.F.R. §104.35).

**23. What is an evaluation under Section 504?**
An evaluation involves reviewing information and data from various sources. This may include, but is not limited to, grades, test scores, attendance records, parent input, teacher observations, medical or psychological evaluations, special education data, medical diagnosis, and health room visit information. Schools must use student-specific data to determine whether the student is eligible under Section 504 and then to determine what services or accommodations to include in the student's Section 504 plan (34 C.F.R. §104.35).

**24. Must a school district obtain parental consent prior to conducting an initial evaluation?**
Yes. School districts must obtain parental permission for initial evaluations. If a school district suspects a student needs or is believed to need special instruction or related services and parental consent is withheld, districts may use due process hearing procedures to seek to override the parents' denial of consent for an initial evaluation.

**25. Who determines whether a student is eligible for services under Section 504?**
Determination of a student's eligibility must be made by a group of persons, including persons knowledgeable about the student (such as the student's teachers, physician, nurse, or counselor), the meaning of the evaluation data, and the placement options (34 C.F.R. §104.35). If a parent disagrees with the determination, he or she may request a due process hearing.

**26. Once a student is identified as eligible, how does a school district determine what services or accommodations to provide the student?**
The school district should first consider the educational impact of the student's disability and identify what, if any, accommodations or services are *necessary* to alleviate the impact of the student's disability on his or her education. If accommodations or services are needed, a Section 504 plan should be developed detailing any services or accommodations that will be provided to the student. Once a plan is developed, the school district must annually review the plan and periodically re-evaluate the student.

**27. What are the responsibilities of general education teachers with respect to the implementation of Section 504 plans?**
General education teachers are responsible for implementing their students' Section 504 plans. If teachers fail to implement the plans, such failure can cause the school district to be out of compliance with Section 504. School districts should develop a process to inform all teachers and appropriate staff (e.g., bus drivers, nurses, para-educators, coaches) of students' Section 504 plans and their obligations to follow all accommodations in the plan.

**28. Are school districts required to provide parents information about their evaluation and placement process?**

Yes. Section 504 requires school districts to provide notice to parents explaining any evaluation and placement decisions affecting their children and explaining the parents' right to review educational records and appeal any decision regarding evaluation and placement through an impartial hearing.

---

*Additional Resources:*

A Parent and Educator Guide to Free Appropriate Public Education under Section 504 of the Rehabilitation Act of 1973 (Puget Sound Educational Service District): http://www.k12.wa.us/Equity/pubdocs/504ManualFinal.pdf

Free Appropriate Public Education for Students with Disabilities: Requirements under Section 504 (U.S. Department of Education): http://www2.ed.gov/about/offices/list/ocr/docs/edlite-FAPE504.html

Frequently Asked Questions about Section 504 and the Education of Children with Disabilities (U.S. Department of Education): http://www2.ed.gov/about/offices/list/ocr/504faq.html

---

**29. What is Title II of the Americans with Disabilities Act (ADA)?**

Title II of the ADA (28 C.F.R. Part 35) is a federal law prohibiting disability discrimination by public entities, including school districts. Title II of the ADA covers all activities of state and local governments regardless of the government entity's size or receipt of Federal funding.

**30. What does Title II of the ADA require of a school district?**

Title II of the ADA requires that state and local governments give people with disabilities an equal opportunity to benefit from all of their programs, services, and activities. Among other requirements, state and local governments are required to follow specific architectural standards in the new construction and alteration of their buildings. They also must relocate programs or otherwise provide access in inaccessible older buildings, and communicate effectively with people who have hearing, vision, or speech disabilities. They are required to make reasonable modifications to policies, practices, and procedures where necessary to avoid discrimination, unless they can demonstrate that doing so would fundamentally alter the nature of the service, program, or activity being provided. Title II is enforced by the U.S. Department of Education's Office for Civil Rights (OCR) and the U.S. Department of Justice. For more information, visit http://www.ada.gov/.

---

*Additional Resources:*

Title II Technical Assistance Manual (U.S. Department of Justice): http://www.ada.gov/taman2.html

Questions and Answers on Disability Discrimination under Section 504 and Title II (U.S. Department of Education): http://www2.ed.gov/about/offices/list/ocr/qa-disability.html

Dear Colleague Letter (January 19, 2012) – Guidance for ADA Amendments (U.S. Department of Education): http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201109.html

---

## STUDENTS AND SERVICE ANIMALS

**31. What is a service animal?**

Under Washington state law, a service animal is *any* animal that is individually trained to do work or perform tasks for a person with a disability. The task that a service animal has been trained to do must be directly related to the person's disability. Examples of such work include: assisting persons who are blind, alerting persons who are deaf or hard of hearing, alerting and protecting a person during a seizure, alerting persons to the presence of allergens, helping persons with psychiatric and neurological disabilities by preventing or interrupting impulsive or destructive behaviors, or performing other duties. Animals whose sole function is to provide comfort, emotional support, or companionship do not qualify as service animals (*see* RCW 49.60.040, 49.60.215, and 40.60.218; Title II of the ADA, 28 C.F.R. §35.136).

> ***Note:*** *Washington state law currently defines service animal more broadly than federal law under the Americans with Disabilities Act (ADA). Titles II and III of the ADA, as of March 2011, only recognize dogs and, in some circumstances, miniature horses as service animals (28 C.F.R. §35.136). In Washington, however, public schools must allow* <u>*any*</u> *type of service animal that has been individually trained to perform a specific task related to a person's disability. The only exception is in "food establishments," which limit service animals to dogs, and in some instances, miniature horses (see RCW 49.60.215 and 40.60.218).*

**32. Where are service animals allowed?**

Service animals must be allowed to accompany persons with disabilities in all areas where members of the public are allowed to go. For students, this includes the classroom, school bus, restrooms, hallways, library, and all other areas where students are allowed. In dining areas, however, such as school cafeterias, state law allows service animals to be limited to dogs and, in some instances, miniature horses (s*ee* RCW 49.60.215 and 40.60.218).

**33. What inquiries may a school district make to a student, parent, or visitor who is requesting to bring a service animal on school grounds?**

A school district may only make two inquiries of a person with a service animal to determine whether to allow the service animal on campus (*see* Title II of the ADA, 28 C.F.R. §35.136):

1. Whether the animal is required because of a disability; and
2. What work or task the animal has been individually trained to perform. Training does not need to be formal and the service animal does not need to be certified.

**34. When can a service animal be excluded?**

Once it is determined that an animal is a service animal, a school district may *only* exclude the service animal if (*see* Title II of the ADA, 28 C.F.R. §35.136):

1. The animal is out of control and the student or handler does not take effective action to control the animal; or
2. The animal is not housebroken.

Annoyance or distraction to staff or students is not a valid reason to exclude a service animal. If a school district excludes a service animal for one or both of the acceptable reasons above, it

should provide a process for the student or his or her parents to appeal the decision. If a school district excludes a student's service animal, the school district must provide the student access and an equal opportunity to participate in the district's programs and activities without having the service animal on the premises, which may require additional accommodations for the student's disability.

**35. May a school district require a service animal to wear a harness, leash, or tether?**
Yes. However, if a harness, leash, or tether interferes with a service animal's work or the student's disability, the student or handler must maintain control through voice, signal, or other effective controls (*see* Title II of the ADA, 28 C.F.R. §35.136).

**36. May a school district exclude a student's service animal if the work or task performed by the service animal can be performed by school staff?**
No. A student has a civil right to be accompanied by a service animal regardless of whether school staff can perform the same work or task.

**37. May a school district exclude a service animal if a student or staff member is allergic to the animal?**
No. An allergy is not a valid reason to deny access or refuse service to a person using a service animal. When a person who is allergic to an animal and a student who uses a service animal must spend time in the same room or school, they both should be accommodated by assigning them, if possible, to different locations in the room or different rooms in the school. School districts are encouraged to work with the parents of both students to develop appropriate accommodations for the service animal and the student with allergies. Depending on the nature of a student's allergy, possible accommodations that might meet the needs of both students may include:
- Establishing different paths of travel for the two students.
- Using a portable air purifier by each student's work station.
- Developing a plan with the two students so they are not using common areas, such as the restroom or library, at the same time.
- Having the classroom, including carpets, walls, and window treatments cleaned, dusted, and vacuumed regularly.
- Adding HEPA filters to the existing ventilation systems.

**38. May a school district exclude a service animal if a student or staff member has a fear of the animal?**
No. Fear of an animal is not a valid reason to deny access or refuse service to people using service animals.

**39. Who is required to care for the service animal?**
The care and supervision of a service animal is solely the responsibility of the student or handler. School district staff are not required to provide care or supervision of a student's service animal (*see* Title II of the ADA, 28 C.F.R. §35.136).

**40. What information may a school district require from an adult handler?**
School districts may require adult handlers to provide the same information required from volunteers or other non-employees of the school district (e.g., background check).

**41. What should a school district consider when a student has a service animal?**
There are multiple aspects of the educational environment that may be impacted by a student's service animal. Some areas that school districts may wish to consider include:
- Notifying appropriate staff that a service animal will be on campus.
- Providing a process for staff, students, and parents to inform administrators of any animal allergies that may require accommodations.
- Educating students and staff on proper behavior around a service animal.
- Planning for the transportation of the service animal, including on the school bus and field trips.
- Developing an emergency evacuation plan to include the service animal.

---

*Additional Resources:*
Service Animals – ADA 2010 Revised Requirements (U.S. Department of Justice):
http://www.ada.gov/service_animals_2010.htm

Service Animal Questions (Washington State Human Rights Commission):
http://www.hum.wa.gov/FAQ/FAQServiceAnimal.html

Service Animals in the Workplace (Job Accommodation Network): http://askjan.org/media/servanim.html

---

## ACCESS TO SCHOOL DISTRICT ONLINE PROGRAMS

**42. What steps should school districts take ensure that all students have equal access to online programs?**
School districts are responsible for ensuring that any online program operated by the district, including a multidistrict online program, is complying with state and federal nondiscrimination laws. School districts must ensure that all students, including students with disabilities and students with limited English proficiency, have equal access to online programs and other alternative learning experiences (ALE). School districts should review recruitment practices to ensure that all students are notified of the opportunity to participate in online programs, including students with disabilities and students with limited English proficiency. Recruitment and promotional materials used by online school programs should include the district's nondiscrimination statement (see page 60).

**43. What eligibility criteria may school districts or multidistrict online programs use to admit students with disabilities?**
A school district may establish eligibility criteria for admission to its online program (e.g. reading, writing, and math achievement) as long as the criteria are:
1. Justified by the nature of the online school program;
2. Applied equally to all applicants; and

3. Subject to modification when necessary to avoid discriminating against a student on the basis of disability, national origin, or other protected class, unless the school district can demonstrate that making the modification would fundamentally alter the nature of its online school program.

**44. May a school district or multidistrict online program deny admission to a student solely because the student has an Individualized Education Plan (IEP) or Section 504 Plan?**

No. A school district or multidistrict online program cannot deny admission to a student solely based on disability, or deny admission to a student with a disability solely because the student needs special education or related aids or services. A school district or multidistrict online program may not ask a parent to revoke consent for special education services as a condition of acceptance. Moreover, an online program should not use the district's classroom size as a basis for denying admission if the online program does not have the same capacity limits as a physical, bricks-and-mortar classroom.

**45. Are school districts or multidistrict online programs required to provide a free appropriate public education (FAPE) to students with disabilities enrolled in their online program?**

Yes. School districts must follow all requirements related to identification, evaluation, placement, and the provision of FAPE under the Individuals with Disabilities Education Act (IDEA) and Section 504 for eligible students in their online program. A school district or multidistrict online program should review the student's educational records including evaluations and the student's IEP to determine how services will be provided. Given the nature of the online program, a student's IEP may need to be revised. In some cases, the IEP may have lapsed and the non-resident district providing the online program will need to develop a current IEP. For more information about special education regulations, review chapter 392-172A WAC or visit OSPI's Special Education web site at: http://www.k12.wa.us/specialed/.

**46. How may a school district that offers an online program deliver related services outlined in a student's IEP or Section 504 plan?**

If a student needs related services that cannot be provided online, the school district providing the online program must determine how those services will be delivered. Some methods for delivering related services can include:

- Contracting with the student's resident district.
- Contracting with another district that is located close to the student's physical location.
- Contracting with private providers, or determining whether some services can be provided using teletherapy.

---

*Additional Resources:*

Special Education Guidelines for Online Schools (OSPI):
http://digitallearning.k12.wa.us/about/districts/special_education/

OSPI Digital Learning Department: http://digitallearning.k12.wa.us/

OSPI Alternative Learning Experiences: http://www.k12.wa.us/alternativeed/default.aspx

---

## SINGLE-SEX CLASSES

### 47. May school districts provide single-sex classes, programs, or activities?

Under Washington law, school districts may not provide any course, program, or activity separately based on sex (RCW 28A.640.020, WAC 392-190-050). Separation of students based on sex is permitted for:

1. Physical education classes, if the class meets the criteria listed below;
2. Classes that deal with human sexuality; and
3. Choir, when based on vocal range or quality.

*Note: Even if a single-sex class or activity is permissible under federal law, school districts in Washington must abide by Washington state law which prohibits single-sex classes.*

### 48. When may a school district separate male and female students for physical education (PE) classes?

A school district may offer single-sex PE classes in grades 7 through 12 if (WAC 392-190-050):

1. It can clearly be shown under the factual circumstances of the particular case that the maintenance of a separate physical education class or activity for boys and girls truly constitutes the best method of providing both sexes, as a whole, with an equal opportunity to participate in such class or activity; and
2. The two classes or activities are substantially equal.

School districts may also group students in PE classes using objective standards of individual performance that are developed and applied without regard to sex (WAC 392-190-050).

### 49. Are there any exceptions to the state's prohibition on single-sex classes?

Separating students into single-sex classes may be permissible in special cases if it is part of a school district's affirmative action program to promote gender equality and to remedy the effects of past discrimination. If a school district provides single-sex classes under this exception, the school district must abide by the following procedures:

1. The board of directors must provide adequate notice and opportunity for public comment;
2. The board of directors must establish that there is a rational basis for concluding that the effects of past sex discrimination remain;
3. The school's participation in the proposed single-sex educational activity must be intended to eliminate the effects of the past sex discrimination and promote sex equality in the school district; and
4. The single-sex class or activity must be the exception rather than the rule and must be narrowly tailored to sweep no more broadly than necessary to counter the effects of past sex discrimination.

(*Selah Sch. Dist. v. Billings*, No. 93-2-02264-5 (Yakima County Super. Ct., Wash. Sept. 1, 1994)).

**50. If a school district meets the above exception, what federal regulations must the district follow in order to provide a single-sex class?**

If a school district meets the above exception, the district must also meet Title IX regulations regarding single-sex classes (34 C.F.R. §106.34). To meet these regulations, the single-sex nature of the class or activity must be substantially related to achieving one of two important objectives:

1. To improve educational achievement of its students through the district's overall established policy to provide diverse educational opportunities; or
2. To meet particular, identified educational needs of the district's students.

If a school district has identified an important educational objective and intends to provide a single-sex class, the school district must:

1. Implement the important objective in an evenhanded manner with respect to female and male students;
2. Allow only completely voluntary enrollment in a single-sex class or activity;
3. Provide to all students, including those excluded from the single-sex class or activity, a substantially equal coeducational class or activity in the same subject or activity;
4. Conduct periodic self-evaluations of the single-sex classes or activities at least every two years to ensure that there is a substantial relationship between the single-sex nature of the class or activity and achievement of the selected important objective; and
5. Ensure that their single-sex classes or activity is based on genuine justifications, and do not rely on broad generalizations about different talents, capacities, preferences, or stereotypes of either sex.

---

*Additional Resource:*
Dear Colleague Letter (Jan. 31, 2007) – Single-Sex Education (U.S. Department of Education): http://www2.ed.gov/about/offices/list/ocr/letters/single-sex-20070131.pdf

---

## STUDENT DISCIPLINE

**51. What are the civil rights implications when administering student discipline?**

School districts may not discriminate based on any protected class in any disciplinary action against students. Discipline may include removal from the classroom, in-school suspension, suspension, and expulsion. A pattern of removing a student from the classroom may result in a loss of educational services, similar to a suspension or expulsion.

When taking disciplinary action, schools must apply school and district policies and procedures consistently to ensure that any actions taken are not discriminatory. This includes parent notification and the right to appeal the school's action (*see* chapter 392-400 WAC). School districts must consider whether a student has an IEP or qualifies for services under Section 504 when taking disciplinary action, as the district may be required to conduct a manifestation determination (*see* WAC 392-172A-05140 through 392-172A-05175). A school administrator should meet with the parent, student, and teacher to promptly address any pattern of removal and consider alternative responses to behavior issues.

*Note:* *General student discipline procedures, including short-term suspension, long-term suspension, expulsion, emergency expulsion, and appeals are located in chapter* 392-400 *WAC. Discipline procedures for students in special education are located in WAC* 392-172A-05140 *through* 392-172A-05175.

**52. How should a school district identify potential discrimination in student discipline policies and practices?**
Each school district should annually review student discipline data disaggregated by sex, race, English Language Learners, and disability (Section 504 and Special Education) to identify potential disparities in student discipline data. Each school district should develop a process to conduct this review on an annual basis and should share the results of the data review with school staff.

**53. What should a school district do if members of a protected class are receiving disproportionate discipline?**
When annually reviewing disaggregated discipline data, if a school district finds that members of any protected class are receiving substantially disproportionate discipline, the school district must take action to ensure that such disproportionality is not the result of discrimination. Such action may include training school staff on discipline procedures to ensure they are consistently applied, bias awareness training (*see* WAC 392-190-020) and monitoring discipline data regularly.

## RELIGIOUS DISCRIMINATION
Discrimination and harassment are prohibited in schools based on students' religious background, beliefs, religious dress, or religious expression. Aside from discrimination, school districts should also be aware of constitutional protections regarding religion, including freedom of religion and religious expression under the First Amendment of the United States Constitution.

**54. Are school districts required to reasonably accommodate a student's religion?**
Yes. A school district should reasonably accommodate a student's religious beliefs or practices, unless that accommodation would be an undue hardship on the district. Such accommodations may include excusing absences for religious observances. An accommodation may cause undue hardship if it is costly, compromises safety, or infringes on the rights of other students or employees.

**55. Should a school district exempt a student from dress code requirements to accommodate the student's religion?**
Yes. A school district should exempt dress code requirements when a student's sincerely held religious belief conflicts with the dress code. Conflicts may include school uniform requirements, head covers, jewelry, religious objects, beards, and hair length. For example, a student's religious belief may prohibit her from wearing shorts, which may be part of the school's physical education uniform requirements. In this example, the school should allow the student to wear clothing according to her religious beliefs. If school administrators have legitimate safety concerns related to the student's dress, school administrators should meet with the student and/or parents to consider alternative accommodations. School administrators should bring these concerns to the attention of the school district compliance coordinator before meeting with the student or parents.

**56. May students express their religious beliefs in school assignments?**
Yes. Students must be permitted to express their beliefs about religion in homework, artwork, or other assignments free from discrimination based on the religious content of their submissions.

**57. May students pray or study religious materials during the school day on school premises?**
Yes. Students must be permitted to read religious scriptures or materials and pray or study religious materials with fellow students during recess, lunch, or other non-instructional time. Students must be permitted to pray during non-instructional time before, during, or after the school day, and may pray with fellow students during the school day on the same terms and conditions that they may engage in other conversation or speech.

**58. May a student's absence be excused to participate in religious activities and holidays?**
Yes. Students may attend off-premises religious instruction during the school day, provided that schools do not encourage or discourage participation in such activities or penalize students for attending or not attending. For example, it is lawful for schools to excuse Muslim students briefly from class to enable them to fulfill their religious obligations during Ramadan.

---

*Additional Resource:*
Religion in Schools (OSPI): http://www.k12.wa.us/Equity/ReligionInSchools/default.aspx

Religious Discrimination in Education (U.S. Department of Justice):
http://www.justice.gov/crt/spec_topics/religiousdiscrimination/ff_education.php

---

## GENDER IDENTITY AND GENDER EXPRESSION
**59. What terms are commonly used to describe gender identity or gender expression?**
Individuals use a number of words to describe their gendered experiences. Some people may refer to themselves as trans, transsexual, transgender, male-to-female (MTF), female-to-male (FTM), two-spirit, and a variety of other terms. Terminology can differ based on region, language, race, ethnicity, age, culture, and many other factors. Some common terms are defined below.

- *Gender identity* is a person's deeply felt internal sense of being male or female, regardless of their sex assigned at birth.
- *Gender expression* is the manner in which a person represents or expresses gender to others, often through behavior, clothing, hairstyles, activities, voice, or mannerisms.
- *Transgender* is a general term used to describe a person whose gender identity or expression is different from that traditionally associated with the person's sex assigned at birth.
- *Transitioning* is the process in which a person changes their gender expression to better reflect their gender identity.
- *Gender nonconforming* is a term for people whose gender expression differs from stereotypical expectations about how they should look or act based on the sex they were assigned at birth. This includes people who identify outside traditional gender categories or identify as both genders.

---

**UNDERSTANDING GENDER IDENTITY AND GENDER EXPRESSION**

**Example 1:** Alexis was assigned female at birth, but she identifies as gender nonconforming. Alexis prefers to express herself like a tomboy - she enjoys playing sports with boys in her class, and she prefers that her friends call her Alex. While Alex currently uses female pronouns, she is questioning her gender identity and is considering transitioning to a male role. Currently, Alex is consistently presenting as female at school, but that will change if she decides to transition.

**Example 2:** Although Casey attended kindergarten and first grade as a boy, about midway through first grade, she and her family decided that Casey would transition and begin presenting as a girl. Casey prefers to dress in stereotypically feminine attire such as dresses and skirts. Although she is growing her hair out, it is still in a rather short, typically boyish haircut. Casey, her parents, and school administrators have asked her friends and teachers to use female pronouns to address her. Casey is consistently presenting as female at school.

---

**60. Should transgender and gender nonconforming students have the right to express their gender identity in school?**
Yes. Washington state law prohibits discrimination in public schools based on gender expression and identity (RCW 28A.642.010). Students must be permitted to dress according to the gender in which they consistently identify and should be addressed and treated using the name and pronouns of their choice (i.e., "he" and "him" or "she" and "her"). School districts are encouraged to adopt gender-neutral dress codes that do not restrict a student's clothing choices on the basis of gender. Dress codes should be based on educationally relevant considerations, apply consistently to all students, include consistent discipline for violations, and make reasonable accommodations when the situation requires an exception.

**61. How should school districts address a student's name and sex on official records?**
School districts maintain permanent student records that include a student's legal name and legal gender. To the extent that the school district is not legally required to use a student's legal name and gender on school records or documents, the district should use the name and gender by which the student identifies. School IDs, for example, are not legal documents and should use the student's preferred name. The school district should change a student's official record to reflect a change in the student's legal name or gender upon receipt of documentation that such change has been made pursuant to a court order or through amendment of state- or federally-issued identification. In situations where school staff or administrators are required by law to use or report a student's legal name or gender, such as for standardized testing, school staff should adopt practices to avoid the inadvertent disclosure of such confidential information.

**62. Should schools inform staff, students, or parents about a student's transgender status?**
Information about a student's transgender status, legal name, or gender assigned at birth may constitute confidential medical or education information. Disclosing this information to other students, their parents, or other third parties may violate privacy laws, such as the federal Family Educational Rights and Privacy Act (FERPA) (20 U.S.C. § 1232g; 34 C.F.R. Part 99). School staff should not disclose information that may reveal a student's transgender status to others, including parents and other school staff, unless legally required to do so or unless the student has authorized such disclosure.

**63. Should a school district require proof of medical treatments as a prerequisite for respecting a student's gender identity or expression?**

No. School districts should not require proof of medical treatments in order to respect a student's gender identity or expression. If a school district has an objective basis that would justify questioning whether a student's asserted gender identity is genuine, it may ask for information to show that the student's gender identity or expression is sincerely held. No particular type of information (such as medical history information) should be specifically required.

**64. Should school districts allow transgender students to use the restroom of their choice?**

Yes. School districts should allow students to use the restroom that is consistent with their gender identity consistently asserted at school. Any student – transgender or not - who has a need or desire for increased privacy, regardless of the underlying reason, should be provided access to an alternative restroom (e.g., staff restroom, health office restroom). This allows students who may feel uncomfortable sharing the facility with the transgender student(s) the option to make use of a separate restroom and have their concerns addressed without stigmatizing any individual student. No student, however, should be required to use an alternative restroom because they are transgender or gender nonconforming.

If school administrators have legitimate concerns about the safety or privacy of students as related to a transgender student's use of the restroom, school administrators should bring these concerns to the school district compliance coordinator. Such privacy or safety issues should be immediate and reasonably foreseeable, not speculative. School administrators and/or compliance coordinator should meet with the student and/or parents to determine if there is a need for an alternative facility. Determination to provide an alternative facility for any student should be on a case-by-case basis.

**65. How should school districts address physical education and athletic participation by transgender students?**

School districts should allow students the opportunity to participate in physical education and athletic activities in a manner that is consistent with their gender identity. For interscholastic athletics, should any questions arise as to whether a student's request to participate in a sex-segregated activity consistent with his or her gender identity is bona fide, a student may seek review of his or her eligibility for participation by working through the Gender Identity Participation procedure set forth by the Washington Interscholastic Athletic Association (WIAA), available at http://www.wiaa.com/subcontent.aspx?SecID=350.

**66. Should school districts allow a transgender student to use the locker room of their choice?**

The use of locker rooms by transgender students should be assessed on a case-by-case basis, with the goals of maximizing the student's social integration and equal opportunity to participate in physical education classes and sports, ensuring the student's safety and comfort, and minimizing the stigmatization of the student. In most cases, transgender students should have access to the locker room that corresponds to their gender identity consistently asserted at school. Any student who has a need or desire for increased privacy, regardless of the underlying reason, should be provided with a reasonable alternative changing area, such as the use of a

private area (e.g., a nearby restroom stall with a door), or a separate changing schedule. Any alternative arrangement should be provided in a way that protects the student's ability to keep his or her transgender status private. No student, however, should be required to use a locker room that conflicts with his or her gender identity.

## PREGNANT AND PARENTING STUDENTS

**67. Are students protected from discrimination based on pregnancy or parental status?**
Yes. State and federal law prohibit discrimination in public schools on the basis of sex (RCW 28A.640.010; Title IX, 34 C.F.R. Part 106). This includes pregnancy, parental status, and pregnancy-related conditions including termination or miscarriage. Schools must give all pregnant and parenting students equal access to school programs, extracurricular activities, athletic programs, and educational opportunities. School districts may not require students to change educational plans (e.g., drop out of a class or program) or deny an honor or award based on pregnancy or parental status, including valedictorian status, scholarships, participation in graduation, or election for class office or homecoming court. School districts cannot expel or suspend a student for being pregnant or being a parent (*see* Title IX, 34 C.F.R. Part 106).

**68. May a school district offer special schools or programs for pregnant and parenting students?**
Yes. A school district may offer alternative schools or programs for pregnant and parenting students so long as participation in such programs is ***completely voluntary*** on the part of the student. When discussing such options with students, school personnel should present all options available in a non-coercive manner. Alternative schools or programs for pregnant and parenting students must offer opportunities and programs comparable to those offered for non-pregnant students. Parenting classes and programs must be open to male and female students (*see* Title IX, 34 C.F.R. §106.40).

**69. May a school request a doctor's note for a pregnant student to participate in activities?**
School personnel may only require a doctor's note for pregnant students to participate in school activities if they require it from other students under a physician's care for health-related reasons (*see* Title IX, 34 C.F.R. §106.40).

**70. What if a student is absent due to pregnancy-related conditions or childbirth?**
A school may not penalize a student for absences related to pregnancy or childbirth. Childbirth or pregnancy-related absences deemed medically necessary by a student's doctor must be excused. Health plans, medical benefits, and related services must be provided to pregnant students in the same manner as services are provided to students with temporary disabilities. If home instruction is available for students who need to stay home due to a medical condition, then students are entitled to home instruction if they need to stay home due to pregnancy or childbirth. When a student returns to school following a pregnancy-related absence, the school must reinstate the student to the status she held when the absences began. If other students who miss school for health reasons receive make-up assignments from their teachers, pregnant students are also entitled to receive make-up assignments for classes missed due to pregnancy or childbirth (*see* Title IX, 34 C.F.R. §106.40).

Prohibiting Discrimination in Washington Public Schools
February 2012

# IV. Discriminatory Harassment

**1. Are school districts required to adopt a Harassment, Intimidation, and Bullying policy and procedure?**

Yes. Under RCW 28A.300.285, each school district is required to adopt the state's model Harassment, Intimidation, and Bullying (HIB) policy and procedure, available at http://www.k12.wa.us/safetycenter/BullyingHarassment/default.aspx. While some student misconduct may fall under a school district's HIB policy, the behavior may also trigger responsibilities under nondiscrimination laws. By limiting its response to the school district's HIB policy, a school district may fail to properly consider whether student misconduct also results in discriminatory harassment. If harassment, intimidation, or bullying is based on any protected class, a school district must assess the behavior for civil rights implications.

**2. What is discriminatory harassment?**

Harassment may be discrimination when it is:

1. Based on sex, race, creed, religion, color, national origin, sexual orientation, gender expression or identity, veteran or military status, disability, or the use of a trained dog guide or service animal;
2. Sufficiently serious to create a hostile environment; and
3. Encouraged, tolerated, ignored, or not adequately addressed by school employees.

Harassing conduct may include verbal acts and name-calling, graphic and written statements, or other conduct that may be physically threatening, harmful or humiliating. Harassment does not have to include intent to harm, be directed at a specific target, or involve repeated incidents.

**3. When does discriminatory harassment create a hostile environment?**

Discriminatory harassment creates a hostile environment when the conduct is sufficiently severe, pervasive, or persistent so as to interfere with or limit a student's ability to participate in or benefit from the services, activities, or opportunities offered by a school district. For example, a hostile environment may cause a student to experience emotional distress, physical illness, or declining grades and attendance.

**4. When is a school district responsible for addressing discriminatory harassment?**

A school district is responsible for addressing discriminatory harassment about which it knows or reasonably should have known. In some situations, harassment may be in plain sight, widespread, or well-known to students and staff, such as harassment occurring in hallways, during classes, during extracurricular activities, at recess or lunch, on a school bus, or through graffiti in public areas. In these cases, the obvious signs of the harassment are sufficient to put the school district on notice. In other situations, the school district may become aware of misconduct, triggering an investigation that could lead to the discovery of additional incidents that, taken together, may constitute a hostile environment.

*NOTE: These guidelines are currently under revision and may not reflect OSPI's revised rules in Chapter 392-190 WAC (effective December 19, 2014), which supersede these guidelines where different.*

**5. How should school districts respond to allegations of discriminatory harassment?**
A school district must take prompt and appropriate action to investigate or otherwise determine what occurred. School districts that receive an allegation of discriminatory harassment may need to respond using the discrimination complaint and appeal procedures outlined in WAC 392-190-065, 392-190-070, and 392-190-075 (see page 62). If an investigation reveals that discriminatory harassment has occurred, the school district must take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring. These duties are a school district's responsibility even if the misconduct is also covered by the school district's HIB policy, and regardless of whether a student has complained, asked the school district to take action, or identified the harassment as a form of discrimination.

**6. What are appropriate steps to end discriminatory harassment?**
School and district administrators should look beyond simply disciplining the perpetrators. While disciplining the perpetrators is likely a necessary step, it often is insufficient. A school district's responsibility is to eliminate the hostile environment created by the harassment, address its effects, and take steps to ensure that harassment does not recur. Put differently, the unique effects of discriminatory harassment may demand a different response than would other types of bullying. Appropriate steps to end harassment may include separating the accused harasser and the target, providing counseling for the target and/or harasser, or taking disciplinary action against the harasser. These steps should not penalize the student who was harassed – for example, not requiring the target to change his or her class schedule.

In addition, depending on the extent of the harassment, the school district may also need to provide training or other interventions not only for the perpetrators, but also for the larger school community, to ensure that all students, their families, and school staff can recognize harassment if it recurs and know how to respond. A school district may also be required to provide additional services to the student who was harassed in order to address the effects of the harassment, particularly if the school initially delays in responding or responds inappropriately or inadequately to information about harassment. An effective response may include revising the procedures by which students, parents, and employees may report allegations of harassment (or wide dissemination of existing policies and procedures), as well as wide distribution of the contact information for the school district's compliance coordinator.

**7. What steps should a school district take to stop future harassment and prevent retaliation?**
A school district should take steps to stop further harassment and prevent any retaliation against the person who made the complaint (or was the subject of the harassment) or against those who provided information as witnesses. At a minimum, the school district's responsibilities include making sure that the harassed students and their families know how to report any subsequent problems, conducting follow-up inquiries to discover if there have been any new incidents or any instances of retaliation, and responding promptly and appropriately to address continuing or new problems.

*NOTE: These guidelines are currently under revision and may not reflect OSPI's revised rules in Chapter 392-190 WAC (effective December 19, 2014), which supersede these guidelines where different.*

---

**EXAMPLE – RACE**

*Some students anonymously inserted offensive notes into African-American students' lockers and notebooks, used racial slurs, and threatened African-American students who tried to sit near them in the cafeteria. Some African-American students told school officials that they did not feel safe at school. The school investigated and responded to individual instances of misconduct by assigning detention to the few student perpetrators it could identify. However, racial tensions in the school continued to escalate to the point that several fights broke out between the school's racial groups.*

In this example, school officials failed to acknowledge the pattern of harassment as indicative of a racially hostile environment. Misconduct need not be directed at a particular student to constitute discriminatory harassment and foster a racially hostile environment. Here, the harassing conduct included overtly racist behavior (e.g., racial slurs) and also targeted students on the basis of their race (e.g., notes directed at African-American students). The nature of the harassment, the number of incidents, and the students' safety concerns demonstrate that there was a racially hostile environment that interfered with the students' ability to participate in the school's educational programs and activities. Had the school recognized that a racially hostile environment had been created, it would have realized that it needed to do more than just discipline the few individuals whom it could identify as having been involved. By failing to acknowledge the racially hostile environment, the school failed to meet its obligation to implement a more systemic response to address the unique effect that the misconduct had on the school climate. A more effective response could have included, in addition to punishing the perpetrators, such steps as reaffirming the school's policy against discrimination (including racial harassment), publicizing the means to report allegations of racial harassment, training staff on constructive responses to racial conflict, hosting class discussions about racial harassment and sensitivity to students of other races, and conducting outreach to involve parents and students in an effort to identify problems and improve the school climate. Finally, had school officials responded appropriately and aggressively to the racial harassment when they first became aware of it, the school might have prevented the escalation of violence that occurred.

---

**EXAMPLE – DISABILITY**

*Several classmates repeatedly called a student derogatory names related to his disability in school and on the school bus. On one occasion, these students tackled him, hit him with a school binder, and threw his personal items into the garbage. The student complained to his teachers and guidance counselor that he was continually being taunted and teased. School officials offered him counseling services and a psychiatric evaluation, but did not discipline the offending students. As a result, the harassment continued. The student, who had been performing well academically, became angry, frustrated, and depressed, and often refused to go to school to avoid the harassment.*

In this example, the school failed to recognize the misconduct as disability harassment. The harassing conduct included behavior based on the student's disability, and limited the student's ability to benefit fully from the school's education program (e.g., absenteeism). In failing to investigate and remedy the misconduct, the school did not comply with its obligations under state and federal nondiscrimination laws. While counseling may be a helpful component to remedy harassment, the school in this example did not adopt a comprehensive approach to eliminating the hostile environment. Such steps should have at least included disciplinary action against the harassers, consultation with the district's compliance coordinator to ensure a comprehensive and effective response, special training for staff on recognizing and effectively responding to harassment of students with disabilities, and monitoring to ensure that the harassment did not resume*.*

**EXAMPLE – SEXUAL ORIENTATION**

*Over the course of a school year, a gay high school student was called names (including anti-gay slurs and sexual comments), physically assaulted, threatened, and ridiculed because he did not conform to stereotypical notions of how teenage boys are expected to act and appear. As a result, the student missed school to avoid further harassment. The school did not recognize that the misconduct was discriminatory harassment. The school responded to complaints from the student by reprimanding the perpetrators consistent with its HIB policy. The reprimands of the identified perpetrators stopped the harassment by those individuals. It did not, however, stop others from undertaking similar harassment of the student.*

As noted in the example, the school failed to recognize the pattern of misconduct as a form of discriminatory harassment based on the student's sexual orientation and gender expression. It may be discriminatory if students are harassed for their sexual orientation, for not exhibiting what is perceived as a stereotypical characteristic for their sex, or for failing to conform to stereotypical notions of masculinity and femininity. In this example, the school had an obligation to take immediate and effective action to eliminate the hostile environment. By responding to individual incidents of misconduct on an ad hoc basis only, the school failed to confront and prevent a hostile environment from continuing. Had the school recognized the conduct as a form of discriminatory harassment, it could have employed the full range of sanctions (including progressive discipline) and remedies designed to eliminate the hostile environment. For example, this approach could have included a more comprehensive response to the situation that involved notice to the student's teachers so that they could ensure the student was not subjected to any further harassment, more aggressive monitoring by staff of the places where harassment occurred, increased training on the scope of the school's harassment and discrimination policies, notice to the target and harassers of available counseling services and resources, and educating the entire school community on civil rights and expectations of tolerance, specifically as they apply to gender stereotypes. The school also should have taken steps to clearly communicate the message that the school does not tolerate harassment and will be responsive to any information about such conduct.

*Additional Resources:*

Dear Colleague Letter (October 26, 2010) - Harassment and Bullying (U.S. Department of Education):
http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.html

Racial Incidents and Harassment against Students (U.S. Department of Education):
http://www2.ed.gov/about/offices/list/ocr/docs/race394.html

OSPI School Safety Center - Model HIB Policy and Procedure and additional resources:
https://www.k12.wa.us/SafetyCenter/BullyingHarassment/default.aspx

# V. Sexual Harassment

**1. What is sexual harassment?**
Sexual harassment is a form of prohibited sex discrimination. Under WAC 392-190-056, sexual harassment is unwelcome conduct or communication that is sexual in nature and:
1. Submission to that conduct or communication is made a term or condition (explicitly or implicitly) of obtaining an education or employment or is used as a factor in decisions affecting that person's education or employment (*quid pro quo*); or
2. That conduct or communication has the purpose or effect of substantially interfering with an individual's educational or work performance, or of creating an intimidating, hostile, or offensive educational or work environment (*hostile environment*).

Sexual harassment can take different forms depending on the harasser and the nature of the harassment. The conduct can be carried out by school employees, students, and non-employee third parties, such as a visiting speaker. Both males and females can be targets of sexual harassment, and the harasser and the target can be of the same sex.

**2. What are some examples of sexual harassment?**
Sexual harassment can occur in any school program or activity and can take place in school facilities, on a school bus, or at off-campus locations, such as a school-sponsored field trip or training program at another location. The conduct can be verbal, nonverbal, or physical and can include, but is not limited to:
- Making sexual propositions or pressuring a person for sexual favors.
- Touching of a sexual nature.
- Writing graffiti of a sexual nature.
- Displaying or distributing sexually explicit drawings, pictures, or written materials.
- Circulating or showing e-mails or web sites of a sexual nature.
- Making sexual jokes, suggestive remarks, sexual rumors, or derogatory comments.
- Physical interference with movements, such as blocking or following someone.
- Acts of physical violence, including rape, sexual assault, sexual battery, and sexual coercion.

**3. When does sexual harassment create a hostile environment?**
Hostile environment harassment occurs when unwelcome conduct of a sexual nature is so severe, persistent, or pervasive that it affects a student's ability to participate in or benefit from an education program or activity, or creates an intimidating, threatening or abusive educational environment. A hostile environment can be created by a school employee, another student, or even someone visiting the school, such as a student or employee from another school. Whether a hostile environment has been created depends on the particular circumstances of the incident(s). The conduct does not necessarily have to be repetitive. If sufficiently severe, single or isolated incidents can create a hostile environment.

Prohibiting Discrimination in Washington Public Schools
February 2012

*NOTE: These guidelines are currently under revision and may not reflect OSPI's revised rules in Chapter 392-190 WAC (effective December 19, 2014), which supersede these guidelines where different.*

**4. What is quid pro quo sexual harassment?**
Quid pro quo sexual harassment occurs when submission to or rejection of unwelcome sexual advances, requests for sexual favors, or other sexual conduct is made a term or condition of obtaining an education or employment, or is used as a factor in decisions affecting that person's education or employment (WAC 392-190-056). This can include requests for sexual conduct in exchange for a job, benefits, grades, assignments, or honors. This may be based on a single incident or a series of incidents. Quid pro quo sexual harassment can be perpetrated by a teacher or administrator to a student, an administrator to a teacher, or a student in a position of responsibility to another student.

**5. Is it sexual harassment if a teacher hugs a student?**
Not all physical contact is sexual in nature. It is important to recognize that the prohibition of sexual harassment does not extend to legitimate nonsexual touching or conduct. For example, an athletic coach hugging a student who made a goal or a kindergarten teacher's consoling hug for a child with a skinned knee would not be considered sexual harassment unless it is unwelcome and occurs under inappropriate circumstances. Similarly, one student's demonstration of a sports maneuver or technique requiring contact with another student would not be considered sexual harassment. However, in some circumstances, nonsexual conduct may take on sexual connotations and may rise to the level of sexual harassment. A teacher repeatedly hugging and putting his or her arms around a student under inappropriate circumstances or when unwanted could create a hostile environment.

**6. What must school districts include in their sexual harassment policy and procedure?**
Each school district is required to adopt and implement a sexual harassment policy and procedure (RCW 28A.640.020; WAC 392-190-057 and 392-190-058). A school district's sexual harassment policy and procedure provide the district with a mechanism for discovering sexual harassment as early as possible and for effectively correcting problems. Each school district's sexual harassment policy and procedure should be easily understood and must include the following (WAC 392-190-057):
1. Definitions consistent with RCW 28A.640.020 (2)(f);
2. District and staff responsibilities;
3. Informal complaint procedures;
4. Complaint procedures consistent with WAC 392-190-065, 392-190-070, and 392-190-075 (see page 62);
5. Investigative procedures and reasonable and prompt timelines (see Appendix E on page 79);
6. Remedies available to victims of sexual harassment;
7. Disciplinary actions against violators which must conform with collective bargaining agreements and state and federal laws;
8. Reprisal, retaliation and false accusations prohibition;
9. Dissemination and implementation; and
10. Internal review.

*NOTE: These guidelines are currently under revision and may not reflect OSPI's revised rules in Chapter 392-190 WAC (effective December 19, 2014), which supersede these guidelines where different.*

School districts may request a sample sexual harassment policy and procedure by contacting OSPI's Equity and Civil Rights Office at (360) 725-6162/TTY: (360) 664-3631 or by e-mail at equity@k12.wa.us.

**7. Should school districts provide sexual harassment training for students and employees?**
While OSPI does not require school districts to provide sexual harassment training, districts are encouraged to provide periodic training to ensure that students and employees are aware of their rights and responsibilities related to sexual harassment.

**8. How must a school district inform students, parents, and employees of its sexual harassment policy and procedure?**
Each school district is responsible for informing students, parents, employees, and volunteers about the district's sexual harassment policy and procedure and the contact information of the school district's compliance coordinator who is responsible for receiving and responding to allegations of sexual harassment. A copy of the district's sexual harassment policy must appear in any publication that sets forth the rules, regulations, and standards of conduct for the school or district (e.g., staff and student handbooks) (WAC 392-190-058). The sexual harassment policy must also be posted in each school building in a location visible to students and staff, such as an announcement board (WAC 392-190-058). School districts may choose to inform students, parents, and employees of the policy through information notices, school newsletters, or other written or online communications.

**9. What is the responsibility of a school employee who witnesses or receives a report of possible sexual harassment?**
Any staff member who witnesses or receives a report of possible sexual harassment should immediately report the incident to a school administrator or school district compliance coordinator. School districts must follow their sexual harassment policy and procedure and must take prompt and effective action to determine what happened. School districts should ensure that employees clearly understand the extent of their responsibilities for reporting sexual harassment.

**10. What steps should a school district take to end sexual harassment and prevent it from recurring?**
If a school district determines that sexual harassment has occurred, the district must take reasonable, prompt, age-appropriate, and effective action to end the harassment, prevent it from recurring, and prevent any retaliation against the person who made the complaint or was the subject of the harassment. The appropriate steps should be tailored to the specific situation. The school district may need to develop and publicize new policies or conduct staff and/or student training. Depending on the nature and severity of the harassment, counseling, discipline, further separation of the target and harasser, or notification of law enforcement may be necessary. Responsive measures should be designed to minimize the burden on the target as much as possible. If the school district's initial response does not stop the harassment and prevent it from happening again, the district must take additional, stronger measures.

*NOTE: These guidelines are currently under revision and may not reflect OSPI's revised rules in Chapter 392-190 WAC (effective December 19, 2014), which supersede these guidelines where different.*

**11. What is an example of how a school district can remedy the effects of sexual harassment?**

If the school is required to remedy the effects of the harassment on the victim, the types of action required will vary depending on the circumstances.

---

**EXAMPLE – REMEDYING SEXUAL HARASSMENT**

*A high school student informs the school that another student in her class has been sexually harassing her. To avoid him, she has been arriving late to class. As a result, she has missed some pop quizzes.*

If the school district delays its response to this situation and the student suffers additional effects from the harassment, such as missing additional pop quizzes because she continues to arrive late to class, the district may be required remedy the effects of the harassment that could have been prevented if the district had responded promptly and effectively. In this case, the appropriate remedy may have included such actions as calculating the student's grade without factoring in the student's failure to take the quizzes, giving the student another opportunity to take the quizzes, or arranging for an independent assessment of the student's work.

---

**12. How can a school district determine if its sexual harassment policy and procedure is effective?**

Each school district should periodically review responses to allegations to determine if the sexual harassment policy and procedure were followed and to monitor the number of incidents that were reported. If there is an increase in the numbers of incidents reported, the school district should consider additional actions, including staff and/or student training.

---

*Additional Resources:*

Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties (U.S. Department of Education): http://www2.ed.gov/about/offices/list/ocr/docs/sexhar01.html

Sexual Harassment: It's Not Academic (U.S. Department of Education):
http://www2.ed.gov/about/offices/list/ocr/docs/ocrshpam.html

Dear Colleague Letter (April 4, 2011) – Sexual Harassment and Sexual Violence (U.S. Department of Education):
http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html

---

# VI. Recreational and Athletic Activities

**1. What is discrimination in recreational and athletic activities?**
Discrimination is prohibited in all interscholastic, club, and intramural sports provided by a school district. School districts must provide a similar quality of experience to male and female athletes. That is, the benefits, opportunities, and treatment of each sex must be equal or equal in effect. That does not mean they must be the same. Nondiscriminatory factors can account for differences, such as different equipment needs for football and lacrosse teams. To determine if differences are caused by discrimination, a school district should look for disparities between the male and female athletic programs in each school. A disparity is a difference on the basis of sex in benefits or services that has a negative impact on athletes of one sex when compared with benefits or services available to athletes of the other sex. Simply being treated differently is not enough to constitute a disparity.

## SEPARATE TEAMS
**2. Are school districts required to provide all elementary sports coeducational?**
Yes. If a school district offers athletic opportunities to students in grades K through 6, such opportunities must be coeducational (WAC 392-190-026).

**3. May school districts offer separate teams for boys and girls in grades 7 through 12?**
Yes. A school district may maintain separate teams for boys and girls in grades 7 through 12 if it is the best method of providing an equal opportunity for students to participate, and the girls' and boys' teams are substantially equal (WAC 392-190-026).

## ANNUAL EVALUATION OF ATHLETIC PROGRAMS
**4. How do school districts determine whether their boys' and girls' athletic programs are substantially equal?**
Each school is obligated to ensure that the overall benefits and treatment of their girls' and boys' athletic programs are comparable. State law requires each school district to evaluate its recreational and athletic programs at least **once each year** to ensure that equal opportunities are available to male and female students in each school's interscholastic, club, and intramural athletic program (RCW 28A.640.020; WAC 392-190-030). School districts are required to submit a summary of the results from their annual evaluation to OSPI via the Equity Assurance Report in iGrants form package 447 (see page 67).

**5. How should each school conduct the annual evaluation of their athletic programs?**
When evaluating their athletic programs, school districts must compare the following components in the girls' and boys' athletic program, as applicable, at each school building that offers an athletic program (WAC 392-190-030):
1. Students' athletic interests and abilities;
2. Scheduling of games and practices;
3. Equipment, uniforms, and supplies;

> *NOTE: These guidelines are currently under revision and may not reflect OSPI's revised rules in Chapter 392-190 WAC (effective December 19, 2014), which supersede these guidelines where different.*

4. Facilities;
5. Coaching;
6. Publicity and awards;
7. Medical services and training;
8. Travel and per diem; and
9. Housing, laundry and dining facilities and services.

The evaluation requires school districts to obtain and analyze information to identify any disparities in benefits or services in the above components that favor one program (boys or girls) over another. School districts remain responsible for ensuring equity throughout their athletic programs, even if an incident or particular practice does not fit into one of the above program components.

OSPI provides team, building, and district worksheets with the factors for each program component to assist school districts as they evaluate their athletic programs: http://www.k12.wa.us/Equity/Districts/AthleticPrograms.aspx

**6. When should school districts conduct the evaluation?**
Each school district must evaluate its athletic programs **annually** at the conclusion of each school year, to be inclusive of all sports offered (WAC 392-190-030). It is recommended that schools and districts develop a systemic process to evaluate their athletic programs throughout the school year. For instance, the building administrator or athletic director designated to complete the evaluation may choose to require all coaches to complete a team worksheet or other data collection tool at the conclusion of their respective seasons.

**7. Is compliance based on individual schools or on the overall school district?**
Each school building must annually evaluate their athletic programs for equity. A school district may be found out of compliance even if only one school is out of compliance.

**8. At what grade levels must a school district evaluate its athletic program?**
School districts must annually evaluate all interscholastic, club, or intramural athletic programs offered in grades 7 through 12 (WAC 392-190-030).

## STUDENTS' ATHLETIC INTERESTS AND ABILITIES
**9. How should a school evaluate if it is equally accommodating the interest and abilities of male and female students?**
Schools must ensure that their athletic programs accommodate the needs and abilities of both sexes, but are not required to have equal participation of male and female students in their athletic programs (i.e., 50 percent female and 50 percent male athletes). School districts should use the Three Part Test below to determine if the district and each school are in compliance with this component.

## THREE PART TEST FOR ATHLETIC EQUITY

### 10. What is the Three Part Test for athletic equity?

A three part test was developed under federal law to determine if a school or district is equally accommodating the interests and abilities of male and female students. A similar approach is followed in applying Washington state law. If a school district meets any **one** part of this test, it is in compliance with respect to the interests and abilities component.

### 11. What is Part One of the Test?

Part One of the Test requires that athletic participation opportunities for male and female students be provided in numbers substantially proportionate to their respective enrollments. Compliance with Part One is determined on a case-by-case basis. If the numbers of male and female students participating in athletics are comparable or nearly comparable to their respective enrollment numbers, the school would meet compliance under Part One of the Test. Part One of the Three-Part Test requires schools to collect the following data:

- *School Enrollment* (schools may use the October 1 count)
    - The number of males enrolled in the school
    - The number of females enrolled in the school
    - Total number of males and females enrolled in the school
- *Student Participation in the Athletic Program*
    - The number of males who participated in the school's athletic program
    - The number of females who participated in the school's athletic program
    - Total number of males and females who participated in the athletic program

Schools are encouraged to collect the number of students who tried out for a team, but may not have made the team roster due to a cut policy. This may be helpful in identifying the level of student interest in a particular sport.

---

**EXAMPLE**

In the following example, the school cannot meet compliance under Part One of the Test. The participation percentage (47%) of female students is not comparable to the enrollment percentage (39%) of female students.

| # of Boys Tried Out | # of Boys Participated (BP) | # of Boys Enrolled (BE) | Total Athletic Participation (Boys & Girls) (TP) | Total Enrollment (Boys + Girls) (TE) |
|---|---|---|---|---|
| 156 | 150 | 280 | 245 | 533 |

Percent of Boys Enrolled (BE/TE) = 280/533 = **53%**
Percent of Athletic Opportunities for Boys (BP/TP) = 150/245 = **61%**

| # of Girls Tried Out | # of Girls Participated (GP) | # of Girls Enrolled (GE) | Total Athletic Participation (Boys & Girls) (TP) | Total Enrollment (Boys + Girls) (TE) |
|---|---|---|---|---|
| 95 | 95 | 253 | 245 | 533 |

Percent of Girls Enrolled (GE/TE) = 253/533 = **47%**
Percent of Athletic Opportunities for Girls (GP/TP) = 95/245 = **39%**

---

**12. How should schools determine the number of participants?**
Schools determine the number of participants by counting the number of students who participate in the school's athletic program. Each spot a student-athlete occupies counts one time. In other words, an athlete who competes on track and cross country occupies two participation spots. The school should count the student in as many sports as he or she participates.

**13. May a school count cheerleading in its proportionality calculations?**
This depends on whether the focus of the cheerleading squad is for competition or for performance and student support. Generally, cheerleading is considered to be an extracurricular activity when it is conducted in conjunction with sports contests and the primary purpose is to entertain spectators or to increase audience enthusiasm and participation for those sports contests. The determination of whether cheerleading is a sport is made on a case-by-case basis based on the following criteria:
1. Whether selection for the team is based upon objective factors related to the athletic activity;
2. Whether the activity is limited to a defined season;
3. Whether the activity is administered by the athletic department;
4. Whether the team prepares for and engages in competition in the same way as other teams in the athletic program with respect to coaching, budget, tryout and eligibility, length and number of practice sessions, competitive opportunities, and recognition; and
5. Whether the primary purpose of the activity is athletic competition and not the support or promotion of other athletes.

Meeting these criteria can be very challenging for schools, as cheerleading is often primarily based on performing and raising school spirit rather than competition. Schools are encouraged to work with their legal counsel to make this determination.

---

*Additional Resource:*
Dear Colleague Letter (Sept. 17, 2008) – Athletic Activities Counted for Title IX Compliance (U.S. Department of Education): http://www2.ed.gov/about/offices/list/ocr/letters/colleague-20080917.html

---

**14. What if a school cannot meet compliance under Part One of the Test?**
If a school discovers that one sex is underrepresented in its athletic program, the school should determine if it can meet compliance under Part Two or Part Three of the Test.

**15. What is Part Two of the Test?**
Part Two requires a school to demonstrate a history and continuing pattern of program expansion that is responsive to the interests and abilities of the *underrepresented* sex. To meet compliance under Part Two, a school must have evidence showing:
1. A historical review demonstrating that the school added sports in response to the developing interests and abilities of the underrepresented sex;
2. A clear and effective method for students to request new sports; and
3. A plan to add more sports in response to known interest.

**16. What is meant by the "underrepresented" sex?**

If a school is working to meet compliance under Part Two of the Test, it was likely unable to demonstrate that the number of male or female students participating in athletics is comparable or near comparable to their respective enrollment numbers, as identified in Part One of the Test. The underrepresented sex is the sex that is provided fewer opportunities to participate in athletics than students of the other sex.

**17. What if a school cannot meet compliance under Part Two of the Test?**

If a school is unable to meet compliance under Part One or Part Two of the Test, the school should determine if it can meet compliance under Part Three of the Test.

**18. What is Part Three of the Test?**

Part Three requires a school to demonstrate that it is effectively accommodating the interests and abilities of students of the underrepresented sex. Interest in a sport may come to a school's attention in a variety of ways including:

- Increasing interest and participation in recreational or intramural sports;
- Requests from parents and students to add a team; and
- The student athletic interest survey conducted every three years, as required by WAC 392-190-040 (see page 44).

To apply Part Three, schools should consider the following:

- The results from the most recent student athletic interest survey (disaggregated by sex).
- Any requests for new or bigger teams, and what happened to those requests.
- Whether club, recreational or intramural teams can become interscholastic teams.

## STUDENT ATHLETIC INTEREST SURVEY

**19. How should schools determine student interest in athletic opportunities?**

Schools may use a variety of techniques to identify students' interests in specific sports. The student athletic interest survey is one component of a school district's overall assessment under Part Three of the Test. Under state law, each school that offers an athletic program must administer a student athletic interest survey at least **once every three years**, using OSPI's sample survey (RCW 28A.640.020 and WAC 392-190-040). A school cannot rely on a survey alone to determine if it is fully and effectively accommodating the interest and abilities of the underrepresented sex. A school should develop other means to receive requests for additional sports or teams (e.g., building-level request forms, designating a building-level employee as the point of contact for students to request additional offerings).

**20. Should the survey be conducted and analyzed district-wide or by each school?**

While the school district as a whole is responsible for ensuring that the student athletic interest survey is conducted every three years, it is more valuable to conduct and analyze results by school than by the entire district. This allows each school to identify the interests of the students enrolled, and will help inform whether or not the school may need to respond to unmet interest to meet compliance under Part Three of the Test.

**21. Are schools required to use the OSPI sample student athletic interest survey?**
Yes. Schools must use the OSPI sample athletic interest survey (WAC 392-190-040). Schools may modify the content of the survey if the district deems it necessary to clarify and assist in the evaluation of student interest. If a school intends to modify the content of the sample survey, the school must provide a copy of the proposed survey to the Equity and Civil Rights Office at OSPI for approval *before* administering the survey. Schools do not need OSPI approval for changes to formatting, adding questions, or adapting the survey for Scantron or online survey. The OSPI sample athletic interest survey is available in multiple languages at: http://www.k12.wa.us/Equity/Districts/AthleticInterestSurvey.aspx.

**22. Why does the OSPI sample athletic interest survey include sports that are not currently offered under the Washington Interscholastic Activities Association (WIAA)?**
OSPI's sample athletic survey includes a list of possible sports that students can select from. While many of these options may not be currently offered or available at each school or may not be sanctioned by WIAA, they must be included in the survey to comply with federal guidance, which requires the inclusion of all sports recognized by the three primary national intercollegiate athletic associations. This guidance is outlined in the U.S. Department of Education's April 20, 2010 Dear Colleague Letter at: http://www2.ed.gov/about/offices/list/ocr/letters/colleague-20100420.html.

**23. What best practices can schools use when administering the student athletic interest survey?**
OSPI recognizes the impact of school and district size when administering the student interest survey. Schools may consider online survey tools or Scantron to conduct the survey and to analyze results. Larger schools may choose to survey a sample of students, but should carefully consider and document the process of selecting the sample populations to ensure that the survey accurately represents student interest. To ensure high response rates, schools are encouraged to administer the survey as part of a mandatory student activity, such as during course registration or advisory periods. Schools should not limit administration of the survey to one day and should have procedures in place to ensure a student only completes one survey.

**24. What should schools do after conducting the student athletic interest survey?**
After conducting a survey, schools must:
1. Disaggregate survey results by sex.
2. Analyze the results of the survey to identify the top sports requested. If the top sports requested are not currently offered, the school should meet with athletic staff and building administrators to determine if additional actions are necessary. If necessary, actions may include: following up with students regarding their interest, researching the feasibility of offering the sport, considering the availability of interscholastic competition, and assessing if there are sufficient numbers of interested and able students to sustain a team. Schools should document these efforts.
3. Analyze the top reasons for non-participation by sex. Schools should identify if the top reasons for non-participation are due to factors within the school's control and determine if any action is required.

4. Determine whether the process used to conduct the survey was effective and take actions to improve the process, if necessary.

5. Communicate the survey results to interested parties, including parents, students, administrators, and coaches. If a top sport requested is currently not feasible, schools should share the reasoning with students and other interested parties, including school board members. It is important to share findings with the student body not only to show value for student opinions and requests, but also to encourage discussion of why students are or are not participating in athletics.

---

*Additional Resources:*

Student Athletic Interest Survey (OSPI): http://www.k12.wa.us/Equity/Districts/AthleticInterestSurvey.aspx

Dear Colleague Letter (April 20, 2010) – Intercollegiate Athletics Policy: Three-Part Test (U.S. Department of Education): http://www2.ed.gov/about/offices/list/ocr/letters/colleague-20100420.html

---

**25. How should schools accommodate unmet interest in specific sports to meet compliance under Part Three of the Test?**
Schools are not obligated to meet every request to expand athletic offerings. However, the school may be obligated to add a team if there is sufficient interest and ability by the underrepresented sex to support a new team and there is interscholastic competition in the school district's normal competitive region. It is important for schools to document and communicate these efforts with the school district and/or school board.

**26. Are schools required to have the same number of teams for boys and girls?**
No. The important issue is not the number of teams, but the quality of opportunities for girls and boys to participate in interscholastic athletics. A school should equally accommodate the interests and abilities of both sexes whenever possible.

**27. What if the underrepresented sex requests a sport that is not feasible for a school to offer?**
Schools should document their process to determine the feasibility of a sport. If enough students of the underrepresented sex express interest in a sport not offered by the school, the school should consider if it can offer the sport as an intramural activity, or coordinate competition with neighboring school districts.

**28. Is a school required to allow a member of the underrepresented sex to try out for a sport that has been limited to members of the opposite sex?**
Schools may provide separate teams for contact sports. However, members of the underrepresented sex must be allowed to try out for teams if it is necessary to meet their level of interest and competitive experience.

**29. If a school is experiencing financial problems that require a reduction in sports programs, how do nondiscrimination laws apply?**

Lack of funds does not excuse discrimination. The same "interest and ability" principles apply when a school must reduce the size of its program or institute a pay-to-play program. If a school is providing comparable programs to meet male and female interests at the time of cutbacks, then the school should make reductions that affect male and female students in similar ways. Schools should follow the principle of comparable opportunities, not necessarily comparable cost.

## SCHEDULING OF GAMES AND PRACTICES

**30. What factors should schools consider when evaluating equal opportunities in scheduling?**

Evaluating equity in scheduling is not simply about the number and times of games. Rather, the overriding concern is the impact that unequal scheduling may have on students' opportunity to participate, compete, attract media coverage, play in front of spectators, and develop a strong overall program. Schools should analyze the following areas in each building's athletic programs annually:

- Number of competitive events per sport.
- Number and length of practice opportunities.
- Time of day that competitive events are scheduled.
- Time of day that practices are scheduled.
- Opportunities to engage in available preseason and postseason competition.

There may be nondiscriminatory differences in the scheduling of certain sports. For example, scheduling of competitions may be limited by a lack of competition in the normal competitive region. Fewer competitive contests may affect practice schedules and pre-season and post-season competitive opportunities. Competitive and practice schedules can also be affected by the availability of facilities. Schools are not required to schedule the same number of games or practices for boys' and girls' teams in the same or similar sport. However, any differences favoring, for example, boys' teams should be offset by differences favoring girls' teams in other sports.

**31. What is considered "prime time" for girls' and boys' competitions?**

The times for competition that are considered "prime time" are those that are most desirable. This may vary from school to school. Some schools, for example, may consider Friday night games as "prime time." When determining whether the school is in compliance, an *overall* program assessment is needed. For example, a schedule that favors a boys' basketball team over a girls' basketball team is only part of the determination. If the difference is offset by scheduling for other sports that favor girls, the school may still be in compliance.

**32. How should a school respond if there are disparities that negatively impact one program over another?**

Disparities in scheduling may discourage participation. If a school identifies that several teams in one athletic program are negatively impacted by inconsistent practice times due to facility

availability, for example, the school should develop and implement a plan to remedy the disparity. The athletic director, building administrators, and coaches should meet and determine a resolution. Schools should document these efforts and communicate them with their school district, as well as with the student-athletes who are impacted by the scheduling issues.

---

**EXAMPLE – PRIME TIME**

*The high school boys' varsity football and basketball games are scheduled for Friday night at 7:00 p.m., making it easier for families and community members to attend. The girls' varsity soccer and basketball teams are consistently scheduled for Friday afternoon at 4:00 p.m. Several parents complain to the athletic director about the scheduling.*

This example illustrates a difference in treatment. Solutions could include alternating which team plays during the preferred or "prime" time, or teams could alternate which day they play. The time or day considered "prime" is determined locally by asking students, parents, and coaches.

---

## EQUIPMENT, UNIFORMS, AND SUPPLIES

### 33. What is considered equipment and supplies?

Equipment and supplies include, but are not limited to, practice and game uniforms, shoes, rain-gear, warm-up suits, sport-specific equipment such as bats, balls, nets, gymnastics equipment, and general equipment and supplies such as instructional devices and conditioning and weight training equipment. Stationary equipment, however, such as basketball hoops, field goals, and tennis nets are reviewed under the facilities program component.

### 34. Are schools required to provide equipment and supplies for student athletes?

No. Schools are not required to provide equipment and supplies for athletes. If a school chooses to provide equipment and supplies, however, it must provide them in a way that equally meets the needs of boys' and girls' teams.

### 35. What factors should schools consider when evaluating equal opportunities in equipment and supplies?

To evaluate equal opportunities in a school's equipment and supplies, the school must compare the equipment and supplies provided for girls' and boys' teams and analyze whether the program needs of the girls' and boys' teams are being met equally. The law does not require that schools provide identical equipment, as long as the overall effect of any differences in equipment is negligible. When assessing their equipment and supplies, school should consider the quality, quantity, suitability (does or does not meet rules or specifications), maintenance and replacement, and availability of the equipment and supplies for boys' and girls' teams.

Schools are encouraged to develop a cycle for the purchase of uniforms, equipment, and supplies, and to develop a system to track purchases and planned purchases. If there are immediate disparities between the girls' and boys' programs, the school will be able to prioritize purchases to ensure equity.

**36. If a school purchases new equipment for one team, such as girls' softball, must it purchase new equipment for a like sport, such as boys' baseball?**
All sports are not required to be on the same schedule for receiving new equipment. The test is whether, overall, the amount, quality and availability of equipment are comparable throughout the boys' and girls' programs. As coaches, students, and parents often compare the purchases for like sports, it is helpful to communicate the school's rationale and process when making purchasing decisions.

**37. What if there are inequities in the amount spent on equipment, uniforms, and supplies for boys' and girls' teams?**
Schools can take into account real differences between the costs of girls' and boys' sports that may justify a difference in the amount spent on their equipment and supplies. For example, if it costs more to buy boys' football uniforms than girls' volleyball uniforms, then a school is permitted to spend more on the boys' program, as long as the girls' uniforms are of equal quality.

## FACILITIES
**38. What are facilities?**
Facilities may include, but are not limited to, locker rooms, playing fields (including scoreboards, dugouts, lighting, etc.), gyms, courts, and swimming pools, whether on-campus or off-campus.

**39. What factors should schools consider when evaluating equal opportunities in facilities?**
This program component involves an assessment of whether boys and girls receive equal treatment and benefits related to competitive and practice facilities. Schools should analyze the following areas annually:
- Quality and availability of the facilities provided for practice and competitive events, including on-campus and off-campus facilities.
- Exclusive use of facilities provided for practice and competitive events.
- Maintenance of practice and competitive facilities.
- Preparation of facilities for practice and competitive events.
- Availability and quality of locker rooms.

**40. What is meant by "exclusive" use of facilities?**
This refers to any team's exclusive or priority use of any facility during specific times (e.g., gym, weight room, locker room). Exclusivity may impact whether equal opportunities are provided for all students. For example, a school cannot allow only football players to access the weight room every day after school during fall season.

**41. Is a school district required to have identical practice and competitive facilities for boys' and girls' teams?**
No. A school needs to ensure that the facilities used by boys' teams and girls' teams are comparable with respect to the above factors. The availability and adequacy of facilities is often

dependent upon the number of athletes who need to use a facility at any one time. If many groups use a particular facility, it may also affect the quality of the facility or the necessary maintenance and preparation of the facility.

**42. Is a school responsible for ensuring comparability of city-owned or county-owned facilities used by school teams?**
Yes. If outside school facilities are used for school-sponsored practice or competitions, the school must ensure that, overall, the facilities used by the girls' teams and the facilities used by the boys' teams are comparable.

---

**EXAMPLE – FACILITIES**
*A school's softball field does not provide access to batting cages or covered dugouts, while the boys' baseball team does.*

In this example, the school should evaluate the status of the girls' and boys' practice and competitive facilities in the overall athletic programs, as compliance is not determined on a comparison of "like" sports only. However, for student-athletes, coaches, and parents, it is natural to make such comparisons. The school should determine what action can be taken and if differences can be corrected by developing a gradual process of renovation and a clear timeline for improvement based on available funding. The school may wish to investigate whether batting cages can be shared and if there is a way to immediately provide a cover over the dugout. Schools should communicate and document their efforts to resolve differences.

---

## COACHING

**43. What factors should schools consider when evaluating equal opportunities in coaching?**
When evaluating equal opportunities in coaching, schools should compare the girls' and boys' athletic program considering the following factors:

- *Availability of coaching*
  Compare the relative availability of coaches for boys' and girls' teams. Schools should provide comparable coach-to-athlete ratios for its male and female athletes, including assistant coaches.
- *Assignment of coaches*
  Compare the training, experience, and qualifications of the coaches assigned to the girls' teams with the coaches assigned to the boys' teams. Schools must assign similarly qualified coaches to the boys' and girls' athletic programs.
- *Compensation of coaches*
  Compare the allocation of funds for coaching to the boys' and girls' program. If overall differences exist, consider whether or not these differences are the result of nondiscriminatory factors, such as extra duties or experience.

**44. Are schools required to pay the coaches of boys' and girls' team the same?**
No. While schools are not required to pay the same stipend to coaches of like sports, it is important for the school to be able to justify any differences between the stipends.

## PUBLICITY AND AWARDS

### 45. What factors should schools consider when evaluating equal opportunities in publicity and awards?

The measure of equality is based on the efforts made by a school to provide equal publicity and promotional services for boys' and girls' teams. Schools are not responsible for inequities that result from outside media that provides greater coverage of girls' or boys' sports, so long as equal efforts have been made to obtain coverage. Schools are responsible, however, for internal school publicity.

### 46. What are some examples of publicity?

Some examples of publicity and promotional activities include school newspaper articles, coverage by local media, posters and banners, school-wide announcements, pep assemblies and rallies, trophy cases, and cheerleaders and bands at games. These activities are significant because they help develop athletic programs, encourage students to try out for teams, and communicate to athletes that their hard work is valued.

### 47. Are schools required to provide cheerleading squads and bands at all games?

No. However, schools are required to ensure that when cheerleaders, bands, and pep squads are provided for boys' teams, they must be equally provided for girls' teams. For example, cheerleaders who travel to boys' athletic events should also travel to girls' athletic events.

---

**EXAMPLE – PUBLICITY AND AWARDS**

*A high school has a tradition of hosting a post-season banquet for the boys' football and basketball programs. This banquet is paid for in part, by donations from the football and basketball booster clubs. The athletes receive a steak dinner as well as individual honors during the banquet. The girls' soccer and basketball programs do not have similar funds available.*

In this example, the girls' program is not receiving equivalent benefits in publicity and awards. To resolve this inequity, the school may host seasonal or annual school-wide banquets to allow all student-athletes the opportunity to be honored for their efforts and contribute to a positive event valuing all students.

---

## MEDICAL SERVICES AND TRAINING

### 48. What factors should schools consider when evaluating equal opportunities in medical services and training?

In many schools, medical services will be minimal. Even so, schools must consider this component in the annual evaluation of their athletic programs, if applicable. In evaluating medical services and training, schools should compare the boys' and girls' programs considering the following:

- Access to medical and emergency personnel and assistance.
- Coverage and type of accident and medical insurance.
- Access to trainers.
- Access to and quality of weight, conditioning, and training facilities.

## TRAVEL AND PER DIEM

**49. What factors should schools consider when evaluating equal opportunities in travel and per diem?**

There are many factors that affect the travel needs of a particular team for any particular event. These services must be provided in a way that equally meets the overall needs of the boys' and girls' teams. The following factors should be considered for each team in a school's athletic program:

- *Modes of transportation*
  Schools should compare the types of transportation used by each team, particularly when teams are traveling similar distances. Some differences in transportation may be explained by nondiscriminatory factors such as the number of athletes traveling with the team or the amount of equipment to be transported.
- *Overnight accommodations furnished during travel*
  If a school provides housing accommodations for teams on travel, the school should compare the overall quality of the accommodations, including the number of athletes assigned to share rooms.
- *Length of stay before and after competitive events*
  Schools should consider whether girls' and boys' teams are provided comparable opportunities to arrive at away games with time to rest, have meals, or practice.
- *Per diem allowances*
  Schools have different ways of handling meal allowances for teams on away games. Regardless of how a school covers these costs (e.g., per diems for each player, a set amount for the whole team), the actual amount of money spent on each athlete should be comparable for girls and boys.
- *Dining arrangements*
  If a school makes dining arrangements for athletes on away games, the convenience and quality of the arrangements should equally meet the needs of girls' and boys' teams.

## HOUSING, LAUNDRY, AND DINING FACILITIES AND SERVICES

**50. What if a school does not provide housing, laundry and dining facilities and services?**

Housing, laundry, and dining facilities and services are rarely applicable to Washington schools. If a school district offers such services, however, the district should evaluate them in a similar manner as all other program components.

## BOOSTER CLUBS AND DONATIONS

**51. Can schools accept moneys from outside sources and booster clubs for their athletic programs?**

Yes. Outside sources of funding and donations are acceptable, so long as they do not result in disparities between the boys' and girls' programs. If a donation results in an inequity along gender lines, the school must correct the inequity, using its own funds if needed. If the school uses the donation to give benefits to the boys' sports program, for example, the school has an obligation to find resources from somewhere else to make sure that the girls' program has similar benefits. These benefits do not have to match by sport (e.g., boys' baseball and girls'

softball) because equal opportunity is based on the boys' and girls' entire athletic programs rather than single teams. Budgets for boys' and girls' teams do not have to be equal, but the benefits provided must be equal. A school or district's lack of awareness of booster club activities does not excuse a disparity that may occur due to the donation.

**52. How can schools work with booster clubs to ensure equal opportunities in their athletic programs?**

Interscholastic sports provide an opportunity for parents and community members to participate in their local schools in positive ways. Schools are encouraged to continue these partnerships by developing policies and procedures to ensure that donations do not result in inequity. Some possible actions include:

- Developing and disseminating policies and procedures for fundraising.
- Developing and disseminating procedures to request and report booster club and public donations which allow for school and district oversight and avoid donations going directly to individual coaches or teams.
- Establishing an all-inclusive school-wide sports booster club.
- Providing ongoing training for all coaching staff in the area of equal opportunity, fundraising, and federal and state nondiscrimination laws. Schools should provide training year-round so that all coaches have the opportunity to attend (e.g., new hires).
- Establishing an advisory committee with booster club members, parents, coaches, and athletic directors to encourage collaboration and communication.

## STUDENTS WITH DISABILITIES AND ATHLETIC PARTICIPATION

**53. Can a student be excluded from athletic participation solely because of his or her disability?**

No. Schools may not exclude otherwise qualified students with disabilities, solely by reason of their disability, from participating in any athletic programs or activities, including interscholastic, club, and intramural athletics.

**54. If a student is provided services or accommodations in a Section 504 plan or Individualized Education Plan (IEP), must a school provide those services or accommodations during athletic try outs and participation?**

Yes. Schools must provide students with disabilities an equal opportunity to participate in athletic programs. If a student is provided services or accommodations under a Section 504 plan or IEP, those services or accommodations should also be provided when the student tries out and participates in sports, so long as the accommodations do not fundamentally alter the nature of the sport.

**55. Is a school required to waive or modify an eligibility rule or criteria if a student cannot satisfy the rule because of his or her disability?**

A school must make reasonable modifications to eligibility criteria if it is necessary to avoid discrimination and so long as the modification does not fundamentally alter the nature of the

sport. When determining if a school should waive particular eligibility criteria based on a student's disability, the school should consider the following:

- Is there a direct, causal relationship between the student's disability and their inability to meet the eligibility rule?
- Is the eligibility rule or criteria essential to the sport? Would waiving or altering the rule fundamentally change the nature of the sport?

If the eligibility rule or criteria is required by the Washington Interscholastic Activities Association (WIAA) or other interscholastic activity association, the school district should assist the student to appeal the ineligibility through WIAA's hardship appeal process. During a hardship appeal process, WIAA will modify an eligibility rule as it applies to a specific student if the student demonstrates (1) that the rule or regulation discriminates against the student based on his or her disability, and (2) modification of the rule or regulation would not fundamentally alter the nature of the activity. The Student Appeals of Ineligibility procedures can be found in the WIAA Official Handbook at: http://www.wiaa.com/subcontent.aspx?SecID=350.

**56. What if a student's participation is dangerous for the student or others?**
Schools may consider whether the participation of any student poses a direct threat to the health or safety of the student or others. If there is direct risk to the health or safety of the student or others that cannot be eliminated by a reasonable accommodation, the school may deny the student participation in the activity.

# VII. Employment Discrimination and Affirmative Action

## EMPLOYMENT DISCRIMINATION

### 1. What is employment discrimination?

School districts must provide equal employment opportunity and treatment for all applicants and employees in recruitment, hiring, retention, assignment, transfer, compensation, promotion, training, and other teams and conditions of employment without discrimination based on sex, race, creed, religion, color, national origin, age (40 or older), marital status, veteran or military status, sexual orientation, gender expression or identity, disability, or the use of a trained dog guide or service animal by a person with a disability (*see* chapters 28A.640, 28A.642 and 49.60 RCW; WAC 392-190-0591). Employment discrimination may include, but is not limited to:

- Unfair treatment based on an employee's protected class, including unfair or separate treatment in pay scale, assignment of school duties, opportunities for advancement, conditions of employment, hiring practices, leaves of absence, hours of employment, and assignment of instructional and non-instructional duties.
- Harassment by managers, co-workers, or others in the workplace that creates a hostile work environment.
- Denial of a reasonable workplace accommodation that an employee needs because of religious beliefs or disability.
- Retaliation because an employee complained about employment discrimination, or assisted with an employment discrimination investigation or lawsuit.
- Making employment or placement decisions based on stereotypes or assumptions about one's protected class.
- Discriminating against individuals married to or otherwise associated with people of a certain group.
- Prohibiting an employee from using the restroom consistent with his or her gender identity.

> *Note:* This section is not inclusive of all state and federal laws and regulations related to employment discrimination. School districts should be aware that there are numerous laws and regulations related to employment discrimination, including the Washington Law against Discrimination (chapter 49.60 RCW) and numerous federal laws. For a list of federal laws, visit the U.S. Equal Employment Opportunity Commission's web site at: http://www.eeoc.gov/laws/statutes/index.cfm.

### 2. Where can I find information regarding reasonable accommodations based on disability and religion?

Employees must be able to perform a job's essential duties to be eligible for these protections. Employers may be required, however, to provide reasonable accommodations to enable an employee to do his or her job. Information regarding reasonable accommodations based on

disability and religion can be found on the U.S. Equal Employment Opportunity Commission's web site:

- Disability: http://www.eeoc.gov/laws/types/disability.cfm
- Religion: http://www.eeoc.gov/laws/types/religion.cfm

**3. Where can employees file complaints of employment discrimination?**
Employees may file discrimination complaints with their school district using their district's discrimination complaint and appeal procedures (see page 62). Filing a complaint with the school district does not prohibit the processing of grievances by an employee bargaining representative and/or a member of a bargaining unit pursuant to grievance procedures established at the school district level by local bargaining agreement (WAC 392-190-065). Employees may also file employment discrimination complaints with the following agencies:

Washington State Human Rights Commission
Phone: 1-800-233-3247/TTY: 1-800-300-7525
Web site: http://www.hum.wa.gov/
*Accepts complaints of employment discrimination based on race, creed, color, national origin, sex, marital status, age (40+), sexual orientation, gender identity, disability, HIV/AIDS and Hepatitis C status, and the use of a trained dog guide or service animal. Employment discrimination complaints must be filed within 6 months of the alleged harm.*

U.S. Equal Employment Opportunity Commission
Phone: 1-800-669-4000/TTY: 1-800-669-6820
Web site: http://www.eeoc.gov/
*Accepts complaints of employment discrimination based on race, color, religion, sex, national origin, age (40+), disability, and genetic information.*

---

*Additional Resources:*
U.S. Equal Employment Opportunity Commission (EEOC): http://www.eeoc.gov/index.cfm

Employment and the Washington State Law Against Discrimination (Washington State Human Rights Commission): http://www.hum.wa.gov/Employment/Index.html

Job Accommodation Network (U.S. Department of Labor): http://askjan.org/

---

## AFFIRMATIVE ACTION IN EMPLOYMENT

**4. What is the difference between equal employment opportunity and affirmative action?**
The purpose of equal employment opportunity is to prohibit employment discrimination and eliminate bias in personnel matters. An affirmative action program is a management tool designed to ensure equal employment opportunity and is described in a written plan.

**5. Are all school districts required to have an affirmative action policy or plan?**
Yes. All school districts must adopt either an affirmative action policy or affirmative action plan depending on the number of full time equivalent employees in the district (WAC 392-190-0592).

*Affirmative Action Policy:* School districts with **forty-nine or fewer** full time equivalent employees are not required to develop an affirmative action plan; instead they are required to have an affirmative action policy. This policy must be filed with OSPI's Equity and Civil Rights Office every five years.

*Affirmative Action Plan:* School districts with **fifty or more** full time equivalent employees are required to develop an affirmative action plan, which must be filed with OSPI's Equity and Civil Rights Office. A submission to OSPI is only required when the plan expires, which may be up to five years from the date of the plan's adoption. While school districts may determine the timeline for when they will revise their affirmative action plans, districts are encouraged to develop five-year plans.

**6. What should be included in an affirmative action plan?**
The following provides one format that is commonly used in the development of affirmative action plans. Each school district may revise the following to meet their individual needs.

- *Policy and Review*
  This section references the school district's equal employment opportunity and nondiscrimination policy and outlines the school board review process.
- *Workforce Analysis by Race, Ethnicity, and Sex*
  This section includes a current workforce profile by job group or general salary range, disaggregated by race/ethnicity and sex.
- *Goals and Action Steps*
  This section includes specific goals and action steps to meet those goals. Goals should include:
  - A clear relationship to a utilization analysis where problem areas are identified.
  - An achievable attempt to address defined problems specific to minority categories and women.
  - Projected timelines to meet goals.
- *Staff Responsibilities for Implementation, Monitoring and Evaluation of Progress*
  This section includes the name of the staff member(s) with primary responsibility for the development, implementation, and evaluation of the plan and their expected duties. The assigned staff may also have the responsibility of handling grievances related to allegations of discrimination in employment.
- *Internal Monitoring and Reporting Process*
  This section outlines how the school district will monitor and communicate the progress of goals to appropriate staff and school board members.

See Appendix C on page 75 for instructions and examples of how to conduct a utilization analysis and develop goals and action steps for an affirmative action plan. School districts may request sample affirmative action plans by contacting OSPI's Equity and Civil Rights Office at (360) 725-6162/TTY: (360) 664-3631 or by e-mail at equity@k12.wa.us.

*NOTE: These guidelines are currently under revision and may not reflect OSPI's revised rules in Chapter 392-190 WAC (effective December 19, 2014), which supersede these guidelines where different.*

### 7. What if a school district does not meet its goals?

Goals are included in affirmative action plans to demonstrate good-faith program objectives and to document if particular activities have resulted in gains. Goals are not designed to set strict adherence to numbers or quotas.

---

***Additional Resources:***

Sample Affirmative Action Program (U.S. Department of Labor):
http://www.dol.gov/ofccp/regs/compliance/pdf/sampleaap.pdf

Employment Affirmative Action Plans (OSPI): https://www.k12.wa.us/Equity/Districts/AffirmativeAction.aspx

---

# VIII. Procedural Requirements

## COMPLIANCE COORDINATOR

**1. Are school districts required to designate an employee to coordinate compliance with nondiscrimination laws?**

Yes. Under WAC 392-190-060, all school districts must designate at least one employee to be responsible for monitoring and coordinating the district's compliance with state nondiscrimination laws (chapters 28A.640 and 28A.642 RCW, and chapter 392-190 WAC). Federal nondiscrimination laws require each school district to designate an employee to coordinate compliance with Section 504 (34 C.F.R. §104.7), Title IX (34 C.F.R. §106.8), and Title II of the ADA (28 C.F.R. §35.107). The coordinator for state nondiscrimination laws may also serve as the Title IX and/or Section 504/ADA coordinator. Front office staff at all school buildings and the district office must be aware of the name and contact information of the compliance coordinator(s) so that they may inform students, parents, and others as needed.

**2. How many compliance coordinators should the school district designate for state and federal nondiscrimination laws?**

School districts may choose to designate one coordinator, or they may choose to assign two or more coordinators. This is often determined by the size of the district. School districts may also choose to assign coordinators based on subject-matter (e.g., issues related to sex or issues related to disability) or designate an employee for personnel matters and an employee for student related issues. If there is more than one coordinator, all should be identified in the school district's nondiscrimination statement (see page 60). When there is more than one compliance coordinator, it is important that the school district has clear descriptions of authority and responsibilities for each coordinator.

**3. Who should a school district choose as the compliance coordinator(s)?**

The compliance coordinator(s) should be knowledgeable and experienced in state and federal nondiscrimination laws, the school district's policies and procedures, and how to receive and respond to allegations of unlawful discrimination. The school district should ensure that the coordinator(s) receives appropriate and ongoing training. The responsibilities and expectations of the position (i.e., job description) should be clearly communicated and the coordinator(s) should be provided the time and resources needed to effectively perform these additional duties.

**4. What are the compliance coordinator's responsibilities?**

While school districts may determine additional job requirements, the compliance coordinator is responsible for:

1. Monitoring the school district's compliance with state and federal nondiscrimination laws, including procedural and reporting requirements (see Appendix D on page 78);
2. Receiving and responding to complaints of unlawful discrimination (see page 62); and
3. Investigating complaints (see Appendix E on page 79).

Prohibiting Discrimination in Washington Public Schools
February 2012

*NOTE: These guidelines are currently under revision and may not reflect OSPI's revised rules in Chapter 392-190 WAC (effective December 19, 2014), which supersede these guidelines where different.*

The compliance coordinator should be proactive and should provide professional development to ensure school staff understands their obligations under state and federal laws.

**5. Are school districts required to provide OSPI the name of their compliance coordinator(s)?**
Yes. As part of OSPI's monitoring responsibilities, each school district must submit an annual Equity Assurance Report through iGrants form package 447 (see page 67), which includes the name and contact information for the employees designated as the:

- Compliance coordinator for state laws (chapters 28A.640 and 28A.642 RCW)
- Title IX compliance officer
- Section 504 coordinator

These designated employees are OSPI's point of contact to communicate information and resources related to civil rights in schools. OSPI may also refer individuals with concerns of discrimination to their school district's compliance coordinator to facilitate local resolution. The name and contact information of each school district's compliance coordinators may also be made available on the OSPI web site.

## NONDISCRIMINATION STATEMENT

**6. Are all school districts required to publish a nondiscrimination statement?**
Yes. State and federal regulations contain minor differences relating to the required content of nondiscrimination notices and the methods used to publish them. School districts are encouraged to publish a combined nondiscrimination statement that covers all of the requirements of state and federal laws. This combined notice must include two basic parts:

1. A statement that specifies the basis (protected class) for nondiscrimination, including sex, race, creed, religion, color, national origin, age, veteran or military status, sexual orientation, gender expression or identity, disability, or the use of a trained dog guide or service animal;
2. A statement that the school district provides equal access to the Boy Scouts of America and other designated youth groups; and
3. The name or title, address, and telephone number of the employee or employees responsible for coordinating compliance.

(*See* Title VI, 34 C.F.R. §100.6(d); Title IX, 34 C.F.R. §106.9; Section 504, 34 C.F.R. §104.8; the Age Discrimination Act, 34 C.F.R. §110.25; Title II of the ADA, 28 C.F.R. §35.106; the Boy Scouts of America Equal Access Act, 34 C.F.R. §108.9; and WAC 392-190-060).

---

**SAMPLE NONDISCRIMINATION STATEMENT**:
_____School District does not discriminate in any programs or activities on the basis of sex, race, creed, religion, color, national origin, age, veteran or military status, sexual orientation, gender expression or identity, disability, or the use of a trained dog guide or service animal and provides equal access to the Boy Scouts and other designated youth groups. The following employee(s) has been designated to handle questions and complaints of alleged discrimination: [Name and/or Title] [Address] [Phone Number].

---

**7. Why are school districts required to include the Boy Scouts and other designated youth groups in the nondiscrimination statement?**

The Boy Scouts of America Equal Access Act was passed in 2002 and applies to school districts that receive funds through the U.S. Department of Education. Under the Boy Scouts Act, schools and districts that provide an opportunity for one or more outside youth or community groups to meet on school premises or in school facilities before or after school hours may not deny equal access or a fair opportunity to meet to, or discriminate against, any group officially affiliated with the Boy Scouts of America, or any other youth group listed in Title 36 of the United States Code as a patriotic society. To comply with federal regulations, school districts must inform people of the protections provided under the Boy Scouts Act (34 C.F.R. §108.9). Including the Boy Scouts and other designated youth groups in the district's nondiscrimination statement satisfies this requirement. For more information, visit the U.S. Department of Education's web site at: http://www2.ed.gov/policy/rights/guid/ocr/boyscouts.html.

**8. If a school district offers Career and Technical Education (CTE) programs, are there additional requirements for an annual notice of nondiscrimination?**

Yes. School districts with CTE programs must follow the U.S. Department of Education's Guidelines for Vocational Education Programs, which require districts to advise students, parents, employees, and the general public that all vocational opportunities are offered without regard to race, color, national origin, sex, or disability. A brief summary of program offerings and admission criteria should be included in the announcement, along with the name, address, and telephone number of the person designated to coordinate compliance with Section 504 and Title IX. These guidelines are available on the U.S. Department of Education's web site at: http://www2.ed.gov/about/offices/list/ocr/docs/vocre.html.

**9. On what publications should school districts include the nondiscrimination statement?**

School districts must include a nondiscrimination statement in any publication that is disseminated on an annual or periodic basis to **all** students, parents, participants, applicants, employees, or stakeholders. This includes district publications as well as building publications. Some examples include announcements, flyers, brochures, course catalogs, employment application forms, staff and student handbooks, school newsletters, school calendars, employment recruitment materials, and district web sites. Routine letters or daily announcements do not need to include the statement, although a school may choose to do so.

**10. Where should the statement be located on a publication?**

The nondiscrimination statement can be located anywhere on a publication. No specific font size is required, so long as the statement is legible.

---

*Additional Resources:*
Nondiscrimination Statement (OSPI):
http://www.k12.wa.us/Equity/Districts/NondiscriminationStatement.aspx

Notice of Nondiscrimination (U.S. Department of Education):
http://www2.ed.gov/about/offices/list/ocr/docs/nondisc.html

---

# IX. Discrimination Complaint and Appeal Procedures

**1. Are school districts required to adopt and implement complaint and appeal procedures for allegations of discrimination?**

Yes. All school districts must adopt and implement complaint and appeal procedures to investigate and resolve allegations of unlawful discrimination, including discriminatory harassment. The complaint and appeal procedures must include the following steps:

1. Complaint to the school district (WAC 392-190-065)
2. Appeal to the school board (WAC 392-190-070)
3. Appeal to OSPI (WAC 392-190-075)

School districts may choose to include procedures to address unwritten or informal allegations of discrimination. School districts should ensure that such procedures are consistently applied at each school building. If a school district is unable to resolve an issue informally, the school district should inform the complainant of their right to file a formal complaint.

**2. How should school districts inform students, parents, and employees of the complaint and appeal procedures?**

Each school district must inform students, parents, employees, and volunteers of the district's discrimination complaint and appeal procedures at least once each year (WAC 392-190-060). Some examples of ways in which school districts can inform students, parents, and employees of these procedures include student and parent handbooks, staff handbooks, brochures, flyers, and posters.

School and district front office must be knowledgeable about the discrimination complaint procedures in order to inform parents, students, and employees as needed. School districts are encouraged to have available brochures, flyers, or other information about their discrimination complaint and appeal procedures at the district office and building offices for use by students, parents, employees, and others. OSPI has developed flyers for this purpose, available in multiple languages at: http://www.k12.wa.us/Equity/Flyers.aspx.

**3. What other agencies accept discrimination complaints?**

In addition to filing discrimination complaints with a school district, discrimination complaints can be filed with the following agencies:

> Washington State Human Rights Commission
> Phone: 1-800-233-3247/TTY: 1-800-300-7525
> Web site: http://www.hum.wa.gov/
> *Accepts complaints of discrimination in employment, housing and real estate, public accommodation, and credit and insurance based on race, creed, color, national origin, sex, marital status, family with children status, age (40+), honorably discharged veteran or military status, sexual orientation, gender identity or expression, disability, and the use of a trained dog guide or service animal. Most complaints must be filed within 6 months of the alleged harm.*

> *NOTE: These guidelines are currently under revision and may not reflect OSPI's revised rules in Chapter 392-190 WAC (effective December 19, 2014), which supersede these guidelines where different.*

U.S. Department of Education Office for Civil Rights – Seattle Office
Phone: (206) 607-1600/TDD: (206) 607-1647
Web site: http://www2.ed.gov/about/offices/list/ocr/index.html
*Accepts complaints of discrimination based on race, color, national origin, sex, disability, and age in programs or activities that receive Federal funds from the U.S. Department of Education. Complaints must be filed within 180 days of the incident.*

U.S. Equal Employment Opportunity Commission
Phone: 1-800-669-4000/TTY: 1-800-669-6820
Web site: http://www.eeoc.gov/
*Accepts complaints of employment discrimination based on race, color, religion, sex, national origin, age (40+), disability, and genetic information.*

U.S. Department of Justice Civil Rights Division
Phone: (202) 514-4609/TTY: (202) 514-0716
Web site: http://www.justice.gov/crt/
*Accepts complaints based on disability, race, color, national origin, sex, disability and religion in public schools.*

## DISCRIMINATION COMPLAINTS TO THE SCHOOL DISTRICT

### 4. What is a discrimination complaint?
Under WAC 392-190-065, a discrimination complaint or grievance is a written and signed complaint alleging discrimination based on any of the protected classes by a school or school district. The complaint must describe the specific acts, conditions, or circumstances that are alleged to be discriminatory and why the complainant believes that it is discrimination.

### 5. Who can file a discrimination complaint with a school district?
Under WAC 392-190-065, *anyone* can file a complaint with a school district alleging discrimination based on any of the protected classes. There is no requirement that the person making the complaint be connected with the school district in any way.

### 6. What should a school district do if a complainant has already filed a complaint with another agency or has initiated a proceeding in state or federal court regarding the same claims?
Under WAC 392-190-081, a discrimination complaint made to a school district or an appeal to the school board or OSPI will be held in abeyance during the pendency of any proceeding in state or federal court or before a local, state, or federal agency in which the same claims are at issue under any law.

### 7. What actions must a school district take upon receipt of a discrimination complaint?
School and district staff should contact the school district compliance coordinator immediately when they receive a discrimination complaint. Upon receipt of a complaint, the school district's compliance coordinator must investigate the allegations, and provide the superintendent with a written report of the complaint and the results of the investigation (see Appendix E on page 79). The school district and the complainant may agree to resolve the complaint in lieu of an investigation. The superintendent must respond to the complainant in writing within **30**

Prohibiting Discrimination in Washington Public Schools
February 2012

*NOTE: These guidelines are currently under revision and may not reflect OSPI's revised rules in Chapter 392-190 WAC (effective December 19, 2014), which supersede these guidelines where different.*

**calendar days** after receiving the complaint, unless otherwise agreed to by the complainant. The response must either deny the allegations in the complaint, or describe the reasonable actions the school district will take to resolve the discrimination. The letter must include where and to whom the complainant can appeal the superintendent's decision with the school board (WAC 392-190-065).

---

**SAMPLE LANGUAGE TO INCLUDE IN THE SUPERINTENDENT'S RESPONSE LETTER**

If you are not satisfied with the superintendent's response to your complaint of unlawful discrimination, you may appeal to the school district's board of directors. A written appeal must be filed with the secretary of the school board, [Name] at [Address], by the 10th calendar day after you receive this letter. These procedures are pursuant to Washington Administrative Code 392-190-065, 392-190-070, 392-190-075 and [School District] Policy # [_____].

---

### 8. Can someone other than the compliance coordinator conduct the investigation?

Yes. If the compliance coordinator is concerned about their ability to conduct an unbiased or impartial investigation, or the perception that they will not conduct a fair investigation, the compliance coordinator should delegate this responsibility to another district administrator, outside agency, or legal counsel.

### 9. What if a school district is unable to meet the required investigation and response timeline due to school breaks?

If a school district is unable to complete a thorough investigation due to a school break, such as summer vacation, the district should notify the complainant immediately. The complainant and the school district may agree on an alternative timeline for the district to investigate and respond to the complaint (WAC 392-190-065).

### 10. If the investigation finds that discrimination has occurred, how soon must the school district institute corrective actions?

Any corrective measures necessary to eliminate the discriminatory act, condition, or circumstance must be instituted as soon as possible, but no later than **30 calendar days** after the superintendent's mailing of the written response to the complainant, unless otherwise agreed to by the complainant (WAC 392-190-065).

### 11. What should a school district do once complaints have been resolved?

The compliance coordinator should follow up with the complainant to ensure that any discrimination has stopped and that they did not experience retaliation. The compliance coordinator should keep a confidential investigation file of each complaint with any notes, reports, findings, corrective actions, and any follow-up activities. The compliance coordinator must routinely review all complaints to ensure that they were resolved promptly and effectively. This review should identify if all time frames were met, and allow the coordinator to identify any patterns, repeat offenders, or needed improvements in school or district policies, procedures, or practices. Identified issues should be addressed systemically through training,

*NOTE: These guidelines are currently under revision and may not reflect OSPI's revised rules in Chapter 392-190 WAC (effective December 19, 2014), which supersede these guidelines where different.*

professional development, revisions to policies or procedures, or other school-wide approaches as needed.

**12. Are confidential investigation files subject to public disclosure laws?**
Yes. Confidential investigation files and other records related to discrimination complaints are subject to public disclosure laws. When reviewing complaint and investigation records for public disclosure, school districts should be aware of the exceptions to disclosure under the Public Records Act (chapter 42.56 RCW) and the federal Family Educational Rights and Privacy Act (FERPA) (20 U.S.C. §1232g; 34 C.F.R. Part 99), which include exceptions for certain personal information, student education records, employment and licensing information, and preliminary drafts, notes, recommendations, and intra-agency memorandums. For more information about FERPA requirements, visit the U.S. Department of Education's Family Policy Compliance Office web site at: http://www2.ed.gov/policy/gen/guid/fpco/index.html.

**13. Are complainants protected against retaliation?**
Yes. It is unlawful for a school district to harass, demote, discipline, or otherwise retaliate against anyone because they filed a discrimination complaint or because they participated in a discrimination investigation. School districts should take reasonable steps to protect complainants against retaliation by students, employees, or others.

## APPEALS TO THE SCHOOL BOARD
**14. What if the complainant does not agree with the superintendent's decision or the superintendent does not respond to the complaint within 30 calendar days?**
The complainant may appeal the superintendent's decision by filing an appeal with the secretary of the school board. The superintendent's response letter must include where and to whom the complainant may appeal the superintendent's decision. The appeal must be received by the school board within **10 calendar days** after the complainant received the superintendent's written response to their complaint. A complainant may also appeal to the school board if the superintendent does not respond to their complaint within 30 calendar days (WAC 392-190-070).

**15. What is an appeal to the school board?**
An appeal is a written request from a complainant asking the school board to reconsider their complaint and may include an explanation of why the complainant disagrees with the superintendent's decision (WAC 392-190-070).

**16. When must the school board hold a hearing?**
The school board must hold a hearing within **20 calendar days** after they receive the complainant's appeal. The school board and the complainant may also agree on a different date. At the school board hearing, the complainant and the superintendent may present witnesses and other information that is related to the appeal (WAC 392-190-070).

*NOTE: These guidelines are currently under revision and may not reflect OSPI's revised rules in Chapter 392-190 WAC (effective December 19, 2014), which supersede these guidelines where different.*

**17. When must the school board provide a written decision to the complainant?**

The school board must make a decision and provide a written copy of their decision to all parties involved within **10 calendar days** after the hearing. The decision must include how to appeal to OSPI (WAC 392-190-070).

---

**SAMPLE LANGUAGE TO INCLUDE IN THE SCHOOL BOARD'S WRITTEN DECISION**

If you are not satisfied with the school board's response to your complaint of unlawful discrimination, you may appeal to the Office of Superintendent of Public Instruction (OSPI). A written appeal must be mailed or hand-delivered to OSPI's Administrative Resource Services at P.O. Box 47200; 600 Washington St. SE; Olympia, WA 98504-7200 by the 20th calendar day after you receive this written decision. These procedures are pursuant to Washington Administrative Code 392-190-065, 392-190-070, 392-190-075 and [School District] Policy # [_____].

---

**18. What if the school board does not schedule a hearing or provide a written decision within 10 calendar days of the hearing?**

School districts are obligated to comply with the discrimination complaint and appeal procedures outlined in WAC 392-190-065, 392-190-070, and 392-190-075. If a school district is not in compliance with these procedures, OSPI may request additional information and require corrective action as outlined on page 67.

## APPEALS TO OSPI

**19. What if the complainant does not agree with the school board's decision?**

The complainant may appeal the school board's decision by filing a written appeal with OSPI. The appeal must describe what part of the school board's decision the complainant disagrees with and the relief the complainant is requesting. Appeals should also include the complainant's name, address, telephone number, and school district. A written appeal must be received by OSPI within **20 calendar days** after the complainant received the school board's decision (WAC 392-190-075). Appeals may be hand-delivered or mailed to:

Office of Superintendent of Public Instruction
Administrative Resource Services
P.O. Box 47200
600 Washington St. SE
Olympia, WA 98504-7200

After OSPI receives an appeal, OSPI may schedule a hearing with an Administrative Law Judge through the Washington State Office of Administrative Hearings.

*NOTE: These guidelines are currently under revision and may not reflect OSPI's revised rules in Chapter 392-190 WAC (effective December 19, 2014), which supersede these guidelines where different.*

# X. OSPI Monitoring and Enforcement

## OSPI MONITORING

**1. How does OSPI monitor school districts for compliance with nondiscrimination laws?**

OSPI is responsible for monitoring school districts' compliance with state nondiscrimination laws (chapters 28A.640 and 28A.642 RCW and chapter 392-190 WAC), as well as federal nondiscrimination laws. OSPI currently monitors school districts through a variety of methods, including:

- Collecting, reviewing, and analyzing data and other information.
- Responding to allegations of discrimination by students, parents, employees, and others.
- Conducting compliance reviews, including Consolidated Program Reviews and Methods of Administration Civil Rights Reviews.
- Conducting on-site visits and interviews.
- Reviewing annual assurances and reports submitted by school districts.
- Reviewing compliance issues, including reviews or findings by other state and federal agencies.

**2. What reports are school districts required to submit to OSPI related to nondiscrimination?**

At a minimum, each school district is required to submit the following reports to OSPI. For a checklist of school district procedural and reporting requirements, see Appendix D on page 78.

*Equity Assurance Report – iGrants 447 (annual)*

Each school district must submit an Equity Assurance Report on an annual basis. In this report, each school district evaluates its compliance with specific requirements under chapter 392-190 WAC, including results from their annual evaluation of their athletic programs and information regarding their most recent student athletic interest survey. This report is submitted through iGrants form package 447: https://eds.ospi.k12.wa.us/iGrants

*Affirmative Action Plan or Policy (at least every 5 years)*

Each school district must keep a current affirmative action plan or policy on file with OSPI (see page 56). Affirmative action plans and policies are valid for up to five years after their adoption date. Once a school district's affirmative action plan expires, the school district must update the plan as necessary, and file it with OSPI. Affirmative action plans may be submitted to OSPI via mail, fax, or e-mail.

**3. How does OSPI conduct compliance reviews?**

OSPI conducts periodic compliance reviews of every school district in Washington on a rotation schedule through the Consolidated Program Review. The Consolidated Program Review monitors multiple federally funded programs under the Elementary and Secondary Education Act (ESEA). The review process consists of an OSPI team reviewing school districts' federal and selected state programs. Reviews are conducted either as desk reviews, in which team members review submitted documentation, or on-site reviews where team members review

NOTE: These guidelines are currently under revision and may not reflect OSPI's revised rules in Chapter 392-190 WAC (effective December 19, 2014), which supersede these guidelines where different.

documentation and interview district and building staff. The Civil Rights Consolidated Program Review checklist includes several components for school district compliance with selected state and federal civil rights requirements. At any time, OSPI may conduct additional civil rights compliance reviews of school districts as needed, which may include on-site visits and/or requests for documentation.

If a school district offers a Career and Technical Education (CTE) program, the school district may also be selected for an on-site civil rights review by OSPI's Career and Technical Education division. For more information, visit OSPI's Career and Technical Education web site at: http://www.k12.wa.us/careerteched/CivilRights.aspx.

---

*Additional Resources:*
OSPI Consolidated Program Review: http://www.k12.wa.us/consolidatedreview/default.aspx

OSPI Career and Technical Education (CTE) Civil Rights On-Site Reviews:
http://www.k12.wa.us/careerteched/CivilRights.aspx

---

**4. How does OSPI respond to potential discriminatory actions, policies, or procedures of a school district?**
Upon receiving information of potential discrimination due to a school district's actions, policies, or procedures, OSPI will examine facts and other relevant information to determine if the school district is out of compliance with state or federal nondiscrimination laws. OSPI may request additional information from the school district or outside agencies to assist in this determination.

**5. What will OSPI do if a school district is out of compliance?**
If OSPI finds that a school district is out of compliance with state or federal nondiscrimination laws, OSPI will notify the school district superintendent of the noncompliance in writing. Written notice to the school district superintendent will identify the noncompliance issue, propose corrective action, and give notice of the district's requirement to respond within 30 calendar days after receipt (WAC 392-190-077).

**6. What must a school district do upon receipt of OSPI's notice of noncompliance?**
Upon receipt of OSPI's notice of noncompliance, the school district must respond to OSPI within **30 calendar days** with *one* of the following:
1. *Accept OSPI's findings and corrective actions.*
   If the school district accepts OSPI's findings, OSPI will finalize the corrective action plan, provide technical assistance as needed, and conduct follow-up monitoring.
2. *Propose revisions to the corrective action plan and/or provide additional information to demonstrate compliance.*
   If the school district proposes revisions to the corrective action plan or provides additional information to demonstrate compliance, OSPI will send the school district a final plan within 30 calendar days, including any follow-up activities required for the district.

If the school district denies the allegation, rejects OSPI's request for corrective action, and/or fails to timely address the identified noncompliance, OSPI may initiate a complaint against the school district or may refer the district to other state or federal agencies empowered to order compliance (WAC 392-190-077).

## COMPLAINTS INITIATED BY OSPI

**7. When may OSPI initiate a complaint against a school district?**
If a school district denies OSPI's findings of noncompliance, rejects OSPI's request for corrective action, and/or fails to timely address identified noncompliance, OSPI may initiate a complaint against the school district under WAC 392-190-078. To initiate a complaint, OSPI must send a copy of the complaint to the school district superintendent. The complaint must include written allegations of fact and proposed corrective actions.

**8. What must a school district do upon receipt of an OSPI-initiated complaint?**
Upon receipt of an OSPI-initiated complaint, a school district must provide OSPI a written response to the complaint within **20 calendar days** after the complaint was sent to the school district, unless otherwise agreed to, or for good cause. The school district's response to OSPI must clearly state either that:
1. The school district denies the allegations contained in the complaint and the basis of such denial; or
2. The school district admits the allegations and proposes reasonable corrective action(s) deemed necessary to correct the noncompliance.

**9. What will OSPI do upon receipt of a school district's response to an OSPI-initiated complaint?**
Upon review of the school district's response and all other relevant information, OSPI must make an independent determination as to whether the school district is out of compliance with chapters 28A.640 or 28A.642 RCW or chapter 392-190 WAC. OSPI must issue a written decision to the school district that addresses each allegation in the complaint, including findings of fact, conclusions, and the reasonable corrective measures deemed necessary to correct any noncompliance. OSPI may provide technical assistance necessary to resolve a complaint. All actions must be instituted as soon as possible, but in no event later than **30 calendar days** following the date of the decision, unless otherwise agreed to, or for good cause.

**10. May a school district appeal OSPI's decision?**
Yes. Under WAC 392-190-079, a school district may appeal OSPI's written decision by filing an appeal with OSPI in accordance with the adjudicative proceedings in RCW 34.05.413 through 34.05.494, and the administrative practices and procedures of OSPI in chapter 392-101 WAC. To initiate review under this section, a school district must file a written notice with OSPI within **30 calendar days** after the district received OSPI's written decision. OSPI must conduct a formal administrative hearing in conformance with the Administrative Procedure Act (chapter 34.05 RCW) and may contract with the Washington State Office of Administrative Hearings to hear a particular appeal.

> *NOTE: These guidelines are currently under revision and may not reflect OSPI's revised rules in Chapter 392-190 WAC (effective December 19, 2014), which supersede these guidelines where different.*

## PERMISSIBLE SANCTIONS

**11. What possible sanctions can OSPI use to enforce state nondiscrimination laws?**

Under WAC 392-190-080, if a school district is out of compliance with chapter 28A.640 or 28A.642 RCW or chapter 392-190 WAC, OSPI may impose an appropriate sanction or institute corrective measures, including, but not limited to:

- The termination of all or part of state apportionment or categorical moneys to the school district.
- The termination of specified programs where violations are flagrant.
- The institution of a mandatory affirmative action program within the school district.
- The placement of the school district on probation with appropriate sanctions until such time as compliance is achieved or is assured, whichever is deemed appropriate in the particular case by the State Superintendent of Public Instruction.

# XI. Appendices

# Appendix A – Definitions

**Abeyance:** The condition of being temporarily set aside.

**Appeal:** A request to change an official decision.

**Complaint:** A written and signed allegation describing specific acts, conditions, or circumstances that would violate chapter 392-190 WAC or chapters 28A.640 or 28A.642 RCW (WAC 392-190-065).

**Complainant:** A person who files a written complaint.

**Creed:** Defined broadly and includes religion, observance, practice, and belief.

**Disability:** The presence of a sensory, mental, or physical impairment that is (1) medically cognizable or diagnosable; or (2) exists as a record or history; or (3) is perceived to exist whether or not it exists in fact (RCW 49.60.040).

**Discrimination:** Unfair or unequal treatment of a person or a group because they are part of a defined group, known as a protected class. Discrimination can occur when a person is treated differently or denied access to programs, services, or activities because they are part of a protected class. Discrimination can also occur when a school or school district fails to accommodate a student or employee's disability. Harassment (based on protected class) and sexual harassment can be forms of discrimination when it creates a hostile environment.

**Dog guide:** A dog that is trained for the purpose of guiding persons who are blind or a dog that is trained for the purpose of assisting persons with hearing impairments (RCW 49.60.040).

**Gender expression or identity:** Having or being perceived as having a gender identity, self-image, appearance, behavior, or expression, whether or not that gender identity, self-image, appearance, behavior, or expression is different from that traditionally associated with the sex assigned to that person at birth (RCW 49.60.040). Gender expression is the manner in which a person represents or expresses gender to others, often through behavior, clothing, hairstyles, activities, voice, or mannerisms.

**Gender nonconforming:** A term for people whose gender expression differs from stereotypical expectations based on the sex they were assigned at birth. This includes people who identify outside traditional gender categories or identify as both genders.

**Honorably discharged veteran or military status:** A person who is a veteran as defined in RCW 41.04.007; or an active or reserve member in any branch of the armed forces of the United States, including the National Guard, Coast Guard, and Armed Forces Reserves (RCW 49.60.040).

**Limited English proficiency:** When a person does not speak English as their primary language and has a limited ability to read, write, speak or understand English.

**National origin:** A person's ethnicity, country of origin, or ancestry, which may include persons with limited English proficiency (*see* RCW 49.60.040; Title IV of the Civil Rights Act of 1964, 34 C.F.R. Part 100).

**Parent:** Includes any of the following: (1) A biological or adoptive parent of a child; (2) a foster parent; (3) a guardian generally authorized to act as the child's parent, or authorized to make educational decisions for the student; (4) an individual acting in the place of a biological or adoptive parent including a grandparent, stepparent, or other relative with whom the student lives, or an individual who is legally responsible for the student's welfare; or (5) an adult student (*see* WAC 392-172A-01125).

**Protected class:** A group of people who share common characteristics and are protected from discrimination and harassment by federal and state laws. Protected classes in chapters 28A.640 and 28A.642 RCW include sex, race, creed, religion, color, national origin, honorably discharged veteran and military status, sexual orientation including gender expression and identity, the presence of any sensory, mental or physical disability or the use of a trained dog guide or service animal by a person with a disability.

**Service animal:** An animal that is trained for the purpose of assisting or accommodating a sensory, mental, or physical disability of a person with a disability (RCW 49.60.040).

**Sexual orientation:** Heterosexuality, homosexuality, bisexuality, and gender expression or identity (RCW 49.60.040).

**Teletherapy:** Therapists provide virtual therapy, such as speech-language and occupational therapy services, through the use of web conferences. Teletherapy is an innovative program recognized and approved as an appropriate model of service delivery by the American Speech-Language Hearing Association, American Occupational Therapy Association, and the American Physical Therapy Association.

**Transgender:** A general term used to describe a person whose gender identity or expression is different from that traditionally associated with the person's sex assigned at birth.

# Appendix B – Nondiscrimination Laws

| STATE NONDISCRIMINATION LAWS | |
|---|---|
| **Chapter 28A.642 RCW** Discrimination prohibited<br><br>**Chapter 392-190 WAC** Equal Educational Opportunity | Prohibits discrimination against students and employees of Washington public schools in grades K through 12 on the basis of race, creed, religion, color, national origin, sexual orientation including gender expression or identity, veteran or military status, the presence of any sensory, mental or physical disability, or the use of a trained dog guide or service animal by a person with a disability. |
| **Chapter 28A.640 RCW** Sexual Equality<br><br>**Chapter 392-190 WAC** Equal Educational Opportunity | Prohibits discrimination against students and employees of Washington public schools in grades K through 12 on the basis of sex. |
| **Chapter 49.60 RCW** Washington Law Against Discrimination<br><br>**Title 162 WAC** Human Rights Commission | Prohibits discrimination on basis of age, race, creed, color, national origin, sex, families with children, marital status, sexual orientation including gender identity, age, honorably discharged veteran or military status, the presence of any sensory, mental or physical disability, or the use of a trained dog guide or service animal by a person with a disability.<br><br>Applies to employment, housing, public accommodation, and when seeking credit and insurance. School districts are considered places of public accommodation. |

**State Contacts:**

**Office of Superintendent of Public Instruction (OSPI)**
**Equity and Civil Rights Office**
Phone: (360) 725-6162/TTY: (360) 664-3631
Fax: (360) 664-2967
E-mail: equity@k12.wa.us
http://www.k12.wa.us/Equity/default.aspx

**Washington State Human Rights Commission**
Phone: 1-800-233-3247/TTY: 1-800-300-7525
http://www.hum.wa.gov/

Prohibiting Discrimination in Washington Public Schools
February 2012

| FEDERAL NONDISCRIMINATION LAWS | |
|---|---|
| **Title IV of the Civil Rights Act of 1964**<br>42 U.S.C. §2000c, et seq. | Prohibits discrimination on the basis of race, color, sex, religion, or national origin by public elementary and secondary schools and public institutions of higher learning. |
| **Title VI of the Civil Rights Act of 1964**<br>34 C.F.R. Part 100 | Prohibits discrimination on the basis of race, color, or national origin in all programs or activities that receive Federal financial assistance. |
| **Title VII of the Civil Rights Act of 1964**<br>42 U.S.C. §2000e, et seq. | Prohibits discrimination in employment on the basis of race, color, religion, national origin, or sex. |
| **Title IX of the Education Amendments of 1972**<br>34 C.F.R. Part 106 | Prohibits discrimination on the basis of sex in any education program or activity receiving Federal financial assistance. |
| **Section 504 of the Rehabilitation Act of 1973**<br>34 C.F.R. Part 104 | Prohibits discrimination on the basis of disability in all programs or activities that receive Federal financial assistance. |
| **Title II of the Americans with Disabilities Act**<br>28 C.F.R. Part 35 | Prohibits discrimination on the basis of disability by public entities. |
| **Boy Scouts of America Equal Access Act**<br>34 C.F.R. Part 108 | Requires state and local education agencies that receive Federal funds to provide equal access to the Boy Scouts of America and other designated youth groups. |
| **Age Discrimination Act of 1975**<br>34 C.F.R. Part 110 | Prohibits discrimination on the basis of age in all programs or activities that receive Federal financial assistance. |
| **Equal Educational Opportunities Act of 1974**<br>20 U.S.C. §1701, et seq. | Requires state educational agencies and school districts to take action to overcome language barriers that impede English Language Learner students from participating equally in school districts' educational programs. |

**Federal Contacts:**

**U.S. Department of Education**
**Office for Civil Rights**
Phone: (206) 607-1600/TDD: (206) 607-1647
E-mail: OCR.Seattle@ed.gov
http://www2.ed.gov/about/offices/list/ocr/index.html

**U.S. Department of Justice**
**Civil Rights Division**
Phone: (202) 514-4609/TTY: (202) 514-0716
http://www.justice.gov/crt/

**U.S. Equal Employment Opportunity Commission**
Phone: 1-800-669-4000/TTY: 1-800-669-6820
http://www.eeoc.gov/

Prohibiting Discrimination in Washington Public Schools
February 2012

# Appendix C – Sample Utilization Analysis and Goals for Affirmative Action Plans

A utilization analysis includes a current disaggregated workforce profile, as well as relevant labor market information. One starting point to find labor market information is the U.S. Census Bureau EEO Data Tool (http://www.census.gov/hhes/www/eeoindex/page_c.html). The U.S. Census Bureau anticipates updating this tool to include Census 2010 information by fall 2012.

School districts should use the following steps when completing a utilization analysis:
1. Calculate the percentage of qualified minority (disaggregated by race/ethnic group) and female employees in each job group.
2. Determine whether the percentage of current school employees is less than, greater than, or equal to the available labor market for each job group.
3. If the percentage of employees is less than the available labor market, underutilization exists. If the percentage is greater than or equal to the available labor market, underutilization does not exist.

While equal employment opportunities must be provided for all qualified individuals regardless of age, religion, sexual orientation, disabilities and veteran status, these groups do not need to be included in the utilization analysis.

The format of the utilization analysis is flexible. For example, a school district may choose to illustrate utilization and goals within a table or a narrative within the plan. Regardless of the format, goals should include a timeline (e.g., "within the next five years," or "by 2016") and action statements or programs to meet goals.

### SAMPLE UTILIZATION ANALYSIS AND GOALS

| Job Group: *Administrators* | Total Employees | Female | Total Minority | African American | Hispanic | Asian/ Pacific Islander | Native American |
|---|---|---|---|---|---|---|---|
| Current Utilization – Numbers | 43 | 21 | 4 | 1 | 1 | 2 | 0 |
| Current Utilization – Percent | | 48.8 | 2.3 | 2.3 | 2.3 | 4.7 | 0 |
| Availability Percent | | 43.2 | 11.6 | 3.7 | 3.5 | 2.8 | 1.6 |
| Goals Set (Yes or No) | | No | Yes | Yes | Yes | No | Yes |

*This is only a sample format. School districts are encouraged to develop a format that best serves their needs.*

**INSTRUCTIONS FOR PERFORMING A UTILIZATION ANALYSIS USING THE 4/5 OR 80% RULE**

This rule, commonly used in the development of affirmative action plans, establishes a value that is used to determine whether or not underutilization exists. The following steps are used to apply the 4/5 or 80% rule:

1. Calculate the percentage of minorities and females available in the labor market.
2. Calculate the percentage of minority and female employees.
3. Determine whether the percentage of employees is less than, greater than, or equal to 4/5 of the available labor market.
4. If the percentage of employees is less than 4/5 of the available labor market, underutilization exists. If the percentage is greater than or equal to 4/5 of the available labor market, underutilization does not exist.

---

### UTILIZATION CALCULATIONS USING THE 4/5 OR 80% RULE

**EXAMPLE 1**

| School District | | Available in Workforce (Labor Market) | |
|---|---|---|---|
| Total Employees *Administrators* | Total Female | Total Labor Force | Females in Labor Force |
| 45 | 11 | 12,324 | 6,801 |

*Step 1:* Determine the percentage of females in the labor market
6,801/12,324 = **55.19%**

*Step 2:* Determine the percentage of females employed by the school district
11/45 = **24.44%**

*Step 3:* Apply the 4/5 or 80% Rule
55.19 x .8 = **44.15%**

*Step 4:* Does underutilization exist in this example?
Yes. Four fifths or 80% of the total market force is **44.15%**. The percentage of female employees is **24.44%. Underutilization exists because 22.44% is less than 44.15%.**

**EXAMPLE 2**

| School District | | Available in Workforce (Labor Market) | |
|---|---|---|---|
| Total Employees | Total Female Employees | Total Labor Force | Females in Labor Force |
| 121 | 43 | 16,379 | 4,806 |

*Step 1:* Determine the percentage of females in the labor market
4,806/16,379 = **29.34%**

*Step 2:* Determine the percentage of females employed by the school district
43/121 = **35.53%**

*Step 3:* Apply the 4/5 or 80% Rule
29.34 x .8 = **23.47%**

*Step 4:* Does underutilization exist in this example?
No. Four fifths or 80% of the total market force is **23.47%**. The percentage of female employees is **35.53%. Underutilization does not exist because 35.53% is greater than 23.47%.**

**SAMPLE AFFIRMATIVE ACTION GOALS**

*Administrators:* Minority availability in this job group is 11.6%; current utilization is 2.3%. Within the next five years, the XYZ District will continue its efforts to eliminate underutilization of minorities in this job group by advertising in appropriate media outlets (including minority-focused media), notifying local colleges and universities of internship opportunities, increasing efforts to identify and support current minority certified employees interested in entering administrative programs, and ensuring equal opportunity in the hiring process.

**Sample Supportive Activities and Actions to Meet Goals:**

Recruitment

- Ensure current employees have access to information about job openings and announcements.
- Expand recruitment areas to include minority populations (minority organizations, college job fairs, Historically Black Colleges and Universities, Indian Colleges).
- Attend job fairs or opportunities to meet or partner with racial/ethnic or women organizations.
- Evaluate job vacancy announcements to ensure requirements are job-related.
- Provide job openings and announcements in multiple languages.

Hiring

- Ensure hiring panel members are oriented to the specific job requirements.
- Ensure bias-free selection processes by forming diverse hiring committees, evaluating potential employees on job-related criteria, and completing and maintaining necessary records such as the interview rating forms of panel members.
- Train all personnel responsible for hiring to ensure fairness and identify potential biases.

Training & Retention

- Provide current employees with training and experience that will assist in qualifying them for career advancement.
- Provide knowledge and skills training programs which are reasonably available to employees.
- Provide training and assessment to ensure that staff are culturally aware and recognize the importance of a collaborative work environment; ethnic jokes and harassment of any kind will not be tolerated.

School districts may request sample affirmative action plans by contacting OSPI's Equity and Civil Rights Office at 725-6162/TTY: (360) 664-3631 or by e-mail at equity@k12.wa.us.

# Appendix D – Checklist of Procedural and Reporting Requirements

The following procedural requirements and reports are required for all school districts. Each of these items is discussed in further detail on the page specified.

**Initial Requirements**

☐ Designate an employee to coordinate compliance (see page 59)

☐ Adopt a discrimination complaint and appeal procedure (see page 62)

☐ Adopt a sexual harassment policy and procedure (see page 36)

**Continuous Requirements**

☐ Post the school district's sexual harassment policy in each building (see page 36)

☐ Include a nondiscrimination statement on all major publications and school district web site (see page 60)

**Annual Requirements**

☐ Inform students, parents, employees, and volunteers of the following:
  o Name or title, address, and telephone number of the district's compliance coordinator (see page 60)
  o Discrimination complaint and appeal procedure (see page 62)
  o Sexual harassment policy and procedure (see page 36)

☐ Conduct an evaluation of each school's athletic program (see page 40)

☐ Review course enrollment data for disproportionality (see page 7)

☐ Review discipline data (suspensions and expulsions) for disproportionality (see page 26)

☐ Review any complaints received to ensure prompt and effective resolution (see page 63)

☐ Submit an Equity Assurance Report through iGrants form package 447 (see page 67)

**Other Periodic Requirements**

☐ Conduct a student athletic interest survey (every 3 years) (see page 44)

☐ Adopt or update an affirmative action plan or policy, and keep on file with OSPI (every 5 years) (see page 56)

☐ Conduct staff training on state and federal nondiscrimination laws and bias awareness (recommended at least annually)

*NOTE: These guidelines are currently under revision and may not reflect OSPI's revised rules in Chapter 392-190 WAC (effective December 19, 2014), which supersede these guidelines where different.*

# Appendix E – Investigation Tips and Techniques

**1. What techniques should the compliance coordinator use when investigating complaints?**
There are many tips and techniques that the compliance coordinator can use when investigating discrimination complaints. While a brief overview of basic investigation techniques is provided below, the compliance coordinator should receive additional training as needed.

   a. *Understand the role of the investigator*
   While investigating complaints, the compliance coordinator should be careful to remain independent, impartial, and objective. If the compliance coordinator is concerned about their ability to be unbiased or impartial, or the perception that they will not conduct a fair investigation, the compliance coordinator should delegate this responsibility to another district administrator, outside agency, or legal counsel. The compliance coordinator should always consider consulting with the school district's legal counsel when conducting investigations.

   b. *Communicate with the complainant*
   It is critical that the compliance coordinator communicate with the complainant, and explain what they are going to do and when. The compliance coordinator should explain the investigation process and their obligation to hear from all of the people involved.

   c. *Develop a plan*
   It is important to develop a plan *before* interviewing witnesses, reviewing evidence, and drafting a report. The compliance coordinator should research the legal standards and school district policies involved with a complaint and determine what evidence is needed to reach a conclusion.

   d. *Conduct interviews and gather evidence*
   The compliance coordinator should interview *all* parties and witnesses as soon as possible to get a clear picture of what happened. Interviews should be planned in advance and the interviewer should consider the following tips:
   - Always interview the complainant first.
   - Interview parties and witnesses individually, not in groups.
   - Re-interview people if additional questions or inconsistencies arise.
   - Remind interviewees about confidentiality and the prohibition of retaliation.
   - Allow interviewees to have a representative present if requested, so long as the representative does not speak for the interviewee or interfere with the interview.
   - Encourage each person interviewed to be as specific as possible. Keep detailed notes of questions and answers.

e. *Review relevant documents*

The compliance coordinator should review any documents that may shed light on the complaint, including any history of the issue, patterns of behavior, previous records of misconduct, and responses to past incidents. Some examples of relevant documents may include: school district policies and procedures, student files, personnel files, performance evaluations, discipline records/discipline data, IEPs, Section 504 plans, and letters, notes or e-mails regarding the incident(s).

f. *Complete a report*

After completing a thorough investigation, the compliance coordinator must prepare an investigation report for the school district superintendent. The report should contain the following:

- District policies and/or state or federal laws that are alleged to have been violated.
- Description of incident(s), including date(s) and time(s).
- Name of investigator, complainant, parties, witnesses, and interviewees.
- Summary of findings as to whether the allegations have been substantiated and whether discrimination has occurred.
- Explanation of each finding, including any evidence that support the conclusions.
- Dates and summaries of interviews.
- Recommendations and proposed remedies.

The compliance coordinator must promptly submit the investigation report to the superintendent within 30 calendar days after the complaint was received. The compliance coordinator must keep this report, along with any records of the complaint and investigation, in a confidential investigation file. If the compliance coordinator did not conduct the investigation, they should receive and file all records about the complaint, investigation, and resolution.

**2. What should school districts consider when investigating discriminatory harassment or sexual harassment?**

It may be necessary for school districts to take interim measures to protect staff or students during the investigation of a complaint. For instance, if a student alleges harassment by another student, a school district may need to separate those students until the investigation is complete. If a teacher is the alleged harasser, it may be appropriate for the student to transfer to another class or school. It is good practice for school districts to keep the target or complainant informed of the status of the investigation.

The specific steps in a school district's investigation will vary depending upon the nature of the allegations, the source of the complaint, the age of the student(s) involved, the size and administrative structure of the school, and other factors. In all cases, the inquiry should be prompt, thorough, and impartial. The label used to describe an incident (e.g., bullying, hazing, teasing) does not determine how a school district is obligated to respond. Rather, the nature of the conduct itself must be assessed for civil rights implications.

**3. When investigating discriminatory harassment and sexual harassment complaints, what should a school district do once the investigation is complete?**

If the school district determines that a student was sexually harassed or experienced discriminatory harassment, the district must take reasonable, prompt, age-appropriate, and effective action to end the harassment and prevent it from happening again to the target or to others. If the school district fails to do so, it must remedy the effects of the harassment on the target that could have been avoided if the district had responded promptly and effectively.

The appropriate steps should be tailored to the specific situation. The school district may need to develop and publicize new policies or conduct staff and/or student training. Depending on the nature and severity of the harassment, counseling, discipline, or further separation of the target and harasser may be necessary. Responsive measures should be designed to minimize the burden on the target as much as possible. If the school district's initial response does not stop the harassment and prevent it from happening again, the district may need to take additional, stronger measures. The school district must notify the target (and his or her parents depending on the age of the victim) of the outcome of its investigation and of any discipline imposed that directly relate to the target, such as an order for the harasser to stay away from the target.

# Index

**A**

Abeyance, 63, 71
Ability grouping, 8, 25
Access to courses and programs, 13-32
Accommodations
   Disability, 18-20, 24, 55-56
   Religion, 27-28, 55-56
Affirmative action, 56-58, 67, 77-79
Alternative Learning Experiences (ALE), 23-25
Americans with Disabilities Act, 18, 20
Appeals, 65-66, 69, 71
Athletics, 30, 40-54
   Athletic interest survey, 44-46
   Awards, 51
   Booster clubs, 52-54
   Cheerleading, 44, 52
   Coaching, 50
   Disability, 53
   Donations, 52-54
   Equipment, 48-49
   Evaluation, 40-42
   Facilities, 49-50
   Gender identity, 30
   Interests and abilities, 41-47
   Locker rooms, 30-31, 49
   Medical services and training, 51
   Publicity, 51
   Separate teams, 40
   Scheduling, 47-48
   Survey, 44-46
   Three Part Test for Athletic Equity, 42-44
   Transgender, 30
   Travel, 52
   Underrepresented sex, 43-44, 46
   Uniforms, 48-49
   Washington Interscholastic Activities Association (WIAA), 30, 45, 54

**B**

Bias in textbooks, 12
Bias awareness training, 8
Booster clubs, 52-54
Boy Scouts of America Equal Access Act, 60-61, 74
Bullying, 32

**C**

Career and Technical Education (CTE), 60-61, 68
Cheerleading, 44, 52
Choice enrollment, 10

Citizenship status, 13
Coaching (athletics), 50
Complaints, 56, 62-66
Compliance coordinator, 59-61, 63-65
Compliance reviews, 67-68
Consolidated Program Review, 67
Counseling, 7-11

**D**

Designated employee *(see compliance coordinator)*
Disability
   Accommodations, 18-20, 24, 55-56
   Americans with Disabilities Act, 18, 20
   Athletics, 53
   Online programs, 23-24
   Section 504, 8, 18-20
   Service animals, 21-23
Discipline, 26-27
Discriminatory harassment, 32-35
Diversity in schools and programs, 9-11
Dog guide *(see service animal)*
Dress code, 27, 29

**E**

Employment discrimination, 55-56
Enforcement, 67-70
English Language Learners (ELL), 7-8, 13-17
Enrollment, 7, 10, 13
Equal Access Act *(see Boy Scouts of America Equal Access Act)*
Equity Assurance Report (iGrants 447), 40, 60, 67
Expulsions, 26-27

**F**

Free appropriate public education (FAPE), 15, 17-20, 24, 27

**G**

Gender expression, 28-31
Gender identity, 28-31, 55
Grievance *(see complaint)*
Guide dog *(see service animal)*

**H**

Harassment, 32-39, 55
Hostile environment, 32, 34-36

**I**

iGrants, 40, 60, 67

Individualized Education Plan (IEP), 24, 26, 53
Individuals with Disabilities Education Act, 18, 24
Instructional materials, 12
Inter-district and intra-district transfers, 10
Interpreters, 16-17
Investigating complaints, 37, 63-64, 79-81

**L**
Language access, 16-17
Language acquisition programs, 7, 13-15
Limited English proficiency, 7, 13-17, 72
Locker rooms, 30-31, 49

**N**
National origin, 13-17
Nondiscrimination statement, 60-61

**O**
Online programs, 23-24
OSPI monitoring, 67-70

**P**
Parenting students, 31
Physical education, 25, 30
Prayer *(see religion)*
Pregnant students, 31
Procedural requirements, 18, 78
Protected classes, 72
Public records/public disclosure, 65

**Q**
Quid pro quo, 36-37

**R**
Race, 7, 9-11, 34, 57
Recruitment
   Employment, 77
   Schools or programs, 9, 23
Religion, 27-28, 55

Reporting requirements, 67, 78
Restroom, 30
Retaliation, 33, 37, 55, 65
Reviews *(see compliance reviews)*

**S**
Sanctions, 70
School siting, 10
Section 504, 8, 18-20, 24
Service animals, 21-23
Sexual harassment, 36-39, 80-81
Sexual orientation, 35, 72
Sign language interpretation, 16
Single-sex classes, 25-26
Social Security Numbers, 13
Special education, 8, 15, 18, 24, 27
Specialized schools and programs, 7, 10
Student assignment, 7-11
Student schedules, 8
Student transfers, 10
Substantial equality (athletics), 40
Suspensions, 26-27

**T**
Testing, 7-8
Textbooks, 12
Three Part Test for Athletic Equity, 42-44
Title II of the ADA, 20
Transgender *(see gender identity)*
Transitional Bilingual Instructional Program, 14
Translation, 16-17

**U**
Undocumented students, 13
Utilization analysis, 75

**W**
Washington Interscholastic Activities Association
(WIAA), 30, 45, 54

For more information about the contents
of this document, please contact:
OSPI Equity and Civil Rights Office
E-mail: Equity@k12.wa.us
Phone: (360) 725-6162

Download this material in PDF at:
http://www.k12.wa.us/Equity/ProhibitingDiscrimination.aspx

To order more copies of this document, call 1-888-59-LEARN (1-888-595-3276)
or visit our Web site at http://www.k12.wa.us/publications

This material is available in alternative format upon request.
Contact the Resource Center at (888) 595-3276, TTY (360) 664-3631.
Please refer to the document number below for quicker service:
12-0005



Office of Superintendent of Public Instruction
Old Capitol Building
P.O. Box 47200
Olympia, WA 98504-7200
2012